| Form **211** (March 2024) | Department of the Treasury - Internal R **Application for Award for Ori** | *EXHIBIT 1* | ber )9 |

Do not send the same claim information multiple times or through multipl ...ay cause claim processing delays. Fields on this form have been designed to expand and may cause a narrative or other field to appear when a box is checked.

Check the box to print a blank copy of the form and manually complete ☐

## Section A – Information About the Person or Business You Are Reporting

1. Are you submitting information related to an existing claim    ☐ Yes    ☒ No

Provide claim number(s)

2. Did you submit this information to the IRS, other Federal or State Agencies, or government personnel [i]    ☐ Yes    ☒ No

Provide date, agency, and contact name (if known)

3. Check the box if you are including attachment(s) with this claim submission    ☒

4. Name of taxpayer (person or business; include aliases) who committed the violation
See Answer 4 list of Taxpayer's attached.

5. Taxpayer Identification Number (e.g., SSN, ITIN, or EIN)
Remington Outdoor Company, Inc. EIN 51-0350935; all other EINs for the atached list are unknown.

6. Taxpayer's date of birth or approximate age
2006 - 2009

7. Taxpayer's address (including ZIP code)
See Answer 7 attached.

8. Check the box to add additional taxpayers to the list    ☒

Provide the taxpayer information (use the "+" button to add additional taxpayers to the list)

| Name of Taxpayer | Taxpayer Identification Number | Taxpayer Date of Birth or Approximate Age | Taxpayer Address | |
|---|---|---|---|---|
| See list at item 4 attached. | Unknown | Unknown | See list at item 4 attached. | + x |

9. What is your relationship (current and former) to the alleged noncompliant taxpayer(s) (check all that apply) (attach sheet(s) if needed)
☐ Current employee    ☐ Former employee    ☐ Attorney    ☐ CPA
☐ Relative/Family member    ☐ Other    ☒ None

Current employee and/or former employee; Describe your position, job responsibilities, job titles, and dates of employment as a current or former employee

Attorney; See sub-questions

Are you still acting as an attorney for the taxpayer    ☐ Yes    ☒ No

Describe the nature and scope of your legal representation
N/A

Describe when and under what circumstances you stopped acting as an attorney for the taxpayer
N/A

Is there any information submitted that may be protected by attorney-client privilege or federally authorized tax practitioner privilege    ☐ Yes    ☒ No

Catalog Number 16571S    www.irs.gov    Form **211** (Rev. 3-2024)

Provide relevant facts related to your response, including any indicating privilege may have been waived

N/A

CPA; See sub-questions

Are you still acting as a CPA for the taxpayer ☐Yes ☒No

Describe the nature and scope of your services
N/A

Describe when and under what circumstances you stopped acting as a CPA for the taxpayer
Never acted as a CPA

Is there any information submitted that may be protected by attorney-client privilege or federally authorized tax practitioner privilege ☐Yes ☒No

Provide relevant facts related to your response, including any indicating privilege may have been waived

N/A

Relative/Family member (describe); Do you still maintain a relationship with the taxpayer ☐Yes ☒No

Describe your relationship with the taxpayer

None

Other (describe); Do you still maintain a relationship with the taxpayer ☐Yes ☒No

Describe your relationship with the taxpayer
None

## Section B – Information About the Alleged Violation

10. Alleged violation (check all that apply) (information about IRS compliance work areas is available at irs.gov/whistleblower)

☒Unreported/Under Reported Income ☒Overstated/False Deductions

☐Income Characterization ☐Cryptocurrency/Digital Assets

☐International/Foreign Transaction ☐Failure to Withhold Tax

☐Undisclosed Foreign Bank and Financial Accounts ☒Failure to File Tax/Informational Return

☒Specific Allegations of Tax Fraud ☒Failure to Pay Tax

☐Employee vs. Subcontractor ☒Tax Exempt/ Governmental Entity Tax Issue

☒Money Laundering and Bank Secrecy Act ☒Promoter of Tax Avoidance Schemes

☒Tax Shelter/Abusive Transaction ☐Terrorism

☒Other (identify)    Violation of the Second Amendment - General Public's Right to Bear Arms

11. Describe the alleged violation and provide all pertinent facts. Attach a detailed explanation, include all records and supporting information in your possession, and describe the availability and location of any additional supporting information not in your possession

11. See narratives, affidavits, and exhibits attached. The US Government – FEMA has provided a false narrative and has done its best to destroy crime scene evidence. Information provided is a direct result of joint whistle-blowers' investigation.

12. Is the information in this claim based on public information ☐Yes ☒No

Describe and identify the source with as much particularity as possible

The US Judicial System, including law enforcement, the Internal Revenue Commissioner, and their controlled media have used their best efforts to distort and hide the facts of the alleged Sandy Hook massacre; i.e. that it was a FEMA drill..

Page  of

Describe how you learned about and/or obtained the information (including any documents) that supports this claim (Attach sheet(s) if needed)

The attachments were the result of the joint efforts of these whistle-blowers.  All of the information to prove the Sandy Hook alleged murders and injuries were part of a FEMA drill have been denied and suppressed by the US Judicial System, including law enforcement, the Internal Revenue Commissioner, and their controlled media.

13. Describe the amount of tax owed by the taxpayer(s). Provide all records and a summary of the information you have that supports your claim as to the amount owed (i.e., books, ledgers, records, receipts, tax returns, etc) (Attach sheet(s) if needed)

See Answer 13 attached.

14. Fill in tax year (TY) and dollar amount ($), if known

Check the box to indicate if the alleged violation(s) is ongoing ☒

| Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2022 | 51000000,0 | | | | | | | | | ± | X |

## Section C – Information About Yourself

15. Check the box to indicate if multiple claimants are filing this claim jointly ☒

Provide the claimant's information (use the button to add additional claimants to the list)

| This is a joint claim with William S. Scott | Delete |
|---|---|

16. Name of individual claimant [i]
James H. Fetzer, Ph.D.

17. Claimant's date of birth (MMDDYYYY)
12/06/1940

18. Claimant's SSN or ITIN
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

19. Address of claimant (including ZIP code)
800 Violet Lane, Oregon, WI 53575

Check the box if you agree to have correspondence mailed to the address on record with the IRS [i] ☐

20. Telephone number (including area code)
608-354-4280

21. Email address
jfetzer@d.umn.edu

22. Check the box if Form 2848, Power of Attorney and Declaration of Representative, is attached to this claim submission ☐

23. Are you the spouse or a dependent of an IRS employee ☐Yes ☒No

24. Are you currently, or formerly, an employee of the Department of Treasury or any of its agencies ☐Yes ☒No

Did you obtain this information while you were an employee of the Department of Treasury or any of its agencies ☐Yes ☒No

25. Are you currently, or formerly, an employee of the Federal Government ☐Yes ☒No

Did you obtain this information while acting within the scope of your duties as an employee of the Federal Government ☐Yes ☒No

26. Are there any Federal laws or regulations that require you to disclose this information ☐Yes ☒No

Explain

27. Are there any Federal laws or regulations that prohibit you from disclosing this information ☒Yes ☐No

Explain
The IRS Whistleblower law, rules and regulations prevent me from disclosing the Form 211 information to the public.

28. Are you currently, or formerly, a Federal Government contractor ☐Yes ☒No

Did you obtain this information through your contract with the Federal Government ☐Yes ☒No

Catalog Number 16571S     www.irs.gov     Form **211** (Rev. 3-2024)

Page  of

29. Are you filing this form based on information obtained from an ineligible person ☐Yes ☒No

30. I declare under penalty of perjury that I have examined this application, my accompanying statement, and supporting documentation and aver (affirm) that such application is true, correct, and complete, to the best of my knowledge

| Signature of Claimant (required) [i] SIGN HERE *[signature]* | Date 10/10/2024 |
| --- | --- |

| Add Additional Claimant | William S. Scott |
| --- | --- |

## Section A – Information About the Person or Business You Are Reporting

1. Are you submitting information related to an existing claim ☐Yes ☒No

Provide claim number(s)

2. Did you submit this information to the IRS, other Federal or State Agencies, or government personnel [i] ☐Yes ☒No

Provide date, agency, and contact name (if known)

3. Check the box if you are including attachment(s) with this claim submission ☒

4. Name of taxpayer (person or business; include aliases) who committed the violation
See information supplied by James H. Fetzer, Ph.D. above incorporated in Sections A & B for William S. Scott.

5. Taxpayer Identification Number (e.g., SSN, ITIN, or EIN)

6. Taxpayer's date of birth or approximate age

7. Taxpayer's address (including ZIP code)

8. Check the box to add additional taxpayers to the list ☐

Provide the taxpayer information

| Name of Taxpayer | Taxpayer Identification Number | Taxpayer Date of Birth or Approximate Age | Taxpayer Address |
| --- | --- | --- | --- |
| | | | |
| | | | |
| | | | |
| | | | |

9. What is your relationship (current and former) to the alleged noncompliant taxpayer(s) (check all that apply) (attach sheet(s) if needed)

☐Current employee  ☐Former employee  ☐Attorney  ☐CPA
☐Relative/Family member  ☐Other  ☒None

Current employee and/or former employee; Describe your position, job responsibilities, job titles, and dates of employment as a current or former employee

Page  of

Attorney; See sub-questions

Are you still acting as an attorney for the taxpayer ☐Yes ☐No

Describe the nature and scope of your legal representation

Describe when and under what circumstances you stopped acting as an attorney for the taxpayer

Is there any information submitted that may be protected by attorney-client privilege or federally authorized tax practitioner privilege ☐Yes ☐No

Provide relevant facts related to your response, including any indicating privilege may have been waived

CPA; See sub-questions

Are you still acting as a CPA for the taxpayer ☐Yes ☐No

Describe the nature and scope of your services

Describe when and under what circumstances you stopped acting as a CPA for the taxpayer

Is there any information submitted that may be protected by attorney-client privilege or federally authorized tax practitioner privilege ☐Yes ☒No

Provide relevant facts related to your response, including any indicating privilege may have been waived

Relative/Family member (describe); Do you still maintain a relationship with the taxpayer ☐Yes ☒No

Describe your relationship with the taxpayer

Other (describe); Do you still maintain a relationship with the taxpayer ☐Yes ☐No

Describe your relationship with the taxpayer

## Section B – Information About the Alleged Violation

10. Alleged violation (check all that apply) (information about IRS compliance work areas is available at irs.gov/whistleblower)

☐Unreported/Under Reported Income      ☐Overstated/False Deductions

☐Income Characterization      ☐Cryptocurrency/Digital Assets

☐International/Foreign Transaction      ☐Failure to Withhold Tax

☐Undisclosed Foreign Bank and Financial Accounts      ☐Failure to File Tax/Informational Return

☐Specific Allegations of Tax Fraud      ☐Failure to Pay Tax

☐Employee vs. Subcontractor      ☐Tax Exempt/ Governmental Entity Tax Issue

☐Money Laundering and Bank Secrecy Act      ☐Promoter of Tax Avoidance Schemes

☐Tax Shelter/Abusive Transaction      ☐Terrorism

☐Other (identify) _____

11. Describe the alleged violation and provide all pertinent facts. Attach a detailed explanation, include all records and supporting    ⓘ
information in your possession, and describe the availability and location of any additional supporting information not in your possession

12. Is the information in this claim based on public information        ☐Yes    ☒No

Describe and identify the source with as much particularity as possible

Describe how you learned about and/or obtained the information (including any documents) that supports this claim (Attach sheet(s) if needed)

Independent Research.

13. Describe the amount of tax owed by the taxpayer(s). Provide all records and a summary of the information you have that supports your claim as to the amount owed (i.e., books, ledgers, records, receipts, tax returns, etc) (Attach sheet(s) if needed)

14. Fill in tax year (TY) and dollar amount ($), if known

Check the box to indicate if the alleged violation(s) is ongoing      ☐

| Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) | Tax Year (TY) | Dollar Amount ($) |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |

Catalog Number 16571S      www.irs.gov      Form **211** (Rev. 3-2024)

Page of

## Section C – Information About Yourself

15. Check the box to indicate if multiple claimants are filing this claim jointly ☒

Provide the claimant's information

**Claimant**

16. Name of individual claimant [i]

William S. Scott

| 17. Claimant's date of birth (MMDDYYYY) | 18. Claimant's SSN or ITIN |
|---|---|
| 04/25/1938 | 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 |

19. Address of claimant (including ZIP code)

1065 SW 8th Street, Suite 1977, Miami, FL 33130

Check the box if you agree to have correspondence mailed to the address on record with the IRS [i] ☐

| 20. Telephone number (including area code) | 21. Email address |
|---|---|
| 908-219-2323 | 04wmscott@comcast.net |

22. Check the box if Form 2848, Power of Attorney and Declaration of Representative, is attached to this claim submission ☐

| | Yes | No |
|---|---|---|
| 23. Are you the spouse or a dependent of an IRS employee | ☐ | ☒ |
| 24. Are you currently, or formerly, an employee of the Department of Treasury or any of its agencies | ☐ | ☒ |
| Did you obtain this information while you were an employee of the Department of Treasury or any of its agencies | ☐ | ☒ |
| 25. Are you currently, or formerly, an employee of the Federal Government | ☐ | ☒ |
| Did you obtain this information while acting within the scope of your duties as an employee of the Federal Government | ☐ | ☒ |
| 26. Are there any Federal laws or regulations that require you to disclose this information | ☐ | ☒ |

Explain

| | Yes | No |
|---|---|---|
| 27. Are there any Federal laws or regulations that prohibit you from disclosing this information | ☒ | ☐ |

Explain
The IRS Whistle-blower law, rules and regulations prevent me from disclosing the Form 211 information to the public.

| | Yes | No |
|---|---|---|
| 28. Are you currently, or formerly, a Federal Government contractor | ☐ | ☒ |
| Did you obtain this information through your contract with the Federal Government | ☐ | ☒ |
| 29. Are you filing this form based on information obtained from an ineligible person | ☐ | ☒ |

30. I declare under penalty of perjury that I have examined this application, my accompanying statement, and supporting documentation and aver (affirm) that such application is true, correct, and complete, to the best of my knowledge

| Signature of Claimant (required) [i]  SIGN HERE | Date |
|---|---|
| *[signature]* | 10/10/2024 |

Catalog Number 16571S                    www.irs.gov                    Form **211** (Rev. 3-2024)

**Remington Outdoor Company, Inc., et al, answers to items on Form 211
For Dr. James H. Fetzer and William S. Scott**

4.  List of taxpayers

    a.  Bushmaster Firearms, also known as B.F.I. and B.F.I., Inc., was a Maine corporation created in 1973 and located in Windham, Maine. At all relevant times, Bushmaster Firearms manufactured, marketed and sold AR-15s.

    b.  Bushmaster Firearms, Inc. was another Maine corporation that manufactured, marketed and sold AR-15s. Upon information and belief, Bushmaster Firearms, Inc. manufactured, marketed and sold AR-15s.

    c.  Bushmaster Firearms International, LLC was a Delaware corporation that was formed in 2006. (When originally created, it was named Rambo Acquisition, LLC.). According to corporate filings, Bushmaster Firearms International, LLC was merged into Remington Arms Company, LLC in 2011.

    d.  At all relevant times, Bushmaster Firearms International, LLC manufactured, marketed and sold AR-15s.

    e.  Upon information and belief, Bushmaster Firearms International, LLC manufactured the XM15-E2S that was alleged to have been used in the shooting at Sandy Hook Elementary School on December 14, 2012.

    f.  Remington Arms Company, LLC is a Delaware limited liability corporation.

    g.  Bushmaster Firearms International, LLC was merged into Remington Arms Company, LLC in 2011. At all relevant times, Remington Arms Company, LLC manufactured, marketed and sold AR-15s.

i.  Freedom Group, Inc., which is also sometimes called Freedom Group and Freedom Group, LLC is a Delaware corporation originally formed under another name in 2007. Freedom Group, Inc. is one of the world's largest manufacturers and dealers in firearms, ammunition, and related accessories.

j.  Upon information and belief, from 2006 on, Freedom Group, Inc. controlled, marketed and sold the Bushmaster brand. Upon information and belief, during this time period Freedom Group, Inc. sold Bushmaster brand products directly to retail stores.

k.  Remington Outdoor Company, Inc. is a corporation formed in 2009 that was engaged in the business of manufacturing, marketing and selling AR-15s. Freedom Group, Inc., which upon information and belief at all relevant times controlled the Bushmaster brand, was renamed Remington Outdoor Company, Inc.

l.  Upon information and belief, Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Arms Company, LLC; Bushmaster Holdings, LLC; Freedom Group, Inc.; and Remington Outdoor Company, Inc. are functionally one entity and are hereinafter referred to as "Remington", formerly of 870 Remington Drive, P. O. Box 700, Madison, North Carloline 27025-0700 now c/o Damarr M. Butler, who Represented Rimington while with OMelvany & Myers, LLP, 1625 Eye Street, NW, Washington, D. C. 20006; now attorney Butler is with Jones Day, 51 Louisiana Avenue, N.W., Washington, D. C. 20001-2113, 202-879-3939. (Jones Day had nothing to do with the Sandy Hook – Remington- Soto, et al, frauds).

m.  Remington manufactured, marketed and sold firearms and ammunition under the Bushmaster brand name.

n.  Remington manufactured, marketed and sold the Bushmaster XM15-E2S rifle that is alleged to have been used in the shooting at Sandy Hook Elementary School on December 14, 2012.

o.  The following taxpayers open probate estates in the State of Connecticut, Court of Probate, Region #22 Probate District on the dates and case numbers listed.

p.  On February 7, 2013, Donna L. Soto, 158 Knowlton Street, Stratford, CT 06615, was appointed Administratrix of the Estate of Victoria Leigh Soto at case number case # 13-00070.

q.  On December 3, 2014, Ian and Nicole Hockley, 61 Charter Ridge Drive, Sandy Hook, CT, 06482, were appointed Co-Administrators of the Estate of Dylan Christopher Jack Hockley at case number 14-0564.

r.  On December 4, 2014, David Cole Wheeler, 10 Lakeview Terrace, Sandy Hook, CT 06482, was appointed Administrator of the Estate of Benjamin Andrew Wheeler at case number 14-0567.

s.  On January 22, 2013, Mary A. D'Avino, 48 Deerwood Drive, Bethlehem, CT 06751, was appointed Administratrix of the Estate of Rachel Marie D'Avino a/k/a Rachel M. D'Avino at case number 13-0036.

t.  On December 8, 2014, Mark and Jacqueline Barden, 35 Paugussett Road, Sandy Hook, CT 06482, were appointed Co-Administrators of the Estate of Daniel G. Barden at case number 14-0577.

u.  On March 7, 2013, William D. Sherlach, 33 Vintage Road, Trumbull, CT 06611, was appointed Executor of the Estate of Mary Joy Sherlach at case number 13-00062.

v.  Mr. Sherlach also sued Remington in his individual capacity for loss of consortium.

w. On December 9, 2014, Neil Heslin, 90 Polar Drive, Shelton, CT 06484, and Scarlett Lewis, 6 Great Ring Road, Sandy Hook, CT 06842, were appointed Co-Administrators of the Estate of Jesse McCord Lewis at case number 13-0048.

x. On December 10, 2014, Leonard Pozner, 261 South Main Street, #332, Newtown, CT 06470, was appointed Administrator of the Estate of Noah Samuel Pozner at case number 14-0589.

y. On January 3, 2013, Gilles J. Rousseau, 67 Horse Fence Hill Road, Southbury, CT 06488, was appointed Administrator of the Estate of Lauren G. Rousseau at case number 13-0007.

z. All of the above decedents estates brought a legal action against Bushmaster (sic Remington) at case number 15 CV 6050025 S before the Superior Court, Complex Litigation Docket, at Waterbury, CT.

aa. Natalie Hammond brought a legal action in the same Superior Court action against Bushmaster (sic Remington) in her individual capacity for injuries she alleged she suffered at Sandy Hook on December 14, 2012.

7. Remington", formerly of 870 Remington Drive, P. O. Box 700, Madison, North Carolina 27025-0700 now c/o Damarr M. Butler, who Represented Remington while with OMelvany & Myers, LLP, 1625 Eye Street, NW, Washington, D. C. 20006; now attorney Butler is with Jones Day, 51 Louisiana Avenue, N.W., Washington, D. C. 20001-2113, 202-879-3939.

13. It was publicly announced that the nine decedents' estates listed in 4 above received a total of $73 million dollars. After they paid their attorney fees and costs, it is believed they retained approximately 70% of this amount, $51.1 million dollars. It is also believed they did not report this amount as taxable income. Instead they claimed, with or without a tax return, that the amount paid to them is for pain and suffering and, therefore, is not taxable. These joint Whistle-

blowers claim the amount paid to the decedents estates or unknown others to be identified is taxable at ordinary income rates as nobody listed as a decedent in item 4 above died or was injured at Sandy Hook Elementary School on December 14, 2012, or any other day.

## ATTACHMENT TO REMINGTON FORM 211

## FACTS

On February 15, 2022, *The Washington Post* reported that Sandy Hook families settled claims against Bushmaster Firearms ("Remington Outdoor – parent company) for $73 million. (See **Exhibit A,** "Sandy Hook Families announce $73 million settlement with Remington Arms in landmark agreement", *The Washington Post* (February 15, 2022). Donna L. Soto, not individually but as the administrator of the estate of Victoria L. Soto was one of nine plaintiffs to share in that award.

Dr. James H. Fetzer believes, and therefore alleges this award was based upon an Extrinsic Fraud, which laid the basis for ensuing Fraud upon the Court as follows:

## THE EXTRINSIC FRAUD

1. On December 14, 2012, The U.S. Federal Emergency Management Agency conducted a Site Activation Call-down Drill. The drill was listed on the CT FEMA schedule as Exercise L-366 and distributed with a map from FEMA Headquarters in Bridgeport, CT, to Sandy Hook Elementary School in Newtown, CT (**Exhibit B**).

2. The Exercise Plan explains that it will be conducted on 12/13/12 beginning at 8:00 AM and end at 11:20 PM to be evaluated on 12/14/12 as a real-time (LIVE) event (**Exhibit C**). This mock FEMA drill (in which no one died) was converted into a fraud against the American people and its judicial system with the claim that 6 adults and 20 children had been killed and two adults injured.

2 Further proof comes from the Affidavit of Brian Davidson, who is a Private Investigator licensed in Texas of October 28, 2022, who conducted a review of the Connecticut State Police files and not only found proof that the Sandy Hook event was not a mass murder but that the site was not even an operating school (**Exhibit D**).

3 These findings are confirmed by other official documents of the US government, including the FBI Consolidated Crime Report for 2012, which shows no murders or non-negligent manslaughters in Newtown during 2012. Since Sandy Hook is a subdivision of Newtown, the FBI Report confirms that there were no murders of non-negligent manslaughters in Sandy Hook during 2012 (**Exhibit E**).

3. The party who has appeared in several Sandy Hook lawsuits under the name of Leonard Pozner (expert witness) is not the same person whose photo has been published millions of times around the world as the Sandy Hook (crime

1

scene) Leonard Pozner, which Wolfgang Halbig identified (**Exhibit F**), and has now been confirmed by Brian Davidson, P.I. (**Exhibit G**)

## FRAUD UPON THE COURT

5. The fraud against the court began between February 7, 2013, and December 11, 2014, when Donna L. Soto, administrator of the Estate of Victoria L. Soto (case # 13-00070), Nicole Hockley, co-administrators of the estate of Dylan C. Hockley (case # 14-0564); William Sherlach, executor of the estate of Mary J. Sherlach (case # 13-00062); Leonard Pozner, administrator of the estate of Noah S. Pozner (case # 14-0589); Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau; David C. Wheeler, administrator of the estate of Benjamin A. Wheeler (case # 14-0567); Neil Heslin and Scarlett Lewis, co-administrators of the estate of Jesse McCord Lewis (case # 13-0048); Mark and Jacqueline Barden, co-administrators of the estate of Daniel G. Barden (case # 14-0577); and Mary D'Avino, administratrix of the estate of Rachel M. D'Avino (case # 13-0036) opened probate estates in the State of Connecticut, Court of Probate, Region #22 Probate District, for the above alleged decedents.

6. On January 26, 2015, the fraud on the court was continued by the filing by Donna L. Soto, Administrator of the Estate of Victoria L. Soto, Nicole Hockley, co-administrators of the estate of Dylan C. Hockley; William Sherlach, executor of the estate of Mary J. Sherlach; Leonard Pozner, administrator of the estate of Noah S. Pozner; Gilles J. Rousseau, administrator of the estate of Lauren G. Rousseau, David C. Wheeler, administrator of the estate of Benjamin A. Wheeler; Neil Heslin and Scarlett Lewis, co-administrators of the estate of Jesse McCord Lewis; Mark and Jacqueline Barden, co- administrators of the estate of Daniel G. Barden; and Mary D'Avino, administratrix of the estate of Rachel M. D'Avino, of a complaint for damages against Bushmaster Firearms International, LLC, et al., in the Superior Court of Connecticut at case number UWY-CV-15-60520025-S.

7. The Plaintiffs alleged that the persons they represent were murdered on the morning of December 14, 2012, at Sandy Hook Elementary School, Newtown, CT.

8. On April 14, 2016, by unpublished opinion, Ct. Superior Court Judge Barbara N. Bellis granted the Defendants' Motions to Dismiss. Her decision was overruled on appeal and the case remanded for trial. *Soto, et al v. Bushmaster Firearms International*, LLC, *et al.*, 331 Conn 53, 202 A. 3d 262 (2019), *cert denied*, 547 U. S. 1111, 126 S. Ct. 1913.

9. On July 27, 2020, Remington Outdoor Company, Inc. and its subsidiaries and affiliates, which included Bushmaster Firearms International, LLC, filed for bankruptcy in the United States Bankruptcy Court for the Northern District of Alabama, at case number 20-81688-CRJ11.

10. Neither the *Jones v Heslin* nor the *Soto v Bushmaster* cases were decided by a trial by jury on the merits. To the contrary, they were decided on preliminary motions. The citation by the WI Appellate Court in the decision against Dr. Fetzer was a furtherance of the extrinsic fraud practiced upon the court and Dr. Fetzer.

2

11. On September 10, 2021, Dr. Fetzer filed a Motion to Intervene in the case of *Soto, et al v Bushmaster, et al* (**Exhibit H**).

12. On September 20, 2021, Remington filed its objection to Dr. Fetzer's Motion to Intervene in *Soto v Bushmaster* (**Exhibit I**).

13. On September 22, 2021, Judge Bellis denied the Fetzer Motion to Intervene.

14. On September 24, 2021, Fetzer filed a Motion to Intervene in the Remington bankruptcy to present evidence that nobody died at Sandy Hook (**Exhibit J**).

15. On September 27, 2021, without objection from attorneys for the Remington Creditors committee to the Fetzer Motion to Intervene, the Bankruptcy Court denied the Fetzer Motion.

16. On May 16, 2022, the Plaintiff's withdrew the *Soto v Bushmaster* case as settled.

17. The share of the $73 million settlement that was made to Donna L. Soto, not individually, but as administrator of the estate of Victoria L. Soto was either omitted or else claimed on the IRS tax forms to be payments for non-taxable damages, which is false because nobody died at Sandy Hook on December 14, 2012. (See *Nobody Died at Sandy Hook: It was a FEMA Drill to Promote Gun Control (2015; 2nd ed., 2016;* redacted. ed. 2024) https://jameshfetzer.org/wpcontent/uploads/2024/04/NobodyDiedAtSandyHookExpanded Revised_Redacted.pdf

## DONNA SOTO DECEPTION

As an example of the egregiousness of the fraud being perpetrated in this case, the party calling herself "Donna Soto" is not even the mother of Victoria L. Soto, but a crisis actor who also played the role of "Susan Bro" in Charlottesville as follows:

a. Donna L. Soto is not the mother of Victoria L. Soto, whose name is Victoria Aurelia and who is the daughter of Debbie Aurelia (now Debbie Aurelia Halsted, Clerk of Newtown).
(See https://www.newtown-ct.gov/people/debbie-aurelia-halstead-master-municipal-clerk-mmc-mctc)

b. Victoria L Soto did not die on December 14, 2012, at Sandy Hook Elementary School as claimed in the attached amended complaint. (See, for example, "Sandy Hook: What We Know Now that We Didn't Know Then", https://www.bitchute.com/video/U5lxB2bvX8qV)

3

c. Donna L. Soto is a Sandy Hook crisis actor but also played the role of Susan Bro during the Charlottesville event, August 12-13, 2017. (See **Exhibit K** and "Hate Did Not Win", December 11, 2018, https://www.nytimes.com/video/us/100000006257567/heather-heyer-james-fields-susan-bro-charlottesville.html

d. Victoria L. Aurelia also play the role of "Eva Morales" during the Uvalde event, May 24, 2022, which was modeled after Sandy Hook. ((See, for example, "Sandy Hook: What We Know Now that We Didn't Know Then", https://www.bitchute.com/video/U5lxB2bvX8qV)

5. In 2015, Matthew Mills raised the issue of "Victoria Soto" being a fiction and not a real person, but he did not handle it properly. See "Sandy Hook 'truther' arrested after confronting victim's younger sister at a race to say deadly shooting was 'staged" and that her hero sister never even existed", https://www.dailymail.co.uk/news/article-3313761/Sandy-Hook-truther-arrested-confronting-victim-s-younger-sister-race-say-deadly-shooting-staged-hero-sister-never-existed.html (**Exhibit L**)

**Exhibits B through L** are hereby incorporated by reference to this claim. The Third Amended Complaint dated August 18, 2021, by Donna L. Soto, et al. (attached as **Exhibit M**) is therefore a fraud.

## ARGUMENT

There is no statute of limitations for presentation of evidence to the IRS of fraud committed by a taxpayer.   United States v Throckmorton, 98 U. S. 61 (1878).

It is illegal to lie to the United States Government.  This applies to matters within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States.  18 U.S.C. § 1001.

In describing the situations in which the prohibited conduct must occur, the courts have construed the statute broadly and stressed that Section 1001 protects the government "from the perversion which might result from the deceptive practices described." *Bryson v. United States*, 396 U.S. 64 (1969).

The event on December 14, 2012, at Sandy Hook Elementary School was a Federal Emergency Management Agency ("FEMA"), an agency of the United States Government, drill.  Nobody died.  See

**Exhibit B**: Drill L-366 on CT FEMA Schedule (December 14, 2012) This is an announcement of the forthcoming FEMA exercise to be held in Newtown on December 13 and presented as a LIVE event on December 14, which included a map from FEMA Headquarters to the school in Newtown, where the exercise would be conducted.

4

**Exhibit C:** Site Activation Call-down Drill Exercise Plan (10/08/12) This is the exercise plan for the drill to be held in Newtown on December 13, which would begin at 8 AM 2 and end at 11:59 PM, to be evaluated as a real-time event on December 14. Everyone was instructed to sign in with the controller upon arrival (to be paid for participating in the exercise). Refreshments and restrooms were provided.

**Exhibit D:** Affidavit of Brian Davidson, P.I. (October 28, 2022) Brian Davidson, a Private Investigator licensed in TX, reviewed the CT State Police files on Sandy Hook and found proof not only that the building had not been the scene of a mass murder but that it was not even an operating school at the time of the event on December 14, 2012.

**Exhibit E:** FBI Consolidated Crime Report for 2012 (extracts) Even the FBI reported in Its Consolidated Crime Report for 2012 that the number of murders or non-negligent manslaughters in Newtown, CT, was zero (0), a report that has remained constant since it was first published and has not changed in the twelve years since the alleged event.

**Exhibit F:** Affidavit of Wolfgang H. Halbig (December 12, 2023) Wolfgang Halbig, a Former FL State Trooper, US Customs Agent, school administrator, and a nationally recognized school safety expert, was sued by one of the Sandy Hook parents, who had identified himself as Leonard Pozner, father of decedent Noah Pozner, but discovered that the party who appeared in court under that name was not the same as the party who had been identified internationally as "Leonard Pozner", implying fraud had occurred.

**Exhibit G:** Affidavit of Brian Davidson, P.I. (June 15, 2024) Brian Davidson, P.I., followed up with a more thorough investigation and determined that the "Leonard Pozner" who had appeared in the Halbig case was the same "Leonard Pozner" who appeared in the case brought against James Fetzer, Ph.D., in Madison, WI; and that neither of them was the same as the man who had been identified as the Sandy Hook father internationally; that his deceased son, "Noah Pozner", was a legal fiction created from photographs of his (alleged) older half-brother, Michael Vabner; and that, when the ersatz "Leonard Pozner" was featured on 60 MINUTES, his face was reconstructed by the internationally acclaimed artist, Kazu Hero.

---

This case is distinguishable from *Li v Commissioner, 22 F. 4th 1014, 1017* (DC CCA 2022), *cert. denied, because the IRS is estopped from the summary dismissal of a claim that* includes alleged participation in the fraud by FEMA. The assertions by these parties in their Third Amended Complaint are fraudulent and without merit. The IRS has an obligation to treat this award as of fraud and theft by deception.

# REMINGTON EXHIBITS

Exhibit A: "Sandy Hook Families announce $73 million settlement with Remington Arms in landmark agreement", *The Washington Post* (February 15, 2022).                2

Exhibit B: Drill L-366 on CT FEMA Schedule (December 14, 2012)    12

Exhibit C: Site Activation Call-down Drill Exercise Plan (10/08/12)    16

Exhibit D: Affidavit of Brian Davidson, P.I. (October 28, 2022)    37

Exhibit E. FBI Consolidated Crime Report for 2012 (extracts)    77

Exhibit F: Affidavit of Wolfgang H. Halbig (December 12, 2023)    80

Exhibit G: Affidavit of Brian Davidson, P.I. (June 15, 2024)    88

Exhibit H: Fetzer Motion to Intervene (September 16, 2021).    121

Exhibit I: Remington's Objection (September 20, 2021)    126

Exhibit J: Fetzer Motion to Intervene Remington Bankruptcy (September 24, 2021)    131

Exhibit K: Donna Soto also played Susan Bro in Charlottesville    139

Exhibit L:  Sandy Hook "truther" arrested after confronting victim's younger sister at a race to say deadly shooting was "staged" and that her hero sister never even existed (November 11, 2015)    141

Exhibit M:  Third Amended Complaint (August 18, 2021)    149

# EXHIBIT A:

"Sandy Hook Families announce $73 million
settlement with Remington Arms
in landmark agreement",
*The Washington Post* (February 15, 2022)

☰Q

# The Washington Post

*Democracy Dies in Darkness*

**Subscribe**    **Sign in**

**NATIONAL**    Climate    Education    Health    Innovations    Investigations    National Security

# Sandy Hook families announce $73 million settlement with Remington Arms in landmark agreement



The families of the victims of the Sandy Hook massacre reached a $73 million settlement with Remington Arms, the gunmaker of an AR-15 style rifle, on Feb. 15. (Video: The Washington Post)

By Kim Bellware

Updated February 15, 2022 at 7:12 p.m. EST    |    Published February 15, 2022 at 11:18 a.m. EST

**CORRECTION**

A previous version of this article incorrectly stated that Remington accepted liability in a settlement with the Sandy Hook families. A court filing noting the settlement does not mention liability. The article has been corrected to reflect the change.

When the families of nine of the victims of the massacre at Sandy Hook Elementary School began their lawsuit against the gunmaker of the Bushmaster AR-15-style rifle, their goal was to spare other families the pain that had upended their own lives.

On Tuesday, the victims' families marked a victory in that effort with the announcement of a $73 million settlement with the now-bankrupt Remington Arms, which manufactures the Bushmaster.

"They had the motivation to do whatever they could ... so that other families — whether they are in a suburb or township or city — would not have to go through the kind of pain and the loss that they had," Joshua Koskoff, an attorney for the families, said during a Tuesday news conference.

The settlement, reached with the families of five children and four adults who were killed in the 2012 shooting, draws in all four of Remington's insurers and allows the families to share thousands of pages of company documents it obtained during discovery — provisions that legal experts and attorneys for the families say represent a landmark victory in forcing a gun manufacturer to face responsibility for how it markets its products.

Crucially, the settlement also provides a framework for how to pursue legal action against gun manufacturers that have for decades enjoyed broad protection from lawsuits under a federal shield law.

"The plaintiffs' lawyers used a novel legal strategy, which convinced the Connecticut Supreme Court that the case could proceed despite a federal law making it difficult for such suits to even be brought," John Culhane, a law professor at Widener University Delaware Law School, said in an email Tuesday.

Koskoff, the families' attorney, said the settlement sends a signal to gunmakers that they cannot act with impunity and clearly "have skin in the game." He also warned insurers and banks of the steep financial risks to "underwriting companies that elevate profit by escalating risk."

Representatives for Remington could not immediately be reached for comment Tuesday.

Connecticut Attorney General William Tong (D), who in 2017 filed an amicus brief in the state Supreme Court in support of the Sandy Hook families, said in a statement that the families showed the gun industry is not above the law.

"Today's settlement is a clear indication that PLCAA is not the impenetrable shield that the gun industry wishes it to be, and that gun manufacturers who violate state consumer protection laws can and should be held accountable," Tong said. The PLCAA is the federal Protection of Lawful Commerce in Arms Act, a federal shield law that grants gun manufacturers broad immunity from lawsuits.

Tearful family members of the victims gathered at a Connecticut hotel Tuesday as Koskoff discussed the culmination of their eight-year-long battle that began two years after shooter Adam Lanza tore through the Newtown, Conn., elementary school with a high-powered rifle and killed 26 people, including 20 young children.

Koskoff noted the families of the victims "would pay it all back just for one minute" with their loved ones lost in the mass shooting.

"That would be true justice," he said.

Tuesday's agreement isn't the first time a gun manufacturer has settled with the families of victims killed by its firearms: In 2004, Bushmaster agreed to pay $2.5 million to families of victims in the D.C. sniper case.

At the news conference, families recounted the pain of being deprived for nearly a decade of holidays, birthdays and everyday moments with their loved ones killed in the 2012 shooting and grieved over the futures cut short — some as early as six years into their young life.

Nicole Hockley, whose 6-year-old son, Dylan, was among the victims, accused Remington of prioritizing profit over safety.

"It used reckless marketing tactics that appeal to at-risk and violence-prone young men," Hockley said, summarizing the families' argument against Remington. "Marketing that is targeted to those who want to appear more intimidating, more powerful and more masculine though their use of their AR-15s."

The decision to focus narrowly on Remington's marketing is what ultimately lifted the suit from long-shot to pathbreaking.



The first major legal hurdle came in 2016 when a Connecticut judge tossed the suit, saying it wasn't allowed under the PLCAA.

The families appealed, and the Connecticut Supreme Court ruled in their favor in 2019, saying the federal law did offer some carve-outs for state law. The U.S. Supreme Court months later declined the gunmaker's request to dismiss the suit and let the state Supreme Court's ruling stand.

The narrowed lawsuit was filed under the Connecticut Unfair Trade Practices Act and contended, among other things, that the Bushmaster was a "combat weapon" designed for war, yet Remington improperly marketed it to civilians.

**Share this article**                                                ⤳

In particular, the complaint alleged Remington pushed a weapon to young men like Lanza, the 20-year-old shooter who killed 20 first-graders and six educators before turning the gun on himself; Lanza also killed his mother off-site before the school shooting.

In one marketing campaign Koskoff described to reporters, Bushmaster enabled people to "report your friend for not 'being a man' because they didn't own a Bushmaster" and submit the friend's email address to the company so they would be notified.

"Bushmaster in particular was the brand associated with things that are not legal, like combat for civilians and assaultive type things," Koskoff said.

"Plaintiffs don't know in lots of cases how the manufacture designed a weapon, how they advertised it, what kind of corporate decisions were made – and that was central to the Connecticut case," Tobias told The Washington Post. "They had access to documents and could take depositions of high-level employees at Remington; the plaintiffs' counsel will make that available to other counsel for other cases."

The settlement with Remington marks Sandy Hook families' second legal victory in four months. In October, a judge ruled Alex Jones, the right-wing conspiracy theorist and founder of Infowars, had to pay damages to families that stemmed from his false claims that the Sandy Hook school shooting was a "giant hoax."

Calling the settlement "historic," President Biden said, "We can deliver a clear message to gun manufacturers and dealers: they must either change their business models to be part of the solution for the gun violence epidemic, or they will bear the financial cost of their complicity."

The Dec. 14, 2012, tragedy remains the deadliest elementary school shooting in U.S. history. While it was viewed early on as a potential turning point for gun control, meaningful reform has remained elusive: Despite pandemic-forced school closures, 2021 saw the most school shootings at K-12 campuses since at least 1999, according to a Post database.

Embattled Remington isn't the only gun manufacturer under pressure: Last year the Mexican government filed a suit against at least five other major gunmakers alleging that lax controls have fueled a surge in homicides over the past decade.

# EXHIBIT B:
# Drill L-366 on CT FEMA Schedule (December 14, 2012)

10/2/2017    Division of Emergency Management and Homeland Security

Ct.gov State of Connecticut    Governor Dannel P. Malloy |    [          ] [Search]

# DEPARTMENT OF EMERGENCY SERVICES & PUBLIC PROTECTION
## EMERGENCY MANAGEMENT & HOMELAND SECURITY

Home    About Us    Programs & Services    Contact Us

State Response Framework

Homeland Security

Emergency Management

Operations, Training and Exercise

All Hazards Planning

Strategic Planning and Community Preparedness

Hurricane Season Preparedness

Disaster Recovery

FirstNet

Hazard Mitigation

Interoperable Communications

Public Information

Legal

Citizens Corps Advisory Council/CERT/MRC

State Offices: Early Release Late Openings/Closures

NTAS
BULLETIN

Training Calendar

State Road Closures

If You See Something Suspicious, Say Something!
1-866-HLS-TIPS

REGISTER Online to VOTE

Regulations of CT State Agencies

access health CT

VETERANS ct.gov

Connecticut Recovers

## Event Search

Calendar: All Calendars ▼
Event Title: FEMA L366

[OK]

## Search Results

| Date | Time | Event Title |
|---|---|---|
| 1/18/2011 | 8 AM - 5 PM | FEMA / Water Environment Federation Water Sector Interdependencies Training January 18-19, 2011 |
| 11/17/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 11/27/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 12/3/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 12/6/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 12/14/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 12/17/2012 | 9 AM - 4 PM | FEMA L-366 Planning for the Needs of Children in Disasters |
| 11/2/2015 | 1 PM - 5 PM | FEMA Courses: AWR-317 REP Core Concepts and MGT-445 REP Plan Review |

Sandy Hook Elementary, 18 mi. away @9:35am

Return to the Calendar

10/2/2017

Division of Emergency Management and Homeland Security

 **Ct.gov** State of Connecticut

Governor Dannel P. Malloy | [ Search ]

# DEPARTMENT OF EMERGENCY SERVICES & PUBLIC PROTECTION
## EMERGENCY MANAGEMENT & HOMELAND SECURITY

Home        About Us        Programs & Services        Contact Us

**State Response Framework**

**Homeland Security**

**Emergency Management**

**Operations, Training and Exercise**

**All Hazards Planning**

**Strategic Planning and Community Preparedness**

**Hurricane Season Preparedness**

**Disaster Recovery**

**FirstNet**

**Hazard Mitigation**

**Interoperable Communications**

**Public Information**

**Legal**

**Citizens Corps Advisory Council/CERT/MRC**





Dec 14, 2012

FEMA L-366 Planning for the Needs of Children in Disasters

The goal of the course is to enable participants to improve their community's mitigation and emergency operations plan specifically regarding the needs of children. The course will provide them with the information needed to address the unique needs of children prior to, during and following disasters. It will also provide them guidance and direction on how to form coalitions and how to become advocates for the unique needs of children in all aspects of emergency management.

After completing this course, participants will be able to:
· Articulate the importance of providing for the needs of children in disasters in your community's current emergency management plan.

· Explain what is required to keep children safe in emergencies and why those needs are unique.

· Explain the assumptions, concept of operations, organization and assignment of responsibilities that address the unique needs of children prior to, during and following disasters.

· Explain the planning components necessary to address the unique needs of children prior to, during and following disasters
· Incorporate the unique needs of children in disasters into Emergency Operations Plans

· Identify stakeholders and organizations that can assist in preparing for the needs of children in disasters.

· Initiate steps to form coalitions and build teams that have a stake in keeping children safe in disasters

The target audience for this course is local and state emergency managers and planners, Child Services Agencies, NGO's, Child Care Providers, Schools, and Faith-based Organizations.

1. As of October 1, 2012 anyone applying for FEMA courses must obtain a FEMA Student Identification (SID) number. For more information and to obtain a SID go to: https://cdp.dhs.gov/femasid/

You will need this number to complete the course application form (119-25-1) that will be filled out at the beginning of the class. FEMA certificates will be mailed to participants after completion of this course.

2. Class size is limited to 30.   Please sign up as soon as possible to guarantee a spot in the class of your choice.

3. There are no prerequisites for this class.

4. There is no cost for the class and lunch is on your own.

Please watch this short video on how to setup an account.
http://www.ct.gov/demhs/lib/demhs/training/reg/registration.html

**Location:** 2800 Main Street, Bridgeport, CT
This event is 37 miles from you (06457).

**9 AM - 4 PM**
**Contact:** Christopher Ackley
**Email:** christopher.ackley@ct.gov
**Phone:** (203)-696-2640
5 of 40 seats still available
Last day to register: 12/13/2012
Sorry, you may not register for this event.
Input your zip code to calculate the distance to the event: [ 06457 ]  [ Go ]

Go Back

DEMHS Calendar of Events



# EXHIBIT C:
## Site Activation Call-down Drill Exercise Plan (Publishing Date 10/08/12)

FOR OFFICIAL USE ONLY

Federal Emergency Management Agency

**Exercise Plan**
**Mass Casualty Drill**

**Emergency Response For**
**Mass Casualties Involving Children**

# Federal Emergency Management Agency



# Site Activation Call-down Drill Exercise Plan

[MASS CASUALTY DRILL]

**Exercise Date: 12/14/12**          **Publishing Date: 10/08/12**

FOR OFFICIAL USE ONLY

Case: 3:24-cv-00936-wmc   Document #: 1-1   Filed: 12/31/24   Page 35 of 226

Case: 3:24-cv-00936-wmc   Document #: 1-1   Filed: 12/31/24   Page 35 of 226

FOR OFFICIAL USE ONLY
**Federal Emergency Management Agency**

**Exercise Plan**                                    **Emergency Response For**
**Mass Casualty Drill**                        **Mass Casualties Involving Children**

FINAL

**INTENTIONALLY LEFT BLANK**

**Federal Emergency Management Agency**

| | |
|---|---|
| **Exercise Plan** | **Emergency Response For** |
| **Mass Casualty Drill** | **Mass Casualties Involving Children** |

# PREFACE

National Preparedness is sponsored by FEMA and the Department of Homeland Security. This Exercise Plan was produced with input, advice, and assistance from the National Incident Management System (NIMS) exercise planning team, which followed the guidance set forth in the Federal Emergency Management Agency (FEMA), Homeland Security Exercise and Evaluation Program (HSEEP).

The Plan gives officials, observers, media personnel, and players from participating organizations the information necessary to observe or participate in an all hazards preparedness exercise focusing on participants' emergency response plans, policies, and procedures as they pertain to specific scenarios. The information in this document is current as of the date of publication, 10/08/2012, and is subject to change as dictated by the National Incident Management System exercise planning team.

The Preparation for Mass Casualty is a *classified exercise*. The control of information is based more on public sensitivity regarding the nature of the exercise than on the actual exercise content. Some exercise material is intended for the **exclusive** use of exercise planners, controllers, and evaluators, but players may view other materials deemed necessary to their performance. The Exercise may be viewed by all exercise participants, *but the Controller and Evaluator (C/E) Handbook is a restricted document intended for controllers and evaluators only.*

All exercise participants should use appropriate guidelines to ensure the **proper control of information** within their areas of expertise and to protect this material in accordance with current jurisdictional directives. Public release of exercise materials to third parties is at the discretion of The Federal Emergency Management Agency and the Preparation for Mass Casualty exercise planning team.

FOR OFFICIAL USE ONLY

## Federal Emergency Management Agency

**Exercise Plan**
**Mass Casualty Drill**

**Emergency Response For**
**Mass Casualties Involving Children**

This page is intentionally left blank.

FOR OFFICIAL USE ONLY

Federal Emergency Management Agency

**Exercise Plan**                                                      **Emergency Response For**
**Mass Casualty Drill**                                          **Mass Casualties Involving Children**

# HANDLING INSTRUCTIONS

1. The title of this document is *Mass Casualty Drill Involving Children Exercise Plan (ExPlan)*.

2. The information gathered in this ExPlan is *For Official Use Only (FOUO)* and should be handled as sensitive information not to be disclosed. This document should be safeguarded, handled, transmitted, and stored in accordance with appropriate security directives. Reproduction of this document, in whole or in part, without prior approval from The Department of Homeland Security is prohibited.

3. At a minimum, the attached materials will be disseminated only on a need-to-know basis and when unattended, will be stored in a locked container or area offering sufficient protection against theft, compromise, inadvertent access, and unauthorized disclosure.

4. For more information, please consult the following points of contact (POCs):

Agency POC:

Tom Romano
Federal Emergency Management Agency
860-256-0844 (office)
thomas.romano@ct.gove

Exercise Director:

Not Available

21

FOR OFFICIAL USE ONLY
## Federal Emergency Management Agency

**Exercise Plan**                                              **Emergency Response For**
**Mass Casualty Drill**                            **Mass Casualties Involving Children**

This page is intentionally left blank.

FOR OFFICIAL USE ONLY
### Federal Emergency Management Agency

**Exercise Plan**  
**Mass Casualty Drill**

**Emergency Response For**  
**Mass Casualties Involving Children**

## CONTENTS

Preface ...........................................................................................................................i

Handling Instructions ...................................................................................................iii

Chapter 1: General Information ................................................................................ 1-1

    Introduction...........................................................................................................1-1  
    Confidentiality.......................................................................................................1-1  
    Purpose ................................................................................................................1-1  
    Target Capabilities................................................................................................1-1  
    Exercise Objectives..............................................................................................1-2  

Chapter 2: Exercise Logistics ................................................................................. 2-1

    Exercise Summary................................................................................................2-1  
    Exercise Tools......................................................................................................2-3  
    Exercise Implementation ......................................................................................2-3  
    Accident Reporting and Real Emergencies...........................................................2-4  
    Communications Plan...........................................................................................2-4  

Chapter 3: Player Guidelines .................................................................................. 3-1

    Player Instructions................................................................................................3-1  

Chapter 4: Evaluation and Post-Exercise Activities .............................................. 4-1

    Exercise Documentation ......................................................................................4-1  
    After Action Report ..............................................................................................4-1  
    After Action Conference and Improvement Plan ...................................................4-1  

Appendix A: Participating Agencies .......................................................................A-1

Appendix B: Standard Script for Calls ....................................................................B-1

23

FOR OFFICIAL USE ONLY

## Federal Emergency Management Agency

**Exercise Plan**                                        **Emergency Response For**
**Mass Casualty Drill**                        **Mass Casualties Involving Children**

This page is intentionally left blank.

24

FOR OFFICIAL USE ONLY
## Federal Emergency Management Agency

**Exercise Plan**                                                    **Emergency Response For**
**Mass Casualty Drill**                                    **Mass Casualties Involving Children**

# CHAPTER 1: GENERAL INFORMATION

## Introduction

The Preparation for Mass Casualty is a drill designed to establish a learning environment for players to exercise emergency response plans, policies, and procedures as they pertain to a mass casualty incident involving children. A drill is used to validate a single specific operations or function of a single agency/organization and can be used to practice/maintain skills.

This Exercise Plan (ExPlan) was produced at the direction of the Department of Homeland Security with the input, advice, and assistance of the Preparation for Mass Casualty planners.

## Confidentiality

The Preparation for Mass Casualty is a *classified exercise.* The control of information is based more on public sensitivity regarding the nature of the exercise than on the actual exercise content. Some exercise material is intended for the exclusive use of exercise planners, controllers, and evaluators, but players may view other materials deemed necessary to their performance. This ExPlan may be viewed by all exercise participants, *but the Controller and Evaluator (C/E) Handbook is a restricted document intended for controllers and evaluators only.*

All exercise participants should use appropriate guidelines to ensure the proper control of information within their areas of expertise and protect this material in accordance with current Department of Homeland Security directives.  Public release of exercise materials to third parties is at the discretion of the Department of Homeland Security and the Federal Emergency Management Agency and the Preparation for Mass Casualty Planning Team.

## Purpose

The purpose of this exercise is to evaluate player actions against current response plans and capabilities for a mass casualty incident response.

## Target Capabilities

The National Planning Scenarios and the establishment of the National Preparedness Priorities have steered the focus of homeland security toward a capabilities-based planning approach. Capabilities-based planning focuses on planning under uncertainty, since the next danger or disaster can never be forecast with complete accuracy. Therefore, capabilities-based planning takes an all-hazards approach to planning and preparation which builds capabilities that can be applied to a wide variety of incidents. States and Urban Areas use capabilities-based planning to identify a baseline assessment of their homeland security efforts by comparing their current capabilities against the Target Capabilities List (TCL) and the critical tasks of the Universal Task List (UTL). This approach identifies gaps in current capabilities and focuses efforts on identifying and developing priority capabilities and tasks for the jurisdiction. These priority capabilities are articulated in the jurisdiction's homeland security strategy and Multi-Year Training and Exercise Plan, of which this exercise is a component of.

FOR OFFICIAL USE ONLY

## Federal Emergency Management Agency

| | |
|---|---|
| **Exercise Plan** | **Emergency Response For** |
| **Mass Casualty Drill** | **Mass Casualties Involving Children** |

The capabilities listed below have been selected by the Preparation for Mass Casualty planning team from the priority capabilities identified in the Federal Emergency Management Agency's Multi-Year Training and Exercise Plan. These capabilities provide the foundation for development of the exercise objectives and scenario, as the purpose of this exercise is to measure and validate performance of these capabilities and their associated critical tasks.

### CORE CAPABILITY RESEARCH INITIATIVE

The *LLIS.gov* team strives to provide useful and pertinent information to the whole community. In order to deliver relevant lessons learned and innovative practices to our users, the *LLIS.gov* team is focusing its research on Core Capabilities, as defined in the National Preparedness Goal. The *LLIS.gov* team uses the results of State Preparedness Reports (SPRs) to identify the capabilities states have self-assessed as both high-priority and low-proficiency.

The *LLIS.gov* team has already conducted research on Mass Care Services, Cybersecurity, and Community Resilience, and will soon begin research on Housing. The goal of this research is to gather lessons learned, innovative practices, and resources from subject matter experts at all levels of government, NGOs, and the private sector and share them with the whole community. Click on the pages below to view the gathered resources, and please consider contributing your expertise.

### List The Target Capabilities To Be Exercised:

- Mass Prophylaxis
- Mass Death of Children at a School by Firearms
- Suicide or Apprehension of Unknown Shooter
- Use of Media for Evaluation
- Use of Media for Information Distribution

## Exercise Objectives

The Preparation for Mass Casualty exercise planning team selected objectives that focus on evaluating emergency response procedures, identifying areas for improvement, and achieving a collaborative attitude. This exercise will focus on the following objectives:

**This is a list of sample objectives that apply to this exercise. Drills traditionally have 1 to 3 specific objectives.**

**Site Call-Down.** Ability to contact and ensure facilities are available for emergency response functions.

1. Measure the time needed for the jurisdiction to contact owners or managers of Emergency Dispensing Sites during a mass casualty or incident involving children, in accordance with MOUs.

FOR OFFICIAL USE ONLY

## Federal Emergency Management Agency

**Exercise Plan**                                    **Emergency Response For**
**Mass Casualty Drill**                        **Mass Casualties Involving Children**

2.  Measure the time needed for the jurisdiction to receive access confirmation from owners or managers of Emergency Dispensing Sites during a mass casualty incident involving children, in accordance with MOUs.

3.  Measure the percentage of sites that are available for use during a mass casualty incident involving children, in accordance with MOUs.

| Exercise Plan | Emergency Response For |
|---|---|
| Mass Casualty Drill | Mass Casualties Involving Children |

# CHAPTER 2: EXERCISE LOGISTICS

## Exercise Summary

### General

The Preparation for Mass Casualty is designed to establish a learning environment for players to exercise their plans and procedures for responding to an incident involving children as casualties. The Preparation for Mass Casualty will be conducted on 12/13/12, beginning at 8:00 am. Exercise play is scheduled until the Exercise Director/Controller determines that the exercise objectives have been met. Everyone must sign in with controller upon arrival.

### Assumptions and Site Call-Down Instructions

**This section contains the basic instructions on how to conduct this drill using both a manual and automated call-down system. These assumptions and instructions are derived from specific CDC guidance and should result in the necessary output for data collection.** *For more details, please see: Chan, Edward, et al. Working Paper: Operational Assessments for SNS Readiness. Santa Monica: RAND Health, 2008.*

Assumptions constitute the implied factual foundation for the exercise and, hence, are assumed to be present before the start of the exercise. The following general assumptions apply to the Preparation for Mass Casualty:

- *Site call-down list to be tested.* Jurisdictions have different lists of sites that would be called in an emergency. Example site call-down lists include EDSs and warehouse locations. Site call-down lists should be kept up-to-date, readily accessible, and usable. Jurisdictions should select one or more of these lists for use during this site call-down drill.

- *No-notice/no-availability drill.* To collect the best possible performance metrics, site call-down drills should not involve prior notice to those being called; however, *the drills need not require actually making the site available for use* by the health department.

  - *No-notice.* Given that the purpose of the assessment is to estimate the percentage of the sites on the calling list that are reachable and available on a given day, we recommend the drill be conducted on a no-notice basis. At most, only the players who are required to initiate the site call-down procedure should be notified of the drill, but even they need not be warned beforehand. If using an automated calling system, only players who must activate the automated system need to be notified.

  - *No site activation required.* To reduce the burden associated with gathering performance metrics, *sites on the call-down list are not required to actually make their site available for use* by the health department.

- **It is critical that this message is conveyed to the contacts receiving the site activation call.**

- *Calling equipment*. Players should have access to all calling equipment and any call response monitoring technology that would be used during a real emergency in order to track the call responses received.

  - *Automated calling system*. Jurisdictions using automated calling systems should collaborate with the provider of their calling system to perform the site call-down drill.

  - *Manual calling system*. Jurisdictions using manual calling systems should run the drill using the same equipment and facilities that would be used during a real emergency. If this is not practical, the drill should be conducted using equipment and facilities that are as similar as possible.

- *Response method*. Jurisdictions should determine the method by which sites on the call-down list will acknowledge receipt of the call-down message and report their ability to make their site available.

Automated calling system

  - *If an automated response function is available*. Sites on the call-down list should follow the instructions of the automated calling system to acknowledge receipt of the call-down message and report whether or not they are able to make their site available. Typically, persons called can enter a number on their phone after a prompt.

  - *If an automated response function is not available*. Upon being called, sites on the call-down list should acknowledge receipt of the call-down message and report their ability to make their site available. The response can be in the form of an e-mail, phone call, or text message to a phone number specially designated for this purpose. Another option is to set up a call center to receive responses. Only responses received within a predetermined amount of time should be recorded for use in the performance metrics.

Manual calling system

  - During successful phone calls, the caller can manually record receipt of the call-down message and the ability of each site on the call-down list to make their site available.

- *Protocol for non-respondent follow up*. For the purposes of this drill, the following non-responses indicate that the site on the call-down list has *not* acknowledged receipt of the call-down message:

    - Busy signal
    - No answer
    - Voicemail
    - Wrong person answering but correct person is unavailable
    - Wrong number.

Jurisdictions should determine the protocol for how callers or automated calling systems should handle non-responses.

29

FOR OFFICIAL USE ONLY
## Federal Emergency Management Agency

**Exercise Plan**                                    **Emergency Response For**
**Mass Casualty Drill**                              **Mass Casualties Involving Children**

## Exercise Participants

The following are the categories of participants involved in this exercise; for purposes of this call-down drill, participants include the following:

> • *Players*. Players are the personnel who do the calling during the exercise. The players in the exercise should be the people who would do the calling in a real emergency.

> • *Exercise Director/Controller/Evaluator*. This position has the overall responsibility for planning, coordinating, and overseeing all exercise functions. He/she monitors the status of play and the achievement of the exercise design objectives.

> They declare when the drill starts and ends and manage the flow of the drill. This is the only participant who will provide information or direction to the players. However, because the drill focuses on the collection of time-based metrics, they should *not* intervene in timed activities while the drill is in progress.

> He/she is responsible for timing the overall drill, gathering individual call data collection sheets, computing metrics, and taking notes to identify areas for improvement.
> > **For an automated calling system**. He/she should remain unobtrusive and not intervene with player action.
> > **For a manual calling system**. He/she should not intervene with player action. Ideally, the evaluator should be able to listen in on the calls that the players make

## Exercise Tools

### Controller and Evaluator Handbook

The Preparation for Mass Casualty C/E Handbook is designed to help exercise controllers and evaluators conduct and evaluate an effective exercise. This handbook also enables controllers and evaluators to understand their roles and responsibilities in exercise execution and evaluation. Should a player, observer, or media representative find an unattended handbook, it should be provided to the nearest controller or evaluator.

### Master Scenario Events List

The MSEL outlines benchmarks, as well as injects that drive exercise play. It also details realistic input to the exercise players as well as information expected to emanate from simulated organizations (i.e., those nonparticipating organizations, agencies, and individuals who would usually respond to the situation). For the purpose of this drill, the MSEL will not contain injects, but will instead only contain anticipated actions of the players.

## Exercise Implementation

### Exercise Play

Exercise play will begin at 8:00 am on December 13th 2012. Play will proceed according to the events outlined in the MSEL, in accordance with established plans and procedures. The exercise

FOR OFFICIAL USE ONLY

Federal Emergency Management Agency

| Exercise Plan | Emergency Response For |
| Mass Casualty Drill | Mass Casualties Involving Children |

will conclude upon the completion of operations and attainment of the exercise objectives, as determined by the Exercise Director/Controller. The exercise is expected to end at 11:59 pm on 12/13/12 and be evaluated on 12/14/12 as a real-time event.

## Exercise Rules

The following are the general rules that govern exercise play:

- Real-world emergency actions take priority over exercise actions.
- Exercise participants will comply with real-world response procedures, unless otherwise directed by control staff.
- All communications (written, radio, telephone, etc.) made during the exercise will begin and end with the phrase, *"This is a drill."*

## Accident Reporting and Real Emergencies

Due to the nature of this drill, it is not anticipated that any accidents will occur, however, if an accident or real world emergency does occur, the participant is to immediately stop exercise play and attend to the accident or real-world emergency as necessary and notify the Exercise Director/Controller as soon as possible. If a real emergency occurs that affects the entire exercise, the exercise may be suspended or terminated at the discretion of the Exercise Director/Controller.

## Communications Plan

### Exercise Start, Suspension, and Termination Instructions

The exercise is scheduled to run until the Exercise Director/Controller determines that the exercise objectives have been met.

**All spoken and written communication will start and end with the statement, "THIS IS A DRILL."**

### Player Communication

Players will use routine, in-place agency communication systems. Additional communication assets may be made available as the exercise progresses. The need to maintain capability for a real-world response may preclude the use of certain communication channels or systems that would usually be available for an actual emergency incident. In no instance will exercise communication interfere with real-world emergency communications.

See **Appendix B: Standard Script for Calls** for an outline of the recommended script for calling.

| Exercise Plan | Emergency Response For |
|---|---|
| Mass Casualty Drill | Mass Casualties Involving Children |

# CHAPTER 3: PLAYER GUIDELINES

## Player Instructions

### Before the Exercise

- Participants should be familiar with the appropriate emergency plans, procedures, and exercise support documents.

### During the Exercise

- Respond to the exercise events and information as if the emergency were real, unless otherwise directed by an exercise controller.

- All exercise communication will begin and end with the phrase **"This is a drill."** This is a precaution taken so anyone overhearing the conversation will not mistake the exercise play for a real-world emergency.

### Data Collection

Data collection responsibilities depend on the calling system used. For an **Automated Calling System**, the drill *evaluator* is responsible for all data collection and analysis. Most Automated Calling Systems have the capacity to generate reports detailing the results of the call-down. The drill evaluator is responsible for extrapolating the following information from the report:

1. *Recording the drill information*, including date and location of drill, number of players, etc. (see Excel-based data collection spreadsheet).
2. *Recording the following process time stamps (to the hour and minute):*
    a. When the automated system begins contacting sites on the call-down list
    b. When the automated system completes contacting sites on the call-down list
    c. When all sites have acknowledged receipt of the call-down message and reported their ability to make their site available by a pre-determined target time, or a predetermined amount of time has passed.
3. *Computing the performance metrics after the drill.*

For jurisdictions using a **Manual Calling System**, the players will record data that must be collected by the evaluators in the post-exercise period. The *players (callers)* are responsible for:

1. *Recording the following time stamps (to the hour and minute):*
    a. When the player begins contacting sites on the call-down list
    b. When the player completes contacting sites on the call-down list
2. *Recording for each site on the call-down list:*
    a. Whether the site acknowledged receipt of the call-down message
    b. Whether the site reported being able to make their site available by the target time

The drill *evaluator* is responsible for:

1. *Recording the drill information*, including date and location of drill, number of players, etc. (see Excel-based data collection spreadsheet).
2. *Gathering the data collection spreadsheets from each player.*

---

FOR OFFICIAL USE ONLY
## Federal Emergency Management Agency

**Exercise Plan**                                    **Emergency Response For**
**Mass Casualty Drill**                    **Mass Casualties Involving Children**

3. *Computing the performance metrics after the drill.*

# CHAPTER 4: EVALUATION AND POST-EXERCISE ACTIVITIES

## Exercise Documentation

The goal of the drill is to comprehensively exercise and evaluate the Department of Homeland Security and the Federal Emergency Management Agency's plans and capabilities as they pertain to a potential mass casualty incident involving children. After the exercise, data collected by controllers, evaluators, and players will be used to identify strengths and areas for improvement in the context of the exercise design objectives.

### Exercise Evaluation Guides

DHS has developed Exercise Evaluation Guides (EEGs) that identify expected activities for evaluation, provide consistency across exercises, and link individual tasks to disciplines and expected outcomes. The EEGs selected by the Preparation for Mass Casualty trusted agents are contained in the evaluator materials packet along with the C/E Handbook. Supplemental evaluation material designed for the drill may also be used.

### Data Collection Spreadsheet and Scoring Metrics

The Centers for Disease Control and Prevention (CDC) and the RAND Corporation have developed a data collection spreadsheet and scoring metrics computation spreadsheet, for assessing site call-down capability.

## After Action Report

The AAR is the culmination of the Preparation for Mass Casualty. It is a written report outlining the strengths and areas for improvement identified during the exercise. The AAR will include the timeline, executive summary, scenario description, mission outcomes, and capability analysis. The AAR will be drafted by a core group of individuals from the exercise planning team.

## After Action Conference and Improvement Plan

The improvement process represents the comprehensive, continuing preparedness effort of which the drill is a part. The lessons learned and recommendations from the AAR will be incorporated into an Improvement Plan (IP). The *After Action Conference* is a forum for jurisdiction officials to hear the results of the evaluation analysis, validate the findings and recommendations in the draft AAR, and begin development of the IP. The *IP* identifies how recommendations will be addressed, including what actions will be taken, who is responsible, and the timeline for completion. It is created by key stakeholders from the Preparation for Mass Casualty participating agency officials during the After Action Conference.

FOR OFFICIAL USE ONLY
Federal Emergency Management Agency

**Exercise Plan**
**Mass Casualty Drill**

**Emergency Response For**
**Mass Casualties Involving Children**

# APPENDIX A: PARTICIPATING AGENCIES
**Table A.1** *Participating Agencies*

| Participating Agencies |
|---|
| **Federal (if applicable)** |
|  |
|  |
|  |
| **State (if applicable)** |
|  |
|  |
|  |
|  |
| **[Jurisdiction A]** |
|  |
|  |
|  |
| **[Jurisdiction B] (if applicable)** |
|  |
|  |
|  |

FOR OFFICIAL USE ONLY

**Federal Emergency Management Agency**

**Exercise Plan**                                                   **Emergency Response For**
**Mass Casualty Drill**                                  **Mass Casualties Involving Children**

# APPENDIX B: STANDARD SCRIPT FOR CALLS

Callers and automated calling systems should use a standard script to ensure accuracy and consistency of messages and to ensure that time estimates taken from the drill reflect the pace of activity in a true emergency.

The script should: **1)** clearly state that this is a drill; **2)** assess ability to make their site available **(by a hypothetical time)**; and **3)** in the case of a calling tree, provide instructions for further calls.

**The 'hypothetical time' should reflect a realistic approximation of the time needed to prepare a host facility for the receipt of response staff and supplies.**

## Sample Call-Down Script

- This is a site call-down drill being conducted by the Department of Homeland Security and the Federal Emergency Management Agency. Your site is on the Department of Homeland Security's list of facilities that may be used in an emergency. If this were a real emergency, you would be asked to make your site available for use by the Department of Homeland Security's health department.

- Again, *this is only a drill*. There is no need for you to make your site available as a result of this call.

# EXHIBIT D:
## Affidavit of Brian Davidson, P.I. (October 28, 2022)

STATE OF TEXAS                              *
                                           *
                                           *
                                           *
COUNTY OF HARRIS, TX                       *

# AFFIDAVIT

My name is Brian Davidson. I am a licensed Private Investigator in the State of Texas. My date of birth is 06/25/1973. My address is 8022 Bayside Dr. Beach City, TX 77523. My telephone number is 832 304 3577. Today's date is 10/28/2022. I make the following affidavit of my own free will. I have not been promised anything in exchange for completing this affidavit.

I wish to state the following:

I am a private investigator currently residing in the Houston, TX area. I am licensed by the Texas Department of Public Safety Private Security Board and my license number is A17936.

In March of 2022 I began studying the Connecticut State Police files related to the Sandy Hook School shooting which has been published online at https://cspsandyhookreport.ct.gov/. My main area of interest has been the primary scene photographs which were taken at the Sandy Hook Elementary school after the December 14th 2012 massacre. The photographs in the file were provided by the Connecticut Department of Emergency Services and Public Protection.

I was first attracted to the file when I was asked to do an analysis of a photograph that was taken at the scene shortly after the shooting. The peculiar thing that caught my interest about the photograph in question was how the photograph ended up first being used on a Hearst Media server shortly after the shooting even though it was an official crime scene

1 | P a g e

38

photograph taken by an official crime scene investigator. Why would a crime scene investigator on an open investigation provide photographs to the media?

The first thing I do when beginning an analysis is to study the metadata related to the crime scene photographs to make sure that the evidence is authentic and that it hasn't been tampered with in any way. To my dismay I found that all metadata had been stripped from ALL the evidence provided at this website maintained by the Connecticut State Police. After further research I found that the photographs originated from digital cameras that clearly had the capability of preserving the metadata. The lack of metadata was highly unusual and virtually guaranteed that the evidence provided to the public cannot be used as official material in a courtroom setting because the original images and documents have been modified by the deletion of the data. I have never encountered any actual case where photographs or original material was purposely stripped from the files. Therefore, I found myself in unusual territory in relation to this event. Again, the very fact that all metadata had been removed is highly unusual.

The cover letter for the public investigation and signed by Commissioner Reuben Bradford provided to the public states on page 2 the following:

> CFS 1200704559 is the primary investigation, which has been conducted by the Western District Major Crime Squad (WDMCS) from Troop A in Southbury in conjunction with State's Attorney Stephen Sedensky III of the Judicial District of Danbury. They have been supported by WDMCS detectives from each Troop in the district, as well as by Major Crimes detectives from across the state, the Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, Firearms and Explosives, the U.S. Attorney's Office for the District of Connecticut, Newtown Police Department, and numerous other federal, state and local law enforcement agencies too numerous to list.

A17936 [27-10-2022, 16:56:35]
[chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cspsandyhookrepor,,,

The letter goes on to state:

While the wide range of information contained in these reports is presumed to be public, there are many statutes and regulations at both the state and federal levels that either prohibit disclosure, or allow withholding, of certain subsets of information. Each redaction throughout the report is marked with a two-digit code which corresponds to the legal basis supporting it as noted on the attached index. While this coding system makes clear the foundation of each redaction, several types of information that have been withheld warrant additional explanation.

1. Throughout this report, the names and contextually identifying information of involved children have been withheld. This contextual information includes descriptions or images of children, their clothing and their belongings and references to their family members as examples. While the names of the deceased victims are well known, certain facts pertaining to the individual children are not, and the identities of surviving children are not generally known. Consistent with certain permissive exemptions of the Freedom of Information Act and the constitutional rights of crime victims we have chosen to withhold that information.

A17936 [27-10-2022, 16:58:36]
[chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://cspsandyhookrepor..

In my experience, there is no statute which would warrant the stripping of metadata from original evidence prior to the publishing of this information. The fact that these documents cannot be verified is cause for concern to say the least. There are various theories related to the crime in question which may lead a serious crime researcher to believe that events did not take place as portrayed in the media. For the purposes of this affidavit, I am simply going to point out some examples of difficult scenarios related to the evidence.

As a professional and independent researcher, I have studied the available crime scene photography and find many reasons to believe that the event did not take place as portrayed. In a mass casualty shooting blood spatter and pooling would be evident as it is described in reports, however the photographic evidence from the crime scene strains credibility. Therefore, I simply do not believe that the extraordinary lack of blood depicted at the crime scene is possible given the circumstances. I am not an expert in blood spatter or how it would pool under these circumstances. I do believe that as long as a human heart is pumping blood will continue to pump from

3 | Page

the wounds due to the fact that the heart is creating blood pressure in the body of the victim.

All exhibits related to this affidavit are contained in a public Google Drive file located at this url:

https://drive.google.com/drive/folders/1twYmluyTFRI_DJ15pEs9oqF8Eizaumpd?usp=sharing

Here is a visualization of the map of the crime scene as depicted in the provided reports. MapReport_ExhibitA.pdf page 5.

4 | P a g e

41



Above you will see a map of the inside of the school showing the main entrance and the relative position of the classrooms. It is my understanding that the shooter entered the main entrance of the school shooting, the shooter then turned to the left proceeding down the hallway passing room 12 on the left

5 | Page

and entering room 10. The shooter then proceeds to room 8 then returns to room 10 where a suicidal headwound results in death.

## The search and seizure affidavit contains the following description of events: (SearchAndSeizureAffidavit_ExhibitB.pdf Page 4)

3.  That on Friday, 12/14/12, at approximately 0935 hours, Newtown Police Department received a 911 call from a caller at the Sandy Hook Elementary School, 12 Dickinson Drive in Newtown, CT. The caller reported that an active shooting situation was occurring at the Sandy Hook Elementary School.

4.  That as a result of the 911 call, numerous law enforcement personnel including members from the Newtown Police Department and the Connecticut State Police responded to Sandy Hook Elementary School, in Newtown. Upon arrival, law enforcement personnel conducted a search of the interior and exterior of the school. Investigators located CT registration 872YEO, a 2010, black colored Honda Civic unoccupied and parked in the fire lane directly in front of the school. A shotgun was noted in plain view to be in the interior of the vehicle. The registered owner for the Honda Civic is Nancy Lanza, DOB 09/06/60, 36 Yogananda Street in Sandy Hook, CT.

5.  That as investigators entered the school numerous school children and school personnel were located deceased from apparent gunshot wounds in the first three classrooms located off the main hallway, adjacent to the school's front entrance. That investigators also located a teenaged white male dressed in military style clothing, wearing a bullet proof vest lying deceased on the floor in the middle classroom. That the deceased male was in possession of several handguns as well as a military style assault weapon. That the deceased male has been tentatively identified as Adam Lanza, DOB 04/22/92, who resides at 36 Yogananda Street in Sandy Hook, CT.

## The Scene Report contains the following statement (SceneReport_ExhibitC.pdf Page 4)

At the conclusion of the scene processing it was known that eighteen (18) children, four (4) teachers and two (2) administrators were deceased within the school and two (2) children were pronounced deceased at Danbury Hospital. Two (2) other adults (teacher/administrator) were injured and treated at nearby hospitals where they survived their injuries. Also known is that a total of one hundred and fifty four (154) expended 5.56 mm (.223 caliber) bullet casings were recovered from the school to include the patio area adjacent to the front lobby of the school. Two (2) expended 10mm bullet casings were recovered from within the school. Three (3) firearms were recovered from within the school to include a semi-automatic "Bushmaster" .223 caliber rifle, a Glock 10mm pistol and a Sig Sauer P226, 9 mm pistol. Additionally, three hundred and fifty three (353) live rounds of assorted ammunition were also recovered within the school. [NOTE: this information does not include evidence seized by CDMC Van Squad which begins with Exhibit #500].

The same report contains this statement:

6 | Page

43

On Friday 12/14/2012, into the early morning hours of Saturday 12/15/2012, members of the WDMC Van Squad and the OCME began the processing efforts to document, identify and remove the bodies of the twenty four (24) victims and one (1) shooter from within the school.

The victims were first identified by assigning them a numeric number 3 thru 26. 01 02 03 12 ███ ██ ████████████████████████████ ██████ and number 27 was assigned to the shooter). Then an assigned "OCME case number" was written on a tag with their previously assigned numeric and was placed on each victim. Photographic and written scene documentation was completed capturing clothing worn, location of victim, and assigned "OCME number" with identifying photographs of the victim. (NOTE: Prior to processing, the victims were observed to have "triage tags" previously laid upon their bodies by EMS personnel denoting their deceased status).

Once documentation was complete, the victims were placed into a body bag with their associated OCME case number written on the bag while their OCME tag was left on the ground in the place the victim was found. Each victim was carried out of the school and into a large military-style portable tent located within the north parking lot of the school in close proximity to the front lobby. Each victim was then processed by the OCME in an effort to make a positive identification of each victim, using school photographs and clothing descriptions provided by the parents of the children yet to be accounted for. On Saturday, 12/15/2012, all of the victims were transported from the scene to the OCME in Farmington, Connecticut, for an autopsy at a later time.

## Page 10 contains this statement

Only three (3) areas had damage consistent with having been forcibly entered: (1) The front (north) window adjacent to the west side of the front lobby doors was broken with a large hole visible. (2) Classroom #3 interior door between Classroom #3 and Classroom #5 was observed to be forcibly entered to gain access into Classroom #5 with the words "Breach" written on the door. Classroom #5 hallway door was locked and not breached. (3) The north window on the south-east exterior side door was reportedly breached by police to gain entry through this door from this side of the building. This door was located between classroom #46 and classroom #48 and provided access into the east hallway. Police reports indicate that this door was breached by Newtown Police Officer Seabrook. (Refer to Det. Lukienchuk's Nexgen Report #29085).

## Page 11 contains this statement

In the western-most area of the north hallway, before entry into the lobby area, were two deceased adult females, later identified as Principal Dawn Hochsprung (OCME#12-17592) and School Psychologist Mary Sherlach (OCME#12-17595). There was a writing easel lying on its side to the west of the victims. Newtown Police Detective Jason Frank reported to me that he put this easel in this location to prevent exiting children from seeing the victims.

- **Dawn Hochsprung (d.o.b. 03            ) #3 [OCME#12-17592]** was lying on her back in a position with her head to the west and her feet to the east, with her right side adjacent to the south wall of the hallway. Mrs. Hochsprung was positioned west of Mrs. Sherlach and east of the wooden bench located in the lobby beneath the main office windows. Mrs. Hochsprung's feet were touching Mrs. Sherlach's left shoulder. Mrs. Hochsprung had brown hair and was wearing a grey and red hooded sweater, red long sleeve shirt, blue jeans and calf-length brown colored boots. She had a ring on her right ring finger and a bracelet on her left wrist. There was a gold colored necklace in close proximity to the west side of her head. Jewelry seized at autopsy includes a gold colored ring, two silver colored rings (1 with a clear stone), gold colored chain necklace, two gold colored studded earrings, two gold colored with clear stone studded earrings, a charm bracelet, a wrist watch with a brown leather band and a gold colored bracelet. **[Clothing seized from OCME as Exhibit #71]**

- **Mary Sherlach (d.o.b. 03           ) #4 [OCME#12-17595]** was positioned lying on her back with her head to the south and her feet to the north and her head adjacent to the south side of the hallway. Mrs. Sherlach was wearing a blue long sleeve shirt, tan tank top shirt, blue jeans, blue socks with brown colored shoes. There was a pair of eyeglasses on the floor east of her body. There was a blue colored material around her head that was possibly a head dress or large neck scarf. Jewelry seized at autopsy includes two (2) silver colored hoop earrings each with a blue colored stone, silver colored wrist watch, black framed "JM New York" brand reading glasses (+2.50), four (4) gold colored rings (3 with stones). **[Clothing seized from OCME as Exhibit #58]**

Both victims were lying in pools of a blood-like substance appearing to originate from relative wounds on their bodies. Spatter of a blood-like substance was evident on the south wall of the hallway in the area of the two victims. The spatter was measured to

Upon inspecting the photographs of the area where Principal Dawn Hochsprung and Mary Sherlach were found I did not discover evidence of a pool of blood consistent with the description in the reports, nor did I see the spatter as described. Please note that "both victims were lying in pools of blood-like substance appearing to originate from relative wounds on their bodies. Spatter of blood-like substance was evident on the south wall of the hallway in the area of the two victims."

8 | Page

Lets take a closer look.



Source WalkleyPhotos1.pdf Page 12 - The shooter would have entered these doors shooting, then shot Hochsprung and Sherlach and turned left down the corridor.



WalkleyPhotos1.pdf image 14 - Take note of the floors.

10 | P a g e



WalkleyPhotos1.pdf Image 16

12 | P a g e



WalkleyPhotos1.pdf image 23 take note of the walls and door.

It is clear to the casual observer that the area has not been cleaned and there is no evidence of any pools of blood or blood spatter on the walls where Hochsprung and Sherlach were killed. They were shot with high powered weapons and were observed in pools of blood. The area has not been meticulously cleaned as you can see from the dirt on the bottom of the tiles of the walls. Indeed there is no blood residue on the floors from injured people bleeding as they were escorted or carried out of the school. A professional crime scene processing unit would not be responsible for cleaning the crime scene. They would process the scene and then turn it over to a professional bio-hazard crime scene cleaning team. There is no indication that in the 5 days it took to process the crime scene a cleaning team processed the building.

Lets take a closer look at the area and inspect the halls leading to the classrooms where the alleged massacre occurred and see what the evidence indicates.





Tranquilo 61 - Looking down the corridor that the shooter walked to enter room 10 after passing up room 12 which is immediately to the left. Note that the room on the right is room 9 the conference room where the principal, the psychiatrist and the teacher were killed. This is the floor area that is described as having Hochsprung and Sherlach laying in pools of blood. While some evidence of a red substance is present in my opinion, it is not consistent with the statement pools of blood.

There was a blue folder, with the name ▓ 01 02 ▓ written on it, located on the floor in the hallway west of the storage closet (denoted 11A-5). There were stains consistent with blood-like stains on the floor and east door jamb of the Room #9 (Conference Room) doorway. There was a stain consistent with a contact transfer pattern of a blood-like stain on the inside lower portion of the Room #9 (Conference Room) door. Two swabs of this blood-like stain were seized as Exhibit #89. Sgt. Cario reported to me that the area of this blood-like stain, in the threshold of Room #9, was the location he found a woman, later identified as Natalie Hammond. He placed her in a chair within the conference room until such time as she could be removed from the school for further treatment.

SceneReport Page 16.

15 | Page



WalkleyPhotos1 Image 73 Room 9 where Sgt Carrio picked up victim Natalie Hammond and administered first aid while Mr. Hammond was sitting upright in the chair.



Walkley 663 Room 9 Interior



WalkleyScenePhotos Image 71 – the entrance to room 9 (conference room)

19 | P a g e



WalkleyScenePhotos Number 428 The door to Room 9.

## CONFERENCE ROOM (ROOM #9)

The conference room (Room #9) was located on the south side of the north hallway. The conference room door was located on the opposite side of the hallway and approximately 16 feet east of the entrance door for classroom #12. The conference room was approximately 39 feet east of the lobby. The conference room door, as previously mentioned, was wooden with a large circular window in the upper half of the door.

This window was not covered and the door was not locked. The conference room had a carpeted floor with an oval shaped conference table in the middle of the room. There were laptop computers and iPads on the table, as well as seven (7) paper name tags affixed to metal tag holders on the table. These name tags presumably denote the location of people sitting around this conference table. The name tags around the table denoted the names: 04 ███████████████████████ , Natalie Hammond (Lead Teacher), Dawn Hochsprung (Principal), Mary Sherlach (School Psychologist), and 04 ███████████████████████ There was a laptop in the area of Mary Sherlach's name tag, and iPads in the area of Natalie Hammond, 04 , and Dawn Hochsprung's name tags. It appeared from documents on the table that this was a Review Session for student ███████ 01 02 03 12 ███████

This room appeared orderly with the exception that there were chairs tipped over on their sides. Two chairs were tipped over in the area of Dawn Hochsprung's name tag located on the south side of the conference table. There were two chairs tipped over in the southeast corner of the room adjacent to a rectangular table with a desk phone on top of it. The desk phone was a hard-lined phone and was on its receiver. There was a tipped over chair in the southwest corner of the room adjacent to a rectangular table. There was a cream colored hard-lined wall phone mounted in the center of the west wall. This phone was on its receiver. There was a chair tipped over on the west side of the entrance door. There was a chair on the east side of the entrance door that was upright and had blood-like stains on it. Sgt. Cario later reported to me that he placed Natalie Hammond in this chair to render her first aid.

SceneReport Page 18 room 9


Classroom 12 Mrs. Riog - Pages 19-21 of the SceneReport.pdf


~~This room is the first door to the left as the Shooter turned left~~ to proceed down the hall. The scene report simply describes the room and makes no statement that there is any indication that any crime was committed in this room whatsoever.

Classroom 10 - SceneReport.pdf Page 24 (Victims Positions) Overview of Classroom 10

20 | P a g e

57

**CLASSROOM #10:**
**Total Deceased Children** (including transported victim: ███████████): 5
**Total Deceased Teachers:** 2
**Total Surviving Children:** 11 (assuming they all were attending school on this day)

Note that this room contained the deceased shooter as well. In my inspection of the photographs I found little evidence of blood being spilled onto the floors of the hallway or tracked on footprints in the hallway outside the door.

SceneReport.pdf Page 26

**DECEASED VICTIMS LOCATION WITHIN CLASSROOM #10**

- ███████████████████████████████████ was located laying on her back on the floor in the center north side of the classroom between the two clusters of desks. Her head was to the west and her feet to the east. ██████ was wearing ████ 01 02 ████████████████████████████████████████████████████████████████████████████████████ [Clothing was seized from OCME as Exhibit #57]

- **Mrs. Anne Marie Murphy** (d.o.b. ██████████) #7 [OCME#12-17603] was located on the center west side of the room, west of the northern-most cluster of desks and northeast of the door that provides access to classroom #12. She was positioned face down and partially on her left side with her right arm entirely over the chest of a child later identified as ████████████ Mrs. Murphy was located partially on top of and along the east side of ████████████ Her head was to the south and her feet to the north. Her back left side was in contact with the west side of the western-most desk in the northern-most cluster. She was wearing a pink long sleeve sweater, tan top with straps, beige colored slacks, black socks and dress shoes. There was a gold necklace and pair of glasses in her right front pocket. A watch later identified as belonging to Mrs. Murphy was located approximately 3 feet south east of her position. Jewelry seized at autopsy included one pair of dark framed eye glasses, one metal neck chain, two (2) small gold colored hoop earrings, one (1) ring with stones. [Clothing was seized from OCME as Exhibit #65]

- ████████████████████████████████████████ was located on the center west side of the room, west of the northern-most cluster of desks and northeast of the door that provides access to classroom #12. He was positioned face up on his back with both his legs bent completely at the knees and each adjacent to the right

Scene Report page 24

and left sides of his hips. His head was to the north and his knees were to the south. His left (east) side was partially underneath Mrs. Murphy's right (west) side. Mrs. Murphy's right arm was entirely around the chest of ███████He was wearing ████ 01 02 ████████████████████████

[Clothing was seized from OCME as Exhibit #64]

- ██████ 01 02 03 12 ██████ was located northwest of Mrs. Murphy and in close proximity to Mrs. Murphy's right foot. ████████ was located near the northwest corner of the room south of the center portion of the semi-circular table. ████████ was observed in a crouched face down position with her left leg bent at the knee and hip and positioned under her left side. Her right leg was bent at the knee and hip and positioned out to her right side. Her head was to the east and her buttocks to the west. She was wearing ████ 01 02 ████

[Clothing was seized from OCME as Exhibit #61]

- ██████ 01 02 03 12 ██████ was located on the north side of the northern-most cluster of desks, southeast of the semi-circular table. His shoulders and head were underneath the second western-most desk. His head was to the south and his feet were to the north. He was lying on his left side facing west with his legs bent at the knees and hips in a west direction. He was in close proximity to both Mrs. Murphy and Mrs. Soto. Mrs. Murphy was located southwest and Mrs. Soto was located northeast of ████████ ████ was wearing ████ 01 02 ████████████████████

[Clothing was seized from OCME as Exhibit #67]

- **Victoria Soto** (d.o.b. ██ ████ #10 [OCME#12-17610] was located south of the north wall, between the two small book cases that were positioned parallel to each other and perpendicular to the north wall east of the semi-circular table. She was located approximately 2 feet northeast of ████████. She was observed to be lying on her left side with her legs bent at the knees and hips in an east direction. Her head was to the north and her buttocks was to

Scene Report Page 25

22 | P a g e

59

the south. Her left arm was extended perpendicular to the shoulder in an east direction and bent at the elbow in a north direction. She had a long gold colored neck chain around her neck that had her Sandy Hook Staff photo ID attached to it. The ID tag was grasped in her left hand. On the floor adjacent to the east side of her chest area was a set of keys to include a pink flamingo key fob. Mrs. Soto was wearing a green wool scarf, white long sleeve turtleneck sweater, green tank top, "Old Navy" brand blue jeans, black socks with green shamrocks, and calf-length brown colored boots. Jewelry was seized at autopsy to include silver colored with multi-colored leather neck chain with attached "Sandy Hook Staff Photo ID" in the name of Victoria Soto, four (4) rings (three gold colored and one silver colored) and two (2) pearl studded earrings.   [Clothing was seized from OCME as Exhibit #55]

➢ ████████████ 01 02 03 12 ████████████ was reportedly removed from this room at the time of the incident by Newtown Officer William Chapman and transported to Danbury Hospital by ambulance where she later succumbed to her injuries. No clothing evidence from 01 02 03 12 was seized by WDMC. ████ 01 02 ████ was seized at autopsy. (REFER TO DET. COMBES REPORT RELATIVE TO NPD OFFICER CHAPMAN'S STATEMENT-NEXGEN REPORT #00258158).

SceneReport.pdf page 26


Now lets take a look at the photos of room 10

23 | Page

60



WalkleyScenePhotos1 Image 74



## WalkleyScenePhotos Image 96 The above image depicts the following according to Walkley

Photo #96-    Overall view, facing northwest from the western area of the north hallway, depicting the entrance to room marked "**#10 Grade 1 Miss Soto**", located on the northern wall, west of the room marked "**#8 Grade 1 Mrs. D'Amato**", of the north hallway of Sandy Hook Elementary School, located at #12 Dickinson Drive in the Town of Sandy Hook (Newtown), Connecticut; as found by members of the WDMCS.



## Walkley Image 547 - The illuminated entrance to Room 10

Photo #547-    Overall view, depicting the entrance to the room marked "**#10 Grade 1 Miss Soto**".

26 | P a g e

63

## CARPET and OTHER OBSERVATIONS

There were numerous furrow holes consistent with bullet holes in the carpet area in the northwest quadrant in the area of the deceased victims and in most cases in an area that was under the victims. This carpet was cut and pulled back in an effort to recover any remaining lead projectiles with no projectiles located. A 14 feet 2 inches (east to west) and 11 feet 7 inches (north to south) section of carpet was cut from a point adjacent to the west wall with the northwest edge of the cutting approximately 5 feet 9 inches south of the north wall. The projectiles had in each case, penetrated through the carpet, through the tile located under the carpet and into the concrete flooring.    The holes in the carpets and very few bullet holes in the west wall or north windows and bookcases, 03 12 ███████████████████████████████

████████████████████ Evidence of soot, charring and muzzle blast in the area of the bullet holes and of the clothing material of the victims' also indicates that many of these rounds of ammunition were shot 03 12 ██████████████████ Holes and damage consistent with bullet strikes/holes were document as BH #18 thru #28 from within classroom #10. (The locations of these bullet strikes labeled BH#18 thru BH #28 were measured into a sketch map for documentation by the CSP-CARS UNIT.  REFER TO THE SKETCH AND ASSOCIATED REPORTS COMPLETED BY THE CARS UNIT).

Scene Report page 35 Carpet Report does not mention blood.

27 | Page

64



Tranquilo image 64 – the hallway outside of Room 10

29 | Page



Tranquilo 65 - The entrance to room 10.

## Room 8
## Now lets inspect the carpets in room 8.

**DECEASED VICTIMS in Classroom #8:**

The deceased children of classroom #8 were originally located by CSP-Sergeant William Cario to be inside the bathroom with the bathroom door in the fully opened position. The bathroom door opened in a south direction into the bathroom with the hinge on the east side. Six (6) photographs were taken by CSP-Trooper Carlos ·

## SceneReport.pdf page 38 indicates that the deceased children were located in the bathroom.

Guerrera at the time Sgt. Cario was checking the victims for signs of life. These six (6) photographs were seized as Exhibit #51. These photographs depict the children victims within the bathroom and the two (2) adult female victims, later identified as **Rachel D'Avino (d.o.b.** ██ ████ [OCME#12-17609] and Lauren Rousseau (d.o.b. ██ █████ ) [OCME#12-17606] located adjacent to the north side of the bathroom door on the floor against the cabinets under the sink in the southwest corner of the classroom.

From the photographs depicted of Sgt. Cario, he can be observed checking for signs of life in the photographs seized as Exhibit #51. It appears from the photographs that ██ 01 02 03 12 was close to the door of the bathroom. 01 02 03 12 was observed to be close to the door and east of the toilet. 01 02 03 12 was observed along the east side of the bathroom. 01 02 03 12 was observed west of 01 02 03 12 and east of the toilet. No other children's locations were identifiable from these photographs.

Sgt. Cario removed twelve (12) of the fifteen (15) children from the bathroom. One (1) child 01 02 03 12 ) was transported to the hospital. The eleven (11) others were placed on the floor of classroom #8. Three (3) children remained within the bathroom. The two (2) teachers remained in their original found position. Crime Scene Photographs taken by Det. Walkley and Det. Tranquillo depict the scene as it appeared after Sgt. Cario had removed most of the children from the bathroom. Sgt. Cario reported to me that the children that were positioned farther away from the bathroom were the ones he removed last and the children closer to the bathroom and in close proximity to the teachers were removed first. The deceased children were spread out by Sgt. Cario in an east direction over an area of 21 feet from the west wall and 9 feet from the south wall in an effort to find survivors and check the children for signs of life.

There were three (3) children left in the bathroom after checking for signs of life. These children were 01 02 03 12 was located slumped to the floor in a seated position partially on her right side on the south side of the toilet 01 02 03 12 was located, adjacent to the southwest corner of the bathroom, in a standing position and bent over the south side of the toilet. 01 02 03 12 was located in a seated position with her back against the west wall on the north side of the toilet. (REFER TO SGT. CARIO'S NEXGEN REPORT #0026724 AND SGT. COVELLO'S NEXGEN REPORT #002530-relative to Exhibit #51-TFC. Carlo Guerra's six (6) photographs)

## Scene Report Page 39

30 | P a g e

**DECEASED TEACHERS OF CLASSROOM #8**

➤ **Rachel D'Avino (d.o.b. ▮▮▮▮▮▮▮▮** #23 [OCME#12-17609] was in a crouched position; face down with her head in a south direction against the west bathroom door jamb and partially inside the bathroom. Her right leg was positioned fully bent at the knee and hip and positioned under the right side of her torso. Her left leg was bent at the hip and knees and positioned on the east side of her body. Rachel D'Avino was wearing a black, grey and white short sleeve sweater, white shirt with straps, black jeans and white socks and New Balance brand grey and pink sneakers. Jewelry seized at autopsy included two (2) silver colored earring studs. [Clothing seized from OCME as Exhibit #68].

➤ **Lauren Rousseau (d.o.b. ▮▮▮▮▮▮▮▮**) #22 [OCME#12-17606] was located to the north side of Rachel D'Avino. There was a grey plastic waste paper basket and a blue plastic recycling paper basket adjacent to the northeast side of the lower cabinets under the sink in the southwest corner of the room. Lauren Rousseau was positioned lying on her back partially on her right side with her feet pointed in an east direction and her head in a south direction. Her shoulders were against the grey plastic waste paper basket and her head was on the left buttock of Rachel D'Avino. Lauren Rousseau was wearing a grey and white herringbone patterned long sleeve sweater, grey top with straps, blue jeans, grey and blue argyle socks, and black leather zip up boots. She had her Sandy Hook staff photo identification on a lanyard around her neck   Jewelry was seized at autopsy to include Vera Bradley brand multi colored neck lanyard, "Sandy Hook Staff Photo ID" in the name of Ms. Rousseau, Pandora-like charm bracelet, one gold colored wrist watch, one silver colored ring, one pair of dark framed eye glasses. [Clothing seized from OCME as Exhibit #59]

There was a large amount of blood-like stains on the east side of the cabinets under the sink in the area Lauren Rousseau and Rachel D'Avino.

## Scene Report Page 40

Prior to processing, one (1) child was removed from the bathroom of Classroom #8 by Det. Patrick Dragon and transported to Danbury Hospital where he later succumbed to his injuries.

## Scene Report Page 42

31 | Page

One (1) child███████01 02 03 12███████ survived the shooting within
the bathroom of Classroom #8 and was removed from the school prior to
processing.  Reportedly ███01 02 03 12███ was removed from the school by
Newtown Police Officer Leonard Penna (Refer to Tpr. Combes' Nexgen Report
#00258036)

**CLASSROOM #8:**

**Total Deceased Children** (including transported victim: ███01 02 03 12███): 15
**Total Deceased Teachers:**  2
**Total Surviving Children:**  1

## Scene Report Page 43 –
### Spatter of blood-like substance in bathroom of classroom #8

As previously mentioned the bathroom was located within the classroom in the
southwest corner of the room.  This bathroom was measured to be approximately 4
feet 7 inches east to west and 3 feet 1/2 inch north to south.  This bathroom contained
only a toilet.  The toilet was on the center west wall positioned eastward.  There was a
large plastic circular toilet paper dispenser affixed to the south wall, from 2 feet 1 inch
to 3 feet 3 inches from the floor and 1 foot 10 inches to 3 feet from the west wall.  The
bathroom door entrance was located on the east side of the north wall of the bathroom.
The bathroom door was solid wood (no windows) and had a door knob with a push
button locking device on the inside knob.  The exterior knob had a key lock that could
be used to unlock the door.  At the time of processing, this door knob was in the
"unlocked" position.  As previously mentioned, this bathroom door opened inward and
was hinged on the east side.  The doorway was approximately 2 feet 3 inches wide
and 6 feet 7 inches high.  The bathroom had 4 inch square brownish colored tile from
the floor to a height of 4 feet around the walls of the bathroom.  The rest of the wall
was white painted cinder block from the tile (4 feet height) to the ceiling (7 feet 10 ½
inches).  Each cinderblock was approximately 1 foot 8 inches wide and 8 inches tall.

All the walls, the floor and ceiling were covered in a blood-like substance ██03 12██
████████████████████████

The east wall of the bathroom had a distinguishable void pattern that was measured to
be approximately 2 feet 3 inches wide (width of door).  The exterior side of the
bathroom door had a substantial amount of blood-like substance while the interior side
of the bathroom door was clean.  The void on the east wall and the blood-like
substance on the exterior side of the bathroom door were consistent with the door

## Scene Report Page 43 – Bathroom measuring 4'7" by 3'6" with a toilet on the center wall contained approximately 15 children. All but one were declared dead.

33 | Page



**Photo #566-**      Overall view, facing north from the southeastern area of the room, depicting the northeast area of the room, after the established quadrants had been laid out in the room marked "**#8 Grade 1 Mrs. D'Amato**".



**Photo #567-**    Overall view, facing west from the northeastern area of the room, depicting the northwest area of the room, after the established quadrants had been laid out in the room marked "**#8 Grade 1 Mrs. D'Amato**".



**Photo #570-**    Overall view, facing east from the northwestern area of the room, depicting the northeast area of the room, after the established quadrants had been laid out in the room marked "**#8 Grade 1 Mrs. D'Amato**".

71



**Photo #574-**        Overall view, facing northeast from the southwestern area of the room, depicting the northeast area of the room, after the established quadrants had been laid out in the room marked "#8 Grade 1 Mrs. D'Amato".

36 | P a g e



73

Tranquilo 200 - This is the interior of Room 8.

There is not enough blood on the floors to convince me that the events took place as described.

As we venture further down the hallway we find that the shooter would have had to travel the corridor to enter Room 4 at the end of the hall on the left.



Tranquilo 75 - The view from room 5 (right) looking down the hall toward room 4 which would be at the end of the hall on the left where a shotgun slug was recovered from the floor.

What happened to the children in this room? I have seen no explanation for this in my review of the materials. I would like to mention that I have not completed my review of all materials at this point.



**Photo #739-**    Distant view, facing northwest from the southeast area of the room, depicting the location of **Exhibit #99**, one (1) blue colored Tactical Rifle slug 12 gauge, 70mm, 2 ¾ ", located on the south central area

To satisfy my concerns, I would like to see all crime scene photographs in their unredacted form with metadata present in order to make a final report. However, at this point, I stand by my original analysis that the blood evidence does not appear consistent with the events as they have been described.

At this point in time my position is that the evidence appears to be more consistent with the alternative account of a FEMA exercise presented as mass murder to promote gun control.


Signed

Brian Davidson
Panoramic Investigations A17936


SWORN TO and subscribed before me on this $\underline{28}$ day of $\underline{Oct}$ in the year of $\underline{2022}$.



Notary

Page 39 of 39

JENNIFER WASHBURN
Notary ID #130097054
My Commission Expires
January 29, 2023

# EXHIBIT E:
# FBI Consolidated Crime Report for 2012 (extracts)



# CRIME in the United States 2012

Criminal Justice Information Services Division

Feedback | Contact Us | Data Quality Guidelines | UCR Home

CIUS Home | Offenses Known to Law Enforcement | Violent Crime | Property Crime | Clearances | Persons Arrested | Police Employee Data | About CIUS

## Table 8

### CONNECTICUT
Offenses Known to Law Enforcement
by City, 2012

Data Declaration    Download Excel    Table 8 State Listing

| City | Population | Violent crime | Murder and nonnegligent manslaughter | Forcible rape | Robbery | Aggravated assault | Property crime | Burglary | Larceny-theft | Motor vehicle theft | Arson |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Ansonia | 19,271 | 29 | 0 | 4 | 15 | 10 | 455 | 80 | 317 | 58 | 1 |
| Newtown | 27,904 | 7 | 0 | 5 | 0 | 2 | 185 | 32 | 151 | 2 | 1 |
| North Branford | 14,422 | 5 | 1 | 1 | 1 | 2 | 201 | 34 | 160 | 7 | 0 |
| North Haven | 24,119 | 12 | 0 | 0 | 11 | 1 | 578 | 63 | 478 | 37 | 0 |

Data from a recent FBI report shows zero murders occurred in Newtown in 2012. / Click to enlarge

# Crime in Connecticut 2012

| Arrest Statistics for Year 2012 | | | | | | | | | | | | | | | | | Agency: Connecticut Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Murder | Neg. Manslaughter | Forcible Rape | Robbery | Aggravated Assault | Burglary | Larceny-Theft | Motor Vehicle Theft | Arson | Simple Assault | Forgery/Counterfeiting | Fraud | Embezzlement | Stolen Property | Vandalism | Weapons Charges | Prostitution | Sex Offenses |
| <10 | 0 | 0 | 1 | 1 | 1 | 3 | 7 | 0 | 0 | 25 | 0 | 0 | 0 | 0 | 5 | 3 | 0 | 2 |
| 10-12 | 0 | 0 | 6 | 7 | 26 | 42 | 74 | 5 | 4 | 218 | 0 | 2 | 0 | 3 | 40 | 14 | 0 | 30 |
| 13-14 | 0 | 0 | 13 | 47 | 66 | 95 | 364 | 16 | 11 | 790 | 2 | 11 | 4 | 8 | 127 | 52 | 0 | 48 |
| 15 | 0 | 0 | 4 | 61 | 53 | 95 | 362 | 31 | 11 | 666 | 0 | 7 | 1 | 6 | 96 | 28 | 0 | 18 |
| 16 | 0 | 1 | 4 | 78 | 76 | 95 | 435 | 39 | 10 | 705 | 2 | 8 | 2 | 14 | 119 | 36 | 1 | 20 |
| 17 | 3 | 0 | 6 | 99 | 89 | 165 | 586 | 39 | 6 | 733 | 12 | 14 | 3 | 28 | 109 | 36 | 0 | 26 |
| Tot <18 | 3 | 1 | 34 | 293 | 311 | 495 | 1828 | 130 | 42 | 3137 | 16 | 42 | 10 | 59 | 496 | 169 | 1 | 144 |

# EXHIBIT F:
## Affidavit of Wolfgang H. Halbig (December 12, 2023)

## Affidavit of Wolfgang W. Halbig

This document was prepared by:
Wolfgang W. Halbig, pro se
25526 Hawks Run Lane
Sorrento, Florida 32776
Phone: 407-496-5551
Email: Wolfgang.halbig@comcast.net

## Identifying the correct and authentic Leonard Pozner

### STATE OF FLORIDA, COUNTY OF LAKE

1. The undersigned, Wolfgang W. Halbig, being first duly sworn, do with this state under oath and penalty of perjury that the following facts are accurate.

2. I am over the age of 18, and I am a resident of the State of Florida.

3. I know the facts and could testify to them if called a witness.

4. I suffer no legal disabilities and have personal knowledge of the facts below.

5. I, with this, certify that while attending my hearing in courtroom 1b with Judge Josalyn Jones, Assistant State Attorney Chambers, and my Attorney Ms. Umansky, for my case of the State of Florida, Plaintiff, vs. Wolfgang Halbig, Defendant/Petitioner, Case Nos: 2020-cf-000224-axxxxx, and 2020-mm-001628-axxx-xx, a person appeared in in the Circuit Court of the Fifth Judicial Circuit, 550 West Main Street, Tavares, Florida 32778, in and for Lake County, Florida on August 1, 2023, at 1:30 PM to testify that he was Leonard Posner and the only Lenny Posner who had lost his son in the shooting alleged to have occurred on December 14, 2012, at the Sandy Hook Elementary School in New Town, Connecticut.

6. I later learned of a police traffic stop on 09/21/2023 for speeding by the Orange County, Florida, Sheriff's Office. I obtained a copy of the citing Officer's body cam footage on 10/24/2023 using public records request #23-22128. The Officer's body cam footage depicts the same Leonard Pozner who testified at my August 1, 2023, court hearing.

1

81

7. The person who represented himself as Leonard Pozner during my court proceeding is depicted in exhibit A, the body cam photograph attached to this affidavit.

8. My opinion as a former Florida Highway Patrol Officer and US Customs Agent is that the person claiming to be Leonard Pozner in my Florida courtroom is NOT the same person depicted in the business suit attached to this affidavit, and the person depicted in casual clothing is likely not the person depicted in the business suit.

FURTHER, AFFIANT SAYETH NOT.

To the best of my knowledge and belief, I declare that the information herein is accurate, correct, and complete.

Executed this ___13___ day of ___December___, 2023

Wolfgang W. Halbig

SWORN TO and subscribed before me this ___13___ day of ___December___ 2023 Wolfgang W. Halbig, whom I know or who has produced

___FL/DL___ as identification.

(Seal)

Notary Public State of Florida
Tulsi Patel
My Commission HH 302019
Expires 9/30/2026

Notary Public
Notary Printed Name ___Tulsi Patel___

My commission expires ___09/30/2026___

2

82

# Exhibit A



**2**

IMAGE FLIPPED HORIZONTALLY FROM ORIGINAL

The differences in these images makes me conclude that th·
are two different people. The shape, height and alignment
the eyebrows is different. Also the tops of the ears don't ali¡
and the mouth is misaligned despite the fact that person 2 i
smiling. The length of the skull above the brows is greater i
person 1, as is the distance between the nose and lips.

I simply ask her to look at the photos I provided to her and tell me that this was the
Pozner she questioned in our courtrrom.

17

83

# Exhibit C

  

THE PERSON IN PHOTOS 1 AND 2 LOOK LIKE A DIFFERENT PERSON THAN THE ONE IN PHOTO 3. THE REASONS ARE LISTED BELOW.

The left eyebrow of person 1 & 2 is much more angled and shaped differently than person 3 who has a flatter angle to the eyebrow.
The bottom eyelids in person 1 & 2 look flatter as opposed to those of person 3 which seem much rounder.
The right ear of person 1 & 2 seems to stick out from the head farther than person 3's right ear.  1 & 2's ear seems kind of artificial to me, almost prosthetic.
The distance between the tops of the eyelids and the bottom of the eyebrows in person 1 & 2 is greater than in person 3, albeit person 3 is looking up at the camera which will affect this measurement.
The bone structure of the face in person 1 & 2 appears different even though he's slimmer than person 3. The chin is much more square at the bottom and seems wider than person 3's chin which appears rounder and narrower.
The wings of the nose on person 1 & 2 appear significantly narrower than person 3's, and the overall shape from the bridge of the nose to the tip appears different to me.

I hired a Photo Forensic Expert to analyze the photos, I did NOT want to be accused of Falsifying information.
simply ask her to look at the photos I provide her and tell me that this was the Leonard Pozner in court courtroom that she questioned him on August 1, 2023.

WHY WOULD MY OWN ATTORNEY REFUSE TO IDENTIFY THE PHOTO OF THE POZNER SHE QUESTIONED BEFORE JUDE JONES ON AUGUST 1, 2023?

She was my attorney that I paid for.

I am NOT good with technology so please forgive me.

Wolfgang W Halbig
25526 Hawks Run Lane
Sorrento, Florida 32776
407-496-5551

21

84



By Lisa Backus  Published 7:11 am EDT, Wednesday, October 16, 2019





# EXHIBIT G:
## Affidavit of
## Brian Davidson, P.I.
## (June 15, 2024)

06/15/2024

Affidavit of Fact

My name is Brian Davidson, I am a licensed private investigator operating out of the Houston, TX area. My address is 8022 Bayside Dr. Beach City, TX 77523 and my phone number is (832) 304-3577. My Texas Private Security License is A17936. My Private Investigation license was first issued on 05/22/2012. I have never been accused of perjury in a court of law. The following information I will attest to in a court of law if I am called as a witness. I write this affidavit of my own free will and I have not received any compensation for my testimony.

On December 12th 2012 the "Sandy Hook Elementary School Shooting" event took place in Newtown, Connecticut. The official story was that at that event, 20-year-old Adam Lanza shot and killed 26 people, twenty of the "victims" were children who attended the school.[1]

I have provided a previous affidavit related to my assessment of the crime scene photographs to Dr. James Fetzer and have provided my opinion that the photographs provided by the Connecticut State Police Department of Emergency Services and Public Protection[2] event was more consistent with a "False Flag" drill than an authentic murder scene.

Dr. Fetzer has asked me to verify or falsify the conclusions that are set forth in the Affidavit of Wolfgang Halbig dated December 12, 2023, specifically these three claims:

(1) that the man whose photograph has been published worldwide as "Leonard Pozner" from Sandy Hook is not the same person as the person who testified in Dr. Fetzer's lawsuit in Madison, WI, under the name "Leonard Pozner"

(2) that the man who was issued a speeding ticket in FL is the same person who testified in his court case in FL; and

(3) that neither of them is the same as the person who testified in Dr. Fetzer's case in WI. Thus, according to the Halbig Affidavit, there are three Leonard Pozners.

---

[1] https://en.wikipedia.org/wiki/Sandy_Hook_Elementary_School_shooting

Page 1 of 32

89



Figure 1 – This photograph was provided to me by both Dr. Fetzer and Wolfgang Halbig as the man who provided testimony to the courts as "Leonard Pozner".

Using publicly available resources and websites, I have been able to find several facial recognition matches that indicate that the person in the above photograph represents himself to the public as Leonard Pozner. (See A-E below) This does not appear to be the same person as the peron who represented himself as Pozner at Sandy Hook.



**Cruel Intentions: South Florida father fights conspiracy theories, threats tied to son's death**

The term "fake news" has exploded into a national conversation about separating fact from fiction. But for one South Florida father, online lies and conspiracy

FEBRUARY 7, 2017

A.

A17936 [12-05-2024, 17:32:52]
[https://wsvn.com/author/brian-entin/page/47/}

Page 2 of 32

90



A17936 [12-05-2024, 17:26:17]
[https://noahpozner.com/gallery/}

B.

## 02  AN ANGEL WATCHES OVER THEM
of 11



A17936 [12-05-2024, 17:28:30]
[https://people.com/celebrity/newtown-shooting-victims-families-speak/}

C.



A17936 [12-05-2024, 17:37:45]
[https://www.slate.fr/sites/default/files/lennypozner.jpg}

D.



Lenny Pozner leaves the funeral service for his six year-old Noah Pozner, killed in the mass shooting at Sandy Hook Elementary School in Newtown, at the Abraham L. Green Funeral home in Fairfield on Monday, December 17, 2012.

Brian A. Pounds / Brian A. Pounds

A17936 [30-05-2024, 20:54:35]
[https://www.seattlepi.com/news/article/Professor-accused-of-taunting-Sandy-Hook-family...

E.

Page 5 of 32



F.

In Photograph A (above) Noah Pozner appears to be 2 years old, yet Lenny Pozner appears significantly older than in photograph B where Noah Pozner appears to be 5 years old. Noah Pozner was supposedly in 1st grade when he was killed making him 6 years old and making Leonard Pozner 46 years old  at the time of the shooting. In Photographs E thorough F, Pozner appears to be significantly older than when Noah was only 5 years old yet only 1 years had passed.

1. Madison Pozner vs. Sandy Hook Pozner
    a. Halbig compares the Madison Pozner with the Sandy Hook Pozner and finds them to be different persons. They not only appear to have different ears but

to be of substantially different ages and weights. Here is Halbig's comparison:



IMAGE FLIPPED HORIZONTALLY FROM ORIGINAL

The differences in these images makes me conclude that these are two different people. The shape, height and alignment of the eyebrows is different. Also the tops of the ears don't align and the mouth is misaligned despite the fact that person 2 is smiling. The length of the skull above the brows is greater in person 1, as is the distance between the nose and lips.

Figure 2- Halbig's comparison of the Madison Court room Pozner reverses the image on the right showing comparing Pozners left ear with his right hear which has a very distinctive feature of abnormally protruding from the head. The ears are substantially different. The eyebrows and the foreheads appear substantially different.

Here is the original image that I believe that Halbig is using.



Leonard Pozner

Figure 3- An image of Leonard Pozner which is reversed by Halbig's associate to do a face comparison.



**en.paperblog.com**

**debate/tri/week/** - First found on Dec 30, 2015
**topics/american-politician/barack-oba...** - First found on Dec 24, 2015

Filename: **hate-mail-sent-to-prof-james-tracy-for-being--L-tKriin-175x13...**
(175 x 130, 5.7 kB)

A17936 [30-05-2024, 17:19:44]
[https://www.tineye.com/search/848f436fe23d1af80e2cf9ea8fcb6860d089...

Figure 4 - The image was first found by Tineye reverse image search on December 30th 2015 in debate magazine and is available at the following link: https://en.paperblog.com/parents-of-alleged-sandy-hook-victim-want-professor-james-tracy-to-lose-his-job-1373698/

Halbig points out the distinctive ear as the main noticeable feature that indicates that the two people are different. However, a facial recognition match of the courtroom Pozner with the Sandy Hook Pozner indicates that they are likely the same person. This shows the flaws in the facial recognition program itself.

 

Compare Result       Response JSON

Is same person: Probability very high.

Leonard Pozner

A17936 [30-05-2024, 17:29:40]
[https://www.faceplusplus.com/face-comparing/}

Figure 5 – Facial Recognition Technology indicates a high degree of probability that the courtroom Pozner and the photograph of Pozner from December of 2015 are the same person.

2.  The Sandy Hook Pozner

There are other photographs of the Sandy Hook Pozner, which were taken around the time of the purported shooting on December 14, 2012. Notice the difference in their apparent ages and weights, where the Madison Pozner of May 28, 2019, appears substantially younger and lighter than the Pozner from the date of the shooting. 7 years have passed since the day of the shooting and the court appearance, the Pozner character should be 7 years older. See Figures 6-10 below.



**REP-AM.COM**
RepublicanAmerican

HOME    GALLERIES    SEARCH    CONTACT    LIGHTBC

SHARE                                                    Add to Lightbox +    Add to Cart +

15_NEW_121412JS08.JPG                                                    Image 1 of 1



A17936 [30-05-2024, 16:36:51]
[https://photos.rep-am.com/image/I0000bOGJPZIXDRw]

Figure 6 – Pozner image captured from the day of the Sandy Hook shooting. On this day Pozner appears to be in his late 30s or early 40's.

Sort by best match ▾        Filter by website / collection



COLLECTION

**rep-am.photoshelter.com**

image/I0000bOGJPZIXDRw - First found on Dec 23, 2012

A17936 [30-05-2024, 16:37:26]
[https://www.tineye.com/search/252d5c3b959d8b8bd00263f5...

Figure 7 – The photograph was first found by TinEye reverse image search on December 23rd 2012 just 9 days after the Sandy Hook shooting.

Now look at the images from the court hearing. Pozner appears to be older in the image from 2012 than he is at the court hearing.



Figure 8 – Age of Pozners from the Sandy Hook Shooting December 12th 2012 (Left)versus May 29th 2019 (Right).According to the traffic ticket Pozner received his birthdate is.

10/11/1967. This means that Pozner would have been 46 years old on December 12th 2012. The man in the courtroom would be 6.5 years older making him 52 years old at the time of the testimony.  This is inconsistent with the laws of nature.




Figure 9 – Facial Comparison Technology does indicate that the man at the Sandy Hook Shooting is the same man who provided testimony in court as Pozner.  However it is clear to the naked eye that they are different people.



Figure 10 – Another photo of Pozner at the scene of the shooting.

On December 13th 2023 Wolfgang Halbig provided an affidavit to the courts that makes the following statements:

5. I, with this, certify that while attending my hearing in courtroom 1b with Judge Josalyn Jones, Assistant State Attorney Chambers, and my Attorney Ms. Umansky, for my case of the State of Florida, Plaintiff, vs. Wolfgang Halbig, Defendant/Petitioner, Case Nos: 2020-cf-000224-axxxxx, and 2020-mm-001628-axxx-xx, a person appeared in in the Circuit Court of the Fifth Judicial Circuit, 550 West Main Street, Tavares, Florida 32778, in and for Lake County, Florida on August 1, 2023, at 1:30 PM to testify that he was Leonard Posner and the only Lenny Posner who had lost his son in the shooting alleged to have occurred on December 14, 2012, at the Sandy Hook Elementary School in New Town, Connecticut.

6. I later learned of a police traffic stop on 09/21/2023 for speeding by the Orange County, Florida, Sheriff's Office. I obtained a copy of the citing Officer's body cam footage on 10/24/2023 using public records request #23-22128. The Officer's body cam footage depicts the same Leonard Pozner who testified at my August 1, 2023, court hearing.

7. The person who represented himself as Leonard Pozner during my court proceeding is depicted in exhibit A, the body cam photograph attached to this affidavit.

8. My opinion as a former Florida Highway Patrol Officer and US Customs Agent is that the person claiming to be Leonard Pozner in my Florida courtroom is NOT the same person depicted in the business suit attached to this affidavit, and the person depicted in casual clothing is likely not the person depicted in the business suit.

Figures 11 and 12 (Above) – Halbig's statements from his affidavit.

The following image was extracted from the bodycam video of the traffic stop that Halbig acquired in his public record request #23-22128.

Page 13 of 32

101



Figure 13 - A screenshot of Pozner from Halbig's public record request.

The following is a copy of the traffic ticket issued to Leonard Pozner

Figure 14 – The traffic ticket issued to Leonard Pozner

 

Compare Result      Response JSON

Is same person: Probability high.

A17936 [12-05-2024, 18:54:43]
[https://www.faceplusplus.com/face-comparing/]

Figure 15 – Facial recognition technology shows a high probability that the person who testified in court is the same person who received the traffic ticket. Note that the probability of these two people being the same person is only high and not very high as other comparisons normally indicate meaning that they could possibly be dopplegangers.

There are other indicators that there are multiple people playing the role of Leonard Pozner. Facial recognition technology helps shed light on the situation.

 

Compare Result      Response JSON

Is same person: Probability low.

A17936 [28-05-2024, 19:42:41]
[https://www.faceplusplus.com/face-comparing/]

Figure 16 – Facial Recognition shows a low probability that the man who attended the funeral is the same man in the photos when Noah Pozner was approximately 4 years old. In this photo Noah Pozner appears to be approximately 5 years old. This photo would have been taken when Pozner was 45 years old at the time of the photo. He looks significantly younger at this time.

On January 3rd 2021 a 60 Minutes overtime special was posted to the following link on Youtube. https://www.youtube.com/watch?v=XkR_5dCElzU

At 1:41 in the video a man who identifies himself as Leonard Pozner presents himself to the public as a victim of online harassment.



Figure 17 – The 60 minutes character that represented himself to the public as Leonard Pozner.

 

Compare Result        Response JSON

Is same person: Probability low.

A17936 [21-05-2024, 17:39:45]
[https://www.youtube.com/watch?v=XkR_SdCElzU}

A17936 [21-05-2024, 18:10:48]
[https://www.faceplusplus.com/face-comparing/}

Figure 18 – The character on the 60 minutes special is a very low probability match to the driver of the vehicle who received the traffic ticket.  Again Poxner is a public figure, why conceal his face?



**people.com**

celebrity/newtown-shooting-victims-fa... - First found on Apr 3, 2017
celebrity/newtown-shooting-victims-fa... - First found on Apr 3, 2017

Filename: **veronique-pozner-435.jpg** (660 x 495, 59 kB)



**people.com**

celebrity/newtown-shooting-victims-fa... - First found on Oct 30, 2018
celebrity/newtown-shooting-victims-fa... - First found on Apr 3, 2017
**view all 3 matches**

Filename: **veronique-pozner-435.jpg** (435 x 580, 59 kB)



**people.com**

celebrity/newtown-shooting-victims-fa... - First found on Oct 30, 2018

Filename: **veronique-pozner-435.jpg** (435 x 580, 71.5 kB)



**www.people.com**

people/package/0,,20656736,00.html - First found on Oct 19, 2014
people/package/article/0,,20656736_20... - First found on Oct 1, 2013

Filename: **veronique-pozner-150.jpg** (150 x 113, 8 kB)

A17936 [30-05-2024, 18:09:33]
[https://www.tineye.com/search/f5c7be27ed5a01db862fc37029447f...

Figure 19 – Leonard Pozner consented to a People Magazine spread on or before October 1st 2013. The spread was posted to the "celebrity" section of the People Magazine website.



Figure 20– Leonard Pozner and family becoming celebrities. Please take careful note of the character posing as Pozner's on the left-hand side of the image.



# A Little About Me...

Hello! Welcome to my webpage, my name is Michael Vabner and I am a senior at the University of Connecticut at Storrs, CT. I am a currently pursuing my Bachelor of Economics and expect to graduate this coming May 2017. My objective for my career post graduation would be a position where I can put on different hats and expand my skill set. My previous experience includes two internships at the InfoReliance Corporation in Fairfax VA and as a member of the UConn Association of Computing Machinery.

A17936 [30-05-2024, 18:32:12]
[https://www.veteranstoday.com/wp-content/uploads/2018/05/ScreenHunter-774.jpg}

Figure 21 – an image of Michael Vabner from a webpage he used while he was in college.

Compare Result        Response JSON

Is same person: Probability very high.

A17936 [30-05-2024, 18:34:16]
[https://www.faceplusplus.com/face-comparing/}

Figure 22 – Pozners grown up son is a very high probability match to Michael Vabner.




Compare Result    Response JSON

Is same person: Probability very high.

A17936 [30-05-2024,
18:59:53]
[https://www.facebook....

A17936 [30-05-2024, 19:47:13]
[https://www.faceplusplus.com/face-comparing/}

Figure 23 – The photo on the left is straight from the Michael Vabner Facebook Page and it is a very high probability match to the photo on the People page.

Additionally, Noah Pozner supposedly had a sister as is seen in the photographs of Pozner at Sandy Hook. The person claiming to be his sister is Danielle Vabner (Danielle Rogus).




Figure 24- A photograph of Noah Pozner celebrating what appears to be his 8th birthday note that the cake has 8 candles on it. This is impossible if he died at the age of 6.

**Danielle Rogus** updated her cover photo.
December 8, 2014 · 🌐

Can't believe this was taken over 2 years ago, right before I left for college for the first time.



👍 61                                                        5 comments   1 share

A17936 [30-05-2024, 20:36:41]
[https://www.facebook.com/danielle.rogus}

Figure 25 – Danielle Vabner Facebook Post that indicates that this is what Noah Pozner looked like in the 1st grade.



**Danielle Vabner** @daniellelvabner · 18h
Hard to believe this picture was taken over five years ago now — just a few months before Noah was killed at Sandy Hook.

Forever six years old, forever loved, forever my little brother. 💚



A17936 [30-05-2024, 20:25:46]
[https://stevendowdle.weebly.com/personal-essays/archives...

Figure 26 – Danielle Vabner Facebook Post.  Please note that the photograph indicates significant alterations as if it has been built or modified in Photoshop.



Figure 27 – Evaluation of authenticity of photograph. The authentic Facebook post is on the left. The pink areas on the lower right indicate heavy editing and tampering.

Additionally, the following images were obtained by Panoramic Investigations which were taken prior to the filming of the 60 minutes special.



Figure 28 – Renowned makeup artist Kazu Hiro performing his craft on a Subject who is about to be playing Leonard Pozner



Figure 29 – Kazu Hiro performing his craft.



Figure 30 – Kazu Hiro performing his craft.



Figure 31 – Kazu Hiro performing his craft.



Figure 32 – Kazu Hiro with the Subject of his craft who appeared on the 60 minutes special.

The best hair and face makeup



Kazu Hiro, Anne Morgan and Vivian Baker for Bombshell

A17936 [21-05-2024, 17:51:14]
[https://www.724press.com/culture-art/9433-?????????????-?????????-2020}

Figure 33 – Kazu Hiro receiving awards for his Hollywood makeup work.

The makeup artist applying the mask to the character above is world renowned makeup artist Kazu Shinohara Hiro who is known to reside near Los Angeles in Northridge Ca. The makeup artist began Kazu Studios in 1988. His work can be found at his website at kazustudios.com. He has received the following awards according to his website.

**2020 ACADEMY AWARDS OSCAR WINNER "BOMBSHELL"**

**2020 LOCAL 706 UNION AWARD WINNER "BOMBSHELL"**

**2020 BAFTA AWARD WINNER "BOMBSHELL"**

**2020 CRITICS' CHOICE AWARD WINNER "BOMBSHELL"**

**2020 GOLD DERBY AWARDS WINNER "BOMBSHELL"**

**2020 ONLINE FILM & TELEVISION ASSOCIATION WINNER "BOMBSHELL"**

**2020 AWARDS CIRCUIT COMMUNITY AWARDS WINNER "BOMBSHELL"**

**2020 CHICAGO INDIPENDENT FILM CRITICS CIRCLE AWARDS WINNER "BOMBSHELL"**

**2018 ACADEMY AWARDS OSCAR WINNER "DARKEST HOUR"**

**2018 LOCAL 706 UNION AWARD WINNER "DARKEST HOUR"**

**2018 BAFTA AWARD WINNER "DARKEST HOUR"**

**2018 CRITICS' CHOICE AWARD WINNER "DARKEST HOUR"**

**2018 JAPAN COMMISSIONER FOR CULTURAL AFFAIRS AWARD WINNER**

**2018 GQ MEN OF THE YEAR WINNER**

**2018 WIRED AUDI INNOVATION AWARD WINNER**

**2018 BURBANK INTERNATIONAL FILM FESTIVAL WINNER**

**2018 GOLD DERBY AWARDS WINNER "DARKEST HOUR"**

**2018 ONLINE FILM & TELEVISION ASSOCIATION WINNER "DARKEST HOUR"**

**2018 LOS ANGELES FILM FORUM AWARDS WINNER "THE HUMAN FACE"**

**2017 AWARDS CIRCUIT COMMUNITY AWARDS WINNER "DARKEST HOUR"**

**2017 ROME FILM AWARDS WINNER "THE HUMAN FACE"**

**2017 CHICAGO INDIPENDENT FILM CRITICS CIRCLE AWARDS NOMINEE "DARKEST HOUR"**

**2012 ONLINE FILM & TELEVISION ASSOCIATION NOMINEE "HEMINGWAY & GELLHORN"**

The investigator has analyzed the photo of Kazu Hiro with the Leonard Pozner photo above and finds that the image does not present any obvious flaws or touchups and therefore the investigator believes it to be authentic.



Figure 34- The photo of Kazu Hiro and the fake Leonard Pozner appears to be authentic.

Why would a man (Pozner)who is willing to allow a spread in People magazine and considers himself a celebrity need to have his face altered for a 60 minutes special? I find it highly suspicious that whoever this character is would need to take such drastic measures to conceal his identity.

Conclusions - Wolfgang Halbig appears to be correct that the Sandy Hook Pozner and the Madison Pozner are not the same person but probably wrong to think that the FL Pozner was yet a third impostor. Based upon my research, there are more than one person claiming to be "Leonard Pozner", which leads me to agree with Dr. Fetzer that attorneys in these cases may have suborned perjury by using an impostor witness.

It is also my opinion that photographs of Noah Pozner are actually Michael Vabner and his sister Danielle Vabner-Rogus at a younger age with perhaps a relative.

Sincerely,

Brian Davidson

Owner/Manager

Panoramic Investigations – TX License A17936

Notary Stamp

JENNIFER WASHBURN
Notary ID #130097054
My Commission Expires
January 29, 2027

Signature of Notary:

Date of Notarization: 5/28/2024

Notarization Expires: 1/29/2027

# EXHIBIT H:
## Fetzer Motion to Intervene
## Soto v. Bushmaster
## (September 16, 2021)

NO.  UWY-CV15 6050025 S                    :       SUPERIOR COURT

                                                                 State of Connecticut
DONNA L. SOTO,
ADMINISTRATRIX  OF THE ESTATE             :
OF VICTORIA L. SOTO, ET AL.

                                                                 COMPLEX LITIGATION

                                           :       DOCKET
V.


                                           :       AT WATERBURY
BUSHMASTER FIREARMS

INTERNATIONAL, LLC, ET AL.
                                           :       September 10, 2021


## MOTION OF JAMES H. FETZER TO INTERVENE

## and for EXTENSION OF TIME TO RETAIN CONNECTICUT LEGAL COUNSEL


NOW, COMES James H. Fetzer, Ph.D., pro se, to request permission to intervene in this case and for an extension of time, or in the alternative, for a court appointed local counsel, as follows:

1. I am the co-editor of the book, *Nobody Died at Sandy Hook: It was a FEMA drill to Promote Gun Control* (2015; 2ND ed. 2016).

2. In that book, I made the assertion that the Noah Pozner death certificate submitted by Leonard Pozner, one of the Plaintiffs in this case, was a fake.

3. Leonard Pozner sued me for defamation that resulted in two judgments against me for a total of 1.1 million dollars.  That case is currently the subject of a Petition for Review filed in the Wisconsin Supreme Court at consolidated case numbers 2020AP121 and 2020AP1570.

4. I have been injured by the Conn Supreme Court opinion entered in this case published at 331 Conn 53, 202 A. 3d 262, cert denied (2019) by the following:

1

*375*

"On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members. *65 Lanza carried out this massacre using a Bushmaster XM15-E2S semiautomatic rifle that was allegedly manufactured, distributed, and ultimately sold to Lanza's mother by the various defendants in this case. *There is no doubt that Lanza was directly and primarily responsible for this appalling series of crimes."* (emphasis added)

5. The above quote from the Conn Supreme Court was cited by the WI appellate court as authority for the conclusion that people died at Sandy Hook. I request judicial notice by this court that no answer has been filed by the Bushmaster defendants nor has any discovery be taken on the question of did 6 adults and 20 children die at Sandy Hook Elementary School on December 14, 2012.

6. My NJ legal co-counsel, at my direction, has requested all of the defense lawyers in this case and those representing the Remington bankrupt estate and its creditors to withdraw their settlement offers and proceed with a vigorous defense. All of them have ignored that request. Accordingly, I have deemed it urgent to intervene in this case even though I am not represented by legal counsel.

7. Because of the adverse results I sustained in the Wisconsin case brought against me by Leonard Pozner, I want to retain an attorney to anchor either or both of my attorneys pro hac vice to represent me in this case. I believe, with time, I will be able to find a Conn attorney for this limited purpose.

8. When I was originally served with the Pozner Complaint, I used my best efforts to retain legal counsel, but was unable to find an attorney to represent me within the time I was allowed to file my answer. I filed my answer pro se and proceeded to present my defense while also searching for an attorney to represent me. In spite of 50 attempts, I was not able to find a member of the Wisconsin Bar to represent me before the case was heard and subject to a Summary Judgment ruling, which I submit was not appropriate because the authenticity of the death certificate remained in dispute.

9. My efforts to find Wisconsin legal counsel were finally successful prior to the trial for damages. In relation to my appeals to the Court of Appeals and subsequently to the WI Supreme Court, where it stands today, I secured a New Jersey attorney to appear pro hac

2

123

vice to serve as co-counsel with my WI attorney. With time, I believe I can locate Conn legal counsel to effect similar arrangements.

10. It is my belief, subject to my payment of fees and costs, that one or both of my current attorneys will appear pro hac vice in this case provided they are introduced to the court by an Attorney qualified to practice law in Conn.

11. I read news reports that the Plaintiffs in this case have offered nine of the Plaintiffs a total of thirty-three million dollars to settle the case. The acceptance, court approvals, and payments of that exaggerated amount will leave the impression with the Wisconsin court that people died at Sandy Hook. The Plaintiffs have the burden to prove the truth of that finding. To go forward with the settlement without that proof would allow the Conn Supreme Court finding quoted above to remain. That would expose me to future litigation from other Sandy Hook alleged parents and work a fraud upon me.

JAMES H. FETZER, Ph.D., Pro Se

## CERTIFICATION OF SERVICE

On this 10th day of September, 2021, I hereby certify that a copy of the foregoing Motion to Intervene and for Extension of Time to Retain Legal Counsel has been emailed this day to all counsel of record as follows:

FOR THE PLAINTIFFS, Joshua D. Koskoff, Alinor C. Sterling and Jeffrey W. Wisner, KOSKOFF KOSKOFF & BIEDER, 350 Fairfield Avenue, Bridgeport, CT 06604 , Tel: (203) 336-4421 Fax: (203) 368-3244
jkoskoff@koskoff.com
asterling@koskoff.com
jwisner@koskoff.com

H. Christopher Boehning (*pro hac vice*)
Jacobus J. Schutte (*pro hac vice*)
1285 Avenue of the Americas
New York, NY 10019-6064

cboehning@paulweiss.com
jschutte@paulweiss.com

3

124

FOR THE DEFENDANTS

BUSHMASTER FIREARMS INTERNATIONAL LLC, A/K/A;
FREEDOM GROUP, INC., A/K/A;
BUSHMASTER FIREARMS, A/K/A;
BUSHMASTER FIREARMS, INC., A/K/A;
BUSHMASTER HOLDINGS, INC., A/K/A;
REMINGTON ARMS COMPANY, LLC, A/K/A;
REMINGTON OUTDOOR COMPANY, INC., A/K/A

Paul D. Williams, James H. Rotondo, Jeffrey P. Mueller, DAY PITNEY LLP
242 Trumbull Street Hartford, CT 06103
pdwilliams@daypitney.com
jhrotondo@daypitney.com
jmueller@daypitney.com

James B. Vogts (*pro hac vice*)
Andrew A. Lothson (*pro hac vice*)
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300 Chicago, IL 60611 jvogts@smbtrials.com
alothson@smbtrials.com

_____
James H. Fetzer, Ph.D.
800 Violet Lane
Oregon, WI 53575

(608) 835-2707
jfetzer@d.umn.edu

125

# EXHIBIT I:
Remington's Objection
Soto v. Bushmaster
(September 20, 2021)

No. X06-UWY-CV15-6050025-S : SUPERIOR COURT

DONNA L. SOTO, ADMINISTRATRIX OF : COMPLEX LITIGATION DOCKET
THE ESTATE OF VICTORIA L. SOTO, ET AL. :

v. : AT WATERBURY

:

BUSHMASTER FIREARMS
INTERNATIONAL, LLC, ET AL. : SEPTEMBER 20, 2021

### REMINGTON'S OBJECTION TO MOTION TO INTERVENE

Defendants Remington Arms Company, LLC and Remington Outdoor Company, Inc. (collectively, "Remington") hereby submit this objection to the Motion to Intervene (the "Motion") filed by *pro se* party James H. Fetzer (hereinafter "Fetzer") on September 10, 2021 (Entry No. 375.00).

Fetzer, who publicly asserts claims that the December 14, 2012 murders at Sandy Hook Elementary School did not happen, should not be permitted to intervene in this action. The defamation verdict against Fetzer, secured by one of the Plaintiffs in Wisconsin state court, does not create any interest sufficient to grant him the right to intervene here under Connecticut law. Fetzer's Motion, if granted, would present a distraction from the merits of the parties' claims and defenses in this litigation, and would only fuel baseless conspiracy theories.

### LEGAL STANDARD

Connecticut Practice Book Section § 9–18, and its analogue Rule 24 of the Federal Rules of Civil Procedure, apply where a third party seeks to intervene in a pending case. *See Rosado v. Bridgeport Roman Cath. Diocesan Corp.*, 60 Conn. App. 134, 139 (2000) (collecting cases in which Connecticut appellate courts have applied federal Rule 24). To intervene as of right, a party must establish four requirements: "[t]he motion to intervene must be timely, the moving party must have a direct and substantial interest in the subject matter of the litigation, the moving

127

party's interest must be impaired by disposition of the litigation without that party's involvement and the moving party's interest must not be represented adequately by any other party to the litigation." *Shansky v. New Haven Historic Dist. Comm'n*, No. CV196091604S, 2019 WL 4668336, at *1 (Conn. Super. Ct. Aug. 22, 2019) (quoting *Episcopal Church in the Diocese of Conn. v. Gauss*, 302 Conn. 386, 397 (2011)). Intervention will not be granted if a movant fails to satisfy any one of the four requirements. *Id.*

In determining whether intervention is warranted, courts "look to the pleadings, that is, to the motion ... to intervene and to the proposed complaint or defense in intervention, and ... accept the allegations in those pleadings as true. The question on a petition to intervene is whether a well-pleaded defense or claim is asserted." *Episcopal Church*, 302 Conn. at 398. "The inquiry is whether the claims contained in the motion, if true, establish that the proposed intervenor has a direct and immediate interest that will be affected by the judgment." *Kerrigan v. Comm'r of Pub. Health*, 279 Conn. 447, 457 (2006).

## ARGUMENT

Fetzer's Motion should be denied because he has failed to satisfy any of the requirements for intervention here. His claimed "injury" resulting from the Connecticut Supreme Court's recitation of the facts regarding the shootings by Adam Lanza on December 14, 2021 (Motion ¶ 5) fails to establish a "direct and immediate interest" in the subject matter of this litigation, particularly in light of his admission that his purported injury results from a jury verdict in Wisconsin, which was affirmed on appeal. (*See* Motion ¶ 5.) Neither that jury verdict nor any Wisconsin appellate decision would be affected by the outcome of this case. Thus, there is no possibility that this litigation will finally dispose of any of Fetzer's claimed interests, and there is simply no intersection between his interest in denying the basic facts of the shooting, and the

-2-

parties' interests in determining liability in this case. Fetzer's Motion also should be denied as untimely as it was filed nearly two years after the Wisconsin jury verdict in the defamation case brought against him. *See generally Pozner v. Fetzer*, Nos. 2020AP121 & 2020AP1570, 2021 WL 1031358 (Wis. Ct. App. Mar. 18, 2021). Thus, there is no basis in Connecticut law for permitting Fetzer to intervene here, and the Court should deny his Motion.

> DEFENDANTS REMINGTON ARMS COMPANY LLC AND REMINGTON OUTDOOR COMPANY, INC.
>
> By: */s/ James H. Rotondo*
> Jeffrey P. Mueller
> Paul D. Williams
> James H. Rotondo
> For: DAY PITNEY LLP
> 242 Trumbull Street
> Hartford, CT 06103
> Phone: (860) 275-0100
> Fax: (860) 275-0343
> Juris No. 014229
>
> James B. Vogts *(pro hac vice)*
> Andrew A. Lothson *(pro hac vice)*
> SWANSON MARTIN & BELL, LLP
> 330 North Wabash, #3300
> Chicago, IL 60611
> Phone: (312) 321-9100
> Fax: (312) 321-0990
>
> *Their Attorneys*

-3-

129

## CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record and Mr. Fetzer as follows:

Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner
KOSKOFF, KOSKOFF & BIEDER, P.C.
350 Fairfield Avenue
Bridgeport, CT 06604
jkoskoff@koskoff.com
asterling@koskoff.com
jwisner@koskoff.com

James Fetzer
800 Violet Lane
Oregon, WI. 53575


H. Christopher Boehning *(pro hac vice)*
Jacobus J. Schutte *(pro hac vice)*
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON, LLP
1285 Avenue of the Americas
New York, NY 10019-6064
cboehning@paulweiss.com
jschutte@paulweiss.com


/s/ *James H. Rotondo*
James H. Rotondo

-4-

130

# EXHIBIT J:
Fetzer Motion to Intervene
Remington Bankruptcy
(September 24, 2021)

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

In re:                                                    Chapter 11

REMINGTON OUTDOOR COMPANY
                                                          Case No. 20-81688-CRJ11

INC. et al.

                        Debtors                           Jointly Administered


**MOTION OF JAMES H. FETZER TO INTERVENE**

**AND FOR APPOINTMENT OF LOCAL ALABAMA LEGAL COUNSEL**

NOW, COMES James H. Fetzer, Ph.D., pro se, to request permission to intervene in this

case and for an extension of time to locate Alabama counsel to anchor my *own pro hac vice,* or in

the alternative, for a court-appointed local counsel for that purpose, as follows:

1. I am the co-editor of the book, *Nobody Died at Sandy Hook: It was a FEMA drill to Promote Gun Control* (2015; 2ND ed. 2016), which has thirteen contributors, including six Ph.D. (current or retired) professors. On 22 October 2015 we published our findings concluding that the school had been closed since 2008 and that the "shooting" had been a 2-day FEMA drill presented as mass murder to promote the Obama administration's gun control agenda. Amazon.com banned the book on 19 November 2021 even though it had sold nearly 500 copies in less than a month.

2. In that book, I made the assertion that the unsealed Noah Pozner death certificate uploaded to the web by Leonard Pozner, one of the Plaintiffs in the Soto v. Remington case, was a fake. Leonard Pozner sued me for libel regarding published statements of my belief that the unsealed death certificate was fake. I was blocked by the Dane

1

132

County, WI, Circuit Court to present proof that nobody died at Sandy Hook on the ground that, "Whether or not Sandy Hook ever happened or not is not relevant to this—the—the truthfulness or the accuracy of the death certificate", even though the death certificate stated the decedent had died at Sandy Hook Elementary on 14 December 2012 of "multiple gunshot wounds". A Summary Judgment was granted to Pozner against me which violated all summary judgment standards including discounting the only two document experts' reports in the case, both of which said the death certificate was fake. The Wisconsin Appellate Court affirmed the Circuit errors including the summary judgment errors. I have filed my Petition for Review where it is awaiting a ruling from the Wisconsin Supreme Court and available at consolidated case numbers 2020AP121 and 2020AP1570.

3.  When I sought an impeachment witness because I thought the person who testified as "Leonard Pozner" during a video deposition was an imposter, I was held in Contempt of Court and attorney fees were added to my liability in the amount of $650,000 which was more than the $450,000 awarded by a Madison jury selected for damages only.

4.  As the result of a process in which I was not allowed to present my defense (that nobody died at Sandy Hook) but where two forensic experts concluded that the death certificate was fake (which the Circuit Court simply set aside as "someone else's opinion"), I now have two judgments against me for a total of $1,100,000.

5.  I have also been injured by the Conn Supreme Court opinion published at 331 Conn 53, 202 A. 3d 262, cert denied (2019). Upon appeal of the exclusion of my evidence by the Wisconsin Circuit Court showing no one died at Sandy Hook, the Wisconsin Court of

2

133

Appeals (IV District) responded by citing that specific case as though it were judicial fact rather than the presumption it is:

> "On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members. *65 Lanza carried out this massacre using a Bushmaster XM15-E2S semiautomatic rifle that was allegedly manufactured, distributed, and ultimately sold to Lanza's mother by the various defendants in this case. *There is no doubt that Lanza was directly and primarily responsible for this appalling series of crimes.*" (emphasis added)

6. There has been no judicial determination of the truth and accuracy of that quoted summary above and there exists considerable irrefutable evidence to the contrary. According to the FEMA Manual, which we discovered and published in the book, the event was instead a "mass casualty exercise involving children" at Sandy Hook Elementary with "Exercise Date: 12/14/12." It was a FEMA exercise complete with restrooms and refreshments at the Firehouse, where the participants had to sign in with the controller upon arrival and were identified by color-coded nametags on lanyards during the drill. Even the FBI's US Crime Report for 2012 shows zero (0) murders or non-negligent manslaughters in Newtown, of which Sandy Hook is a subdivision.

7. When I learned of the proposed settlement between Remington and nine of the Sandy Hook parents, therefore, I immediately recognized that it was an insurance fraud and

3

published what I knew about it on my blog. I explained the enormity of the deception and added examples to prove my suspicions, including the FBI's US Crime Report for 2012, the staging of the iconic photo sent around the world (of what appears to be a police woman leading a line of children to safety, where there is an earlier photo that reveals a group of parents standing around while she rearranges the kids to get "a better shot"), and a demonstration that the official report on Sandy Hook (by Danbury States Attorney Stephen Sedensky III) fails to connect the alleged shooter to his alleged victims and the weapons he is supposedly used, which would fail to convict.

8. I therefore submitted a Motion to Intervene in the Soto v. Remington lawsuit on 10 September 2021 and the Superior Court Judge for the State of Connecticut issued an Order requesting objections to be filed by 20 September 2021 and my reply by 10 October 2021. The litigants replied on 20 September 2021, where both parties insisted that my involvement was unwarranted, even though I was emphatic that there had been no effort to answer the fundamental question; "Did 20 children and six adults die at Sandy Hook?" I replied on 22 September 2021 explaining why not only my interests were at stake but those of the stockholders and creditors of Remington, not to mention the enormous public interest in knowing the truth about Sandy Hook. The Superior Court promptly denied my Motion to Intervene on the ground that "The interests alleged by the proposed intervenor are insufficient for him to be brought in as a party."

9. I have been handicapped from the beginning of these legal proceedings, including my early inability to obtain a Wisconsin attorney to assist me until after the erroneous Summary Judgment had been granted against me by the Circuit Court, which I am confident would not have happened had I been represented. I was relieved to have

4

135

obtained legal representation since, where a New Jersey attorney joined my Madison attorney *pro hac vice* for the Petition for Review to the Wisconsin Supreme Court. I moved for the Connecticut court to appoint a local counsel for the sole purpose of anchoring one or both of my attorneys in Connecticut for my intervention. The most informative response I received from one attorney was that she knew no one "with the guts and nuts" to take this on.

10. It is my belief, subject to my payment of fees and costs, that one or both of my current attorneys will appear *pro hac vice* in this case provided they are introduced to the court by an Attorney qualified to practice law in Alabama. I also believe that it would expedite justice for this Court to make an appointment of local counsel, where their participation would be involuntary and, accordingly, they would not have to bear the burden of criticism for having association with a "Sandy Hook skeptic".

11. The importance of judicially proving the alleged Sandy Hook Shooting took place on 12/14/12 ought to be obvious even to non-litigants in this case. To go forward with the settlement without that proof would allow the Connecticut Supreme Court finding quoted above to remain. That would expose me to future litigation from other Sandy Hook alleged parents and work a fraud upon me.

12. The Bankruptcy Plan Administrator is not properly supervising the Soto case by approving the $33 million settlement without demanding discovery and requiring the Plaintiffs to prove six adults and twenty children died at Sandy Hook. The inference from the exorbitant size of the settlement offered would cause the public to draw the wrong conclusion while they are ignorant of the voluminous, specific, and detailed evidence to the contrary.

136

13. There is a growing movement that laws should be passed in every state that will not permit the sealing or redaction of any evidence in cases that are used to commit another crime of greater import, namely: the disarmament of the American people against the 2nd Amendment. If a shooting is never used for that purpose, the crime reports may remain sealed for the grieving. The "Sandy Hook School Shooting" is constantly cited in advertisements for disarmament in violation of the 2nd Amendment. And the same is used to ruin gun manufacturers against the law of the land. Under these circumstances all the evidence should be made public. The outrageous $33,000,000 payoff without determining if the crime even took place will only harden what might be one of the greatest deceptions in history. Who really wants to be a part of that?

For these and other good reasons, I respectfully request that this Motion be granted.

JAMES H. FETZER, Ph.D., Pro Se

## CERTIFICATION OF SERVICE

On this 24th day of September, 2021, I hereby certify that a copy of the foregoing Motion to Intervene and for Extension of Time to Retain Legal Counsel has been emailed this day to all counsel of record as follows:

**O'MELVENY & MYERS LLP**
Co-Counsel for the Debtors and
Debtors in Possession
400 South Hope Street
Los Angeles, CA 90071-2899
**Rachel S. Janger**
**rjanger@omm.com**

**BURR & FORMAN LLP**
Co-Counsel for the Debtors and
Debtors in Possession
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
**D. Christopher Carson**
**ccarson@burr.com**

6

137

**FOX ROTHSCHILD LLP**
Co-Counsel for the Committee
345 California Street, Suite 2200
San Francisco, CA 94104
**Michael G. Menkowitz**
**mmendowitz@foxrothschild.com**

**BAKER, DONELSON, BEARMAN,**
**CALDWELL & BERKOWITZ, PC**
Co-Counsel for the Committee
420 20th Street North, Suite 1400
Birmingham, AL 35203
**Matthew M. Cahill**
**mcahill@bakerdonelson.com**

James H. Fetzer, Ph.D., Pro Se
800 Violet Lane.
Oregon, WI 53575

(608) 354-4280
jfetzer@d.umn.edu

7

138

# EXHIBIT K:
## Donna Soto also played Susan Bro in Charlotteville

# Sandy Hook families settle for $73M with gun maker Remington

By DAVE COLLINS    February 15, 2022





*The mother of alleged victim Heather Heyer.
But have we not seen this woman before?*



*We let the two images overlap eachother +
change the transparency = A perfect match*



*Please compare with this 'Sandy Hook-mother*



*So it seems like Susan Bro, mother of Heather
Heyer, and Donna Soto is the same crisis actor*

# EXHIBIT L:

# Sandy Hook "truther" arrested after confronting victim's younger sister at a race to say deadly shooting was "staged" and that her hero sister never even existed (November 11, 2015)

# Sandy Hook 'truther' arrested after confronting victim's younger sister at a race to say deadly shooting was 'staged' and that her hero sister never even existed

- Matthew Mills, 32, was arrested Saturday after getting into a confrontation with a Sandy Hook victim's family
- The Brooklyn man ran in the Vicki Soto 5K run in Stratford, Connecticut and confronted the namesake's younger sister at the end of the race
- Vicki Soto was a heroic first-grade teacher who gave her life trying to protect her students from crazed gunman Adam Lanza
- Police say Mills told the family the shooting was 'staged'; he claims he just 'politely' asked a question
- Mills was charged with trespassing and posted $10k bail after being booked; he is set to appear in court later this month

By ASHLEY COLLMAN FOR DAILYMAIL.COM

PUBLISHED: 08:21 EDT, 11 November 2015 | UPDATED: 14:14 EDT, 11 November 2015

       **133** shares  69 View comments

A Sandy Hook 'truther' entered a charity race in memory of one of the victims over the weekend, just to confront the woman's grieving family with hurtful and bizarre conspiracy theories.

Matthew Mills, 32, was arrested Saturday, after barraging victim Victoria Soto's younger sister at the Vicki Soto 5K run in Stratford, Connecticut.



Police say the Brooklyn, New York man yelled at the victim's family, saying the shooting was 'staged'. Mills himself claims he politely asked Jillian Soto, 27, a question, and that the situation has become overblown.



**Truther: Matthew Mills, 32, was arrested on Saturday after crashing a charity race in memory of a Sandy Hook victim to confront her grieving family with a conspiracy theory about the mass shooting which killed 26**

Vicki Soto was 27 years old in December 2012 when crazed gunman Adam Lanza invaded the Sandy Hook Elementary school  and targeted her first-grade classroom. Soto has become a hero of the day in accounts from witnesses, who say she gave her life trying to keep Lanza from her classroom.

Tragically, Lanza killed her before she was able to save her entire class. Five of the 16 children in Soto's class were among the 26 people killed at Sandy Hook.

But Mills believes that this was all a hoax and he ran in Saturday's race for a chance to confront Soto's family with what he believes is the truth.



**Victim: Victoria Soto has been considered a hero of the shooting for bravely giving her life in an attempt to save her first-grade pupils**

Police say Mills ran up to Vicki Soto's younger sister Jillian and shoved a picture of Vicki in her face - yelling that not only did the shooting never happen but that Vicki herself never existed.

Jillian and another sister were reportedly left shaken from the incident.

In an interview with the **New York Daily News**, Mills contested the police account of events, saying that he signed up for the 5K to 'politely' ask Soto's family a question about whether a picture of Soto sitting on a rock at the beach had been photo-shopped.

'I went to the race to specifically talk to her, but I waited until the end, and I donated also,' Mills said. 'They're making me out to be a bad guy. I just asked one question.'

The man who claims he is a 'journalist' says he was 'soft spoken' when he spoke with Jillian Soto at the race and didn't mean to offend anyone.

'I try not to speculate. There are shootings all the time with no conspiracies related to them. But this conspiracy about the photo has really caught on online. ...People say the rocks don't match up, the shadows don't match up.'




© Stratford Police

© Facebook

**Charges: Mills is due back in court on November 17 for a hearing. He faces charges of trespassing and breach of peace. On the right, Jillian Soto**

After the confrontation, Mills ran from cops but was arrested soon after and booked on charges of trespassing and breach of peace.

He was released on $10,000 bail and is due back in court for his first hearing on November 17.

This isn't the first time Mills has gotten into trouble for his unorthodox beliefs.

Mills crashed a Super Bowl post-game press conference in 2014, and was arrested when he took the microphone away from Seattle Seahawks linebacker Malcolm Smith to spew his speculations about the 9/11 terrorist attacks.

'Investigate 9/11,' Mills said before the microphone was taken back. '9/11 was perpetrated by people within our own government.'



Hero Sandy Hook teacher Vicki Soto laid to rest in 2012

0:00 / 1:15

**Share or comment on this article: Sandy Hook 'truther' Matthew Mills arrested after confronting victim's sister**

# EXHIBIT M:

Third Amended Complaint

August 18, 2021)

NO.   X06 CV15 6050025 S                :          SUPERIOR COURT
                                        :
DONNA L. SOTO, ADMINISTRATRIX          :
OF THE ESTATE OF                        :          COMPLEX LITIGATION
VICTORIA L. SOTO, ET AL.                :          DOCKET
                                        :
V.                                      :          AT WATERBURY
                                        :
BUSHMASTER FIREARMS                     :
INTERNATIONAL, LLC, ET AL.              :          AUGUST 18, 2021

## THIRD AMENDED COMPLAINT

### COUNT ONE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Victoria L. Soto v. Remington)

1.      This is a civil action for damages and injunctive relief stemming from the shooting at Sandy Hook Elementary School on December 14, 2012.

2.      Defendant Bushmaster Firearms, also known as B.F.I. and B.F.I., Inc., was a Maine corporation created in 1973 and located in Windham, Maine. At all relevant times, Bushmaster Firearms manufactured, marketed and sold AR-15s.

3.      Defendant Bushmaster Firearms, Inc. was another Maine corporation that manufactured, marketed and sold AR-15s. Upon information and belief, Bushmaster Firearms, Inc. manufactured, marketed and sold AR-15s.

4.      Defendant Bushmaster Firearms International, LLC was a Delaware corporation that was formed in 2006. (When originally created, it was named Rambo Acquisition, LLC.) According to corporate filings, Bushmaster Firearms International, LLC was merged into Remington Arms Company, LLC in 2011.

5.      At all relevant times, Bushmaster Firearms International, LLC manufactured, marketed and sold AR-15s.

6.      Upon information and belief, Bushmaster Firearms International, LLC manufactured the XM15-E2S that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

7.      Defendant Remington Arms Company, LLC is a Delaware limited liability corporation. Defendant Bushmaster Firearms International, LLC was merged into Defendant Remington Arms Company, LLC in 2011. At all relevant times, Remington Arms Company, LLC manufactured, marketed and sold AR-15s.

1

150

8.      Defendant Bushmaster Holdings, LLC was incorporated in 2006 and operated as a holding company for Bushmaster Firearms International, Inc. Bushmaster Holdings, LLC merged into Freedom Group, Inc. in 2009.

9.      Defendant Freedom Group, Inc., which is also sometimes called Freedom Group and Freedom Group, LLC is a Delaware corporation originally formed under another name in 2007. Freedom Group, Inc. is one of the world's largest manufacturers and dealers in firearms, ammunition, and related accessories.

10.     Upon information and belief, from 2006 on, Freedom Group, Inc. controlled, marketed and sold the Bushmaster brand. Upon information and belief, during this time period Freedom Group, Inc. sold Bushmaster brand products directly to retail stores.

11.     Defendant Remington Outdoor Company, Inc. is a corporation formed in 2009 that is engaged in the business of manufacturing, marketing and selling AR-15s. Freedom Group, Inc., which upon information and belief at all relevant times controlled the Bushmaster brand, was renamed Remington Outdoor Company, Inc.

12.     Upon information and belief, Defendants Bushmaster Firearms; Bushmaster Firearms, Inc.; Bushmaster Firearms International, LLC; Remington Arms Company, LLC; Bushmaster Holdings, LLC; Freedom Group, Inc.; and Remington Outdoor Company, Inc. are functionally one entity and are hereinafter referred to as "Remington."

13.     Remington manufactured, marketed and sold firearms and ammunition under the Bushmaster brand name.

14.     Remington manufactured, marketed and sold the Bushmaster XM15-E2S rifle that was used in the shooting at Sandy Hook Elementary School on December 14, 2012.

15.     On February 7, 2013, Plaintiff Donna L. Soto was appointed Administratrix of the Estate of Victoria Leigh Soto. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit A.

16.     On December 3, 2014, Plaintiffs Ian and Nicole Hockley were appointed Co-Administrators of the Estate of Dylan Christopher Jack Hockley. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit B.

17.     On December 4, 2014, Plaintiff David C. Wheeler was appointed Administrator of the Estate of Benjamin A. Wheeler. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit C.

18.     On January 22, 2013, Plaintiff Mary A. D'Avino was appointed Administratrix of the Estate of Rachel Marie D'Avino a/k/a Rachel M. D'Avino. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit D.

2

151

19. On December 8, 2014, Plaintiffs Mark and Jacqueline Barden were appointed Co-Administrators of the Estate of Daniel G. Barden. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit E.

20. On March 7, 2013, Plaintiff William D. Sherlach was appointed Executor of the Estate of Mary Joy Sherlach. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit F. Mr. Sherlach also brings this action in his individual capacity for loss of consortium.

21. On December 9, 2014, Plaintiffs Neil Heslin and Scarlett Lewis were appointed Co-Administrators of the Estate of Jesse McCord Lewis. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit G.

22. On December 10, 2014, Plaintiff Leonard Pozner was appointed Administrator of the Estate of Noah Samuel Pozner. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit H. On September 14, 2021, Plaintiff Veronique De La Rosa was appointed Co-Administrator of the Estate of Noah Samuel Pozner. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit H-1.

23. On January 3, 2013, Plaintiff Gilles J. Rousseau was appointed Administrator of the Estate of Lauren G. Rousseau. A copy of the fiduciary certificate is attached hereto as Plaintiffs' Exhibit I.

## REMINGTON'S MARKETING AND PROMOTION OF ITS AR-15S VIOLATED THE CONNECTICUT UNFAIR TRADE PRACTICES ACT

24. Born out of the exigencies of modern combat, the AR-15 was designed for the United States Military to be used in combat.

25. The AR-15 was designed with features that were chosen to maximize casualties and engineered to deliver maximum carnage with extreme efficiency on the battlefield.

26. The AR-15's combination of features resulted in a weapon so lethal that the United States Military adopted the AR-15 as its standard-issue service rifle, renaming it the M16.

27. The AR-15 remains the United States Military's weapon of choice today.

28. Remington is the largest purveyor of AR-15s to the civilian market.

29. Remington's AR-15s, including the Bushmaster XM15-E2S, maintain the design, functionality and appearance of its military counterpart, the M16.

30. AR-15s have become the weapon of choice for mass shooters.

31. Remington marketed its AR-15s, including the XM15-E2S, by promoting their militaristic and assaultive uses.

3

152

32.    Remington's militaristic marketing promoted the image of its AR-15s as combat weapons used for the purpose of waging war and killing human beings.

33.    Remington marketed its sporting and competition rifles with five- and ten-round magazines while marketing its AR-15 rifles with thirty-round magazines.

34.    Remington's marketing glorified the lone gunman.

35.    Remington's marketing promoted lone gunman assaults.

36.    Remington's marketing glorified the military design, functionality and appearance of its AR-15s.

37.    Remington's marketing promoted its AR-15s for mass casualty assaults.

38.    Remington's marketing promoted criminal use of its AR-15s by its target market.

39.    Remington's marketing targeted high-risk users.

40.    Remington marketed its AR-15s knowing that they would be accessed by unscreened consumers.

41.    Remington continued to market AR-15s in the manner set forth in this complaint despite evidence of their increasing use in mass shootings.

42.    Remington marketed its AR-15s without regard for public safety.

43.    Remington's marketing was unethical.

44.    Remington's marketing was immoral.

45.    Remington's marketing was unscrupulous.

46.    Remington's marketing was oppressive.

47.    Remington's marketing was reckless.

48.    Remington marketed in the above manner directly and through third parties.

49.    Remington's conduct, as set forth above, occurred prior to and continued through December 14, 2012, and after.

50.    Remington's conduct as previously alleged, in whole or in part, constituted a knowing violation of the Connecticut Unfair Trade Practices Act, Connecticut General Statutes Section 42-110a *et seq*.

4

153

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Victoria Soto.

52.    On December 14, 2012, Victoria Soto suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Victoria Soto, the Estate of Victoria Soto incurred funeral expenses to its financial loss.

### COUNT TWO: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Dylan C. Hockley v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Dylan C. Hockley.

52.    On December 14, 2012, Dylan C. Hockley suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Dylan C. Hockley, the Estate of Dylan C. Hockley incurred funeral expenses to its financial loss.

### COUNT THREE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Mary Joy Sherlach v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Mary Joy Sherlach.

5

154

52. On December 14, 2012, Mary Joy Sherlach suffered the following injuries and losses:

    a. Terror;
    b. ante-mortem pain and suffering;
    c. destruction of the ability to enjoy life's activities;
    d. destruction of earning capacity; and
    e. death.

53. As a result of the injuries and death of Mary Joy Sherlach, the Estate Mary Joy Sherlach incurred funeral expenses to its financial loss.

**COUNT FOUR: Loss of Consortium**
**(William D. Sherlach v. Remington)**

1.-50. Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51. Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering, and death of Mary Joy Sherlach.

52. At all times mentioned herein, the plaintiff William D. Sherlach was the husband of Mary Joy Sherlach.

53. As a result of the aforesaid occurrences to Mary Joy Sherlach, the plaintiff William Sherlach has been deprived of the companionship and society of his wife, all to his damage.

**COUNT FIVE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade**
**Practices Act**
**(Estate of Noah S. Pozner v. Remington)**

1.-50. Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51. Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Noah S. Pozner.

52. On December 14, 2012, Noah Pozner suffered the following injuries and losses:

    a. Terror;
    b. ante-mortem pain and suffering;
    c. destruction of the ability to enjoy life's activities;
    d. destruction of earning capacity; and
    e. death.

53. As a result of the injuries and death of Noah S. Pozner, the Estate of Noah S. Pozner incurred funeral expenses to its financial loss.

6

## COUNT SIX: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Lauren E. Rousseau v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Lauren E. Rousseau.

52.    On December 14, 2012, Lauren E. Rousseau suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Lauren E. Rousseau, the Estate of Lauren E. Rousseau incurred funeral expenses to its financial loss.

## COUNT SEVEN: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Benjamin A. Wheeler v. Remington)

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Benjamin A. Wheeler.

52.    On December 14, 2012, Benjamin A. Wheeler suffered the following injuries and losses:

    a.  Terror;
    b.  ante-mortem pain and suffering;
    c.  destruction of the ability to enjoy life's activities;
    d.  destruction of earning capacity; and
    e.  death.

53.    As a result of the injuries and death of Benjamin A. Wheeler, the Estate of Benjamin A. Wheeler incurred funeral expenses to its financial loss.

7

156

## COUNT EIGHT: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Jesse McCord Lewis v. Remington)

1.-50.   Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.   Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Jesse McCord Lewis.

52.   On December 14, 2012, Jesse McCord Lewis suffered the following injuries and losses:

    a.   Terror;
    b.   ante-mortem pain and suffering;
    c.   destruction of the ability to enjoy life's activities;
    d.   destruction of earning capacity; and
    e.   death.

53.   As a result of the injuries and death of Jesse McCord Lewis, the Estate of Jesse McCord Lewis incurred funeral expenses to its financial loss.

## COUNT NINE: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act
### (Estate of Daniel G. Barden v. Remington)

1.-50.   Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.   Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Daniel G. Barden.

52.   On December 14, 2012, Daniel G. Barden suffered the following injuries and losses:

    a.   Terror;
    b.   ante-mortem pain and suffering;
    c.   destruction of the ability to enjoy life's activities;
    d.   destruction of earning capacity; and
    e.   death.

53.   As a result of the injuries and death of Daniel G. Barden, the Estate of Daniel G. Barden incurred funeral expenses to its financial loss.

8

157

**COUNT TEN: § 52-555 Wrongful Death/Violation of Connecticut Unfair Trade Practices Act**
**(Estate of Rachel M. D'Avino v. Remington)**

1.-50.    Plaintiffs hereby incorporate and reallege as if fully set forth herein Paragraphs 1-50 of Count One.

51.    Remington's conduct as previously alleged was a substantial factor resulting in the injuries, suffering and death of Rachel M. D'Avino.

52.    On December 14, 2012, Rachel M. D'Avino suffered the following injuries and losses:

    a. Terror;
    b. ante-mortem pain and suffering;
    c. destruction of the ability to enjoy life's activities;
    d. destruction of earning capacity; and
    e. death.

53.    As a result of the injuries and death of Rachel M. D'Avino, the Estate of Rachel M. D'Avino incurred funeral expenses to its financial loss.

158

WHEREFORE, THE PLAINTIFFS CLAIM DAMAGES IN EXCESS OF FIFTEEN THOUSAND DOLLARS AND THE FOLLOWING RELIEF AS FURTHER SET FORTH BELOW:

Plaintiffs seek relief as follows:

    A.    Monetary damages;

    B.    Punitive damages;

    C.    Attorneys' fees;

    D.    Costs.

This matter is within the jurisdiction of this court.

Dated at Bridgeport, Connecticut, this 18th day of August, 2021.

THE PLAINTIFFS,

By:    /s/ Joshua D. Koskoff
        Joshua D. Koskoff
        Alinor C. Sterling
        Jeffrey W. Wisner
        KOSKOFF KOSKOFF & BIEDER, PC
        350 Fairfield Avenue
        Bridgeport, CT 06604
        Tel. (203) 336-4421
        Fax: (203) 368-3244
        jkoskoff@koskoff.com
        asterling@koskoff.com
        jwisner@koskoff.com

        H. Christopher Boehning (*pro hac vice*)
        Jacobus J. Schutte (*pro hac vice*)
        1285 Avenue of the Americas
        New York, NY 10019-6064
        cboehning@paulweiss.com
        jschutte@paulweiss.com

        *Their Attorneys*

11

## <u>CERTIFICATION OF SERVICE</u>

This is to certify that a copy of the foregoing has been emailed this day to all counsel of record as follows:

**COUNSEL FOR:**

BUSHMASTER FIREARMS INTERNATIONAL LLC, A/K/A;
FREEDOM GROUP, INC., A/K/A;
BUSHMASTER FIREARMS, A/K/A;
BUSHMASTER FIREARMS, INC., A/K/A;
BUSHMASTER HOLDINGS, INC., A/K/A
REMINGTON ARMS COMPANY, LLC, A/K/A;
REMINGTON OUTDOOR COMPANY, INC., A/K/A

Paul D. Williams
James H. Rotondo
Jeffrey P. Mueller
DAY PITNEY LLP
242 Trumbull Street
Hartford, CT 06103
pdwilliams@daypitney.com
jhrotondo@daypitney.com
jmueller@daypitney.com

James B. Vogts (*pro hac vice*)
Andrew A. Lothson (*pro hac vice*)
SWANSON MARTIN & BELL, LLP
330 North Wabash, #3300
Chicago, IL 60611
jvogts@smbtrials.com
alothson@smbtrials.com

/s/ *Joshua D. Koskoff*
Joshua D. Koskoff
Alinor C. Sterling
Jeffrey W. Wisner

12

161

UNITED STATES
INTERNAL REVENUE SERVICE

JAMES H. FETZER and          )
WILLIAM S. SCOTT             )
                             )  Claim Number
          Whistleblowers     )
_____)

ADDITIONAL FACTS AND ARGUMENT TO BE CONSIDERED ON FORM
211 FOR AN AWARD OF THE SHARE OF THE TAX COLLECTED FROM
THE SANDY HOOK FRAUD CULPRITS

NOW, COMES, James H. Fetzer, Ph.D. ("Dr. Fetzer") and William S. Scott,

("Scott")(Dr. Fetzer and Scott are hereinafter "Whistleblowers"), pro se, to supply

additional facts and argument to be considered during the review of their Form 211

for their claims against Remington Outdoor Company, Inc. and Soto, et al.,

coconspirators, as follows:

1. Attached are the first four pages of the docket for the case of Soto, et al., v

   Bushmaster, et al,  before the Connecticut Superior Court at Waterbury, CT. at

   case number UWY-CV-15-6050025-S to identify the Soto, et al., and Remington,

   et al., culprits in the false claims that a Bushmaster AR-15 was used to murder

   and injure adults and children at Sandy Hook Elementary School, Newtown, CT,

   on December 14, 2012. (Appendix 1)

2. No ballistic evidence was taken from the crime scene to prove which victims, if

   any, were murdered by shots fired from an AR-15.  Neither Bushmaster nor

   Remington offered any defense to the assertion an AR-15 was used to kill any of

   the alleged victims.

3. Attached are the first two pages of the docket for the Remington Outdoor Company, Inc. bankruptcy to identify the culprits responsible for the no effort to defend the Soto, et al, claims that an AR-15 was used by the alleged killer at Sandy Hook. (See **Appendix 2.**)

4. Remington served nine requests for admissions that were the same except for the name of the claimant and each claimant filed objections and answers that were the same. The Pozner response of July 22, 2016, that is the same except for the name of the responder for all other eight claimants (See **Appendix 3**).

5. On July 27, 2021, Remington made offers of compromise of $3,660,000 to each of the nine Soto, et al, claimants. (See **Appendix 4.**)

6. On November 27, 2018, Leonard Pozner, a Plaintiff with the Soto, et al, claimants against Bushmaster, brought an action for defamation against Dr. Fetzer, et al, in the Wisconsin Circuit Court, Dane County, at case number 2018CV003122, and assigned to Judge Frank D. Remington to contend that the declaration by Dr. Fetzer at page 181 of his book, *Nobody Died at Sandy Hook, it was a FEMA drill to promote gun control*, Moon Rock Books, Crestview, FL 32536, (2015; 2nd ed., 2016), ISBN 978-0-692-64417-1 (and three other places)—that the incomplete death certificate for Noah Pozner is fake—was defamatory.

7. Since truth is an absolute defense to defamation, the plaintiff (Pozner) had the burden of proof to demonstrate that the death certificate was not fake to show that Dr. Fetzer's assertions were false.

2

8. Pozner made a jury demand that once made inures to the benefit of Dr. Fetzer.

9. A complete death certificate attached to the complaint was different from the copy Dr. Fetzer published in his book. Both death certificates would have to be identical for Summary Judgement to be available. Unless Pozner can prove the published copy in the book is genuine, a disputed fact exists.

10. To add insult to injury, Judge Remington allowed two different additional copies of the Pozner fake death certificate into evidence prior to Oral Hearing—and a fifth to be introduced without advance notice to Dr. Fetzer—during the Oral Hearing.

11. On June 17, 2019, Judge Remington entered a summary judgment that was confirmed by written order entered on August 18, 2019, finding the Pozner death certificate to be genuine in the face of more than four different death certificates being admitted into evidence. Fetzer submitted two expert witness affidavits that all four different copies of the death certificate in evidence prior to the Oral Hearing were fake, including both the version published by Dr. Fetzer in his book and the different version Pozner attached to his Complaint.

12. In his finding, Judge Remington called the expert witness affidavits as "just another opinion".

13. On July 11, 2019, Dr. Fetzer petitioned to file an interlocutory appeal of the Summary Judgement to the Wisconsin Appellate Court at case number 2019AP001249-LV that was denied on August 9, 2019..

3

14. During discovery, Judge Remington awarded Pozner attorney fees against Dr. Fetzer of $650,000 for contempt of a court for breach of a ban on circulation of the video deposition of Pozner to determine if the party who testified under oath in Madison, WI, as "Leonard Pozner" was the same "Leonard Pozner" who was at the alleged Sandy Hook crime scene.

15. Dr. Fetzer appealed the $650,000 award to the Wisconsin Court of Appeals, District IV at case number 2020AP1570.

16. After entry of the summary judgement, a jury selected for the sole purpose to establish damages awarded Pozner an additional $450,000.

17. Dr. Fetzer appealed the summary judgment and post-trial findings to the WI appellate court at case number 2020AP121 and the contempt of court finding for breach of a confidentiality order at 2020AP1570. They were consolidated for review and all lower court judgements were affirmed by decision dated March 18, 2021.

18. In its Opinion/Decision the WI Appellate Court Judges Michael R. Fitzpatrick, Brian W. Blanchard, and JoAnne F. Kloppenburg stated:

**BACKGROUND**

¶3 The following material facts are taken from the summary judgment submissions and trial testimony, as discussed in more detail in the Discussion section of this opinion. There is no reasonable dispute regarding the following facts.

¶4 On December 14, 2012, a mass shooting occurred at Sandy Hook Elementary School in Newtown, Connecticut.3 Tragically, twenty-six people were killed, including six staff members and twenty children who

4

were aged six and seven. *See, e.g.,* ***Jones v. Heslin***, No. 03-19-00811-CV, 2020 WL 1452025, at *1, *4 (Tex. Ct. App. Mar. 25, 2020) (stating "Neil Heslin's son … was killed in the Sandy Hook Elementary School Shooting in December 2012" and rejecting the substantial truth doctrine as a basis to dismiss Heslin's defamation claim related to statements disputing Heslin's assertion that he held his deceased son in his arms); ***Soto v. Bushmaster Firearms Int'l, LLC***, 202 A.3d 262, 272 (Conn. 2019) ("On December 14, 2012, twenty year old Adam Lanza forced his way into Sandy Hook Elementary School in Newtown and, during the course of 264 seconds, fatally shot twenty first grade children and six staff members, and wounded two other staff members."). Pozner's six-year-old son, N., was one of the children killed during the Sandy Hook shooting.

See *Pozner v. Fetzer*, Nos. 2020AP121, 2020AP1570, unpublished slip op. (WI App March 18, 2021) (affirming circuit court's grant of partial summary judgment and affirming post-judgment order awarding remedial sanctions for contempt), rev. denied, 2022 WI 87, 989 N.W.2d 117 (Feb. 16, 2022) (unpublished table decision), cert. denied, 143 S. Ct. 137 (2022) (mem.), and reh'g denied, 143 S. Ct. 517 (2022) (mem.).

19. Matthew Mills, 32, was arrested on November 7, 2015, after he asked the purported sister of Victoria Soto, who reportedly died during the Sandy Hook event attempting to save her 1st grade students, if this picture is real or fake:



20. Mills said, 'I went to the race to specifically talk to her, but I waited until the end, and I donated also. They're making me out to be a bad guy. I just asked one

question. 'I try not to speculate. There are shootings all the time with no conspiracies related to them. But this conspiracy about the photo has really caught on online. … People say the rocks don't match up, the shadows don't match up.

21. In addition, the below attempt to correct the first image raises additional doubts of the accuracy of either picture:



Note the differences in cheeks, jaw, body shape, length, and knees.

22. Mills was forced to accept a plea bargain. How that works, the prosecutor loads up the number of charges to expose the defendant with numerous years in jail if convicted. The defense attorney then tells the accused he is in serious trouble and extracts a large legal retainer. Then the prosecutor offers the defendant the opportunity to plead he would be convicted if tried or guilty of a lessor offense.

23. The prosecutor, Assistant State's Attorney Craig Nowak, sought to send Mills to prison for a year with two years' probation.

6

24. Connecticut Superior Court Judge William Holden suspended the one year in prison and released Mills on two years' probation and an order to stay away from the Soto family.

## ARGUMENT

The Sandy Hook fraud required the co-operation of the U.S, Supreme Court, of the U.S. Bankruptcy Court for the Northern District of Alabama, and of the trial and appellate courts for the States of Connecticut, Florida, Texas, and Wisconsin.

To accomplish this massive fraud required control of the case selection process in each of those courts. U.S. Government operatives responsible for preservation of the false Sandy Hook narrative selected the trial and appellate judges, including the Justices of the Supreme Court, who would decide Sandy Hook without regard to the facts and applicable law. Each of the Judges selected were promised there would be no findings of judicial impropriety, misconduct, or other remedies against them for ruling on Sandy Hook in a manner that is consistent with the official government narrative that adults and children were murdered with guns, particularly an AR-15, on December 14, 2014.

The States of Connecticut, Florida, Texas and Wisconsin have participated in the Sandy Hook hoax. The deck is stacked against litigants who speak out against the official Sandy Hook narrative.

WI Appellate Court Judges Michael R. Fitzpatrick, Brian W. Blanchard, and JoAnne F. Kloppenburg committed extrinsic fraud against the court when they ruled that "On December 14, 2012, a mass shooting occurred at Sandy Hook Elementary

7

School in Newtown, Connecticut.₃ Tragically, twenty-six people were killed, including six staff members and twenty children who were aged six and seven". To the contrary, as evidenced by this 211 filing, there is abundant and compelling evidence the claim adults and children actually died is false. Most notably, the issue has never been adjudicated.

The cases cited--*Jones v. Heslin*, No. 03-19-00811-CV, 2020 WL 1452025, at *1, *4 (Tex. Ct. App. Mar. 25, 2020) and *Soto v. Bushmaster Firearms Int'l, LLC*, 202 A.3d 262, 272 (Conn. 2019)—were decided on procedural grounds. They were not submitted to a jury for a decision on the merits. Neither was the Jones case in Texas nor the Fetzer case in Wisconsin.

Extreme measures were adopted to ensure that proof it had been a FEMA drill presented as mass murder to promote gun control did not receive public attention. The noted attorney, Robert Barnes, has just composed a video about what really happened to Alex Jones, explaining that it had nothing to do with money and everything to do with censorship and suppression of evidence that contradicts the official narrative (https://www.infowars.com/posts/sandyhook-lawyer-exposes-what-really-happened-to-alex-jones).

The ignorance of the WI Court of Appeals (IV) judges, moreover, is illustrated by their own citation, which includes *See, e.g., Jones v. Heslin*, No. 03-19-00811-CV, 2020 WL 1452025, at *1, *4 (Tex. Ct. App. Mar. 25, 2020) (stating "Neil Heslin's son ... was killed in the Sandy Hook Elementary School Shooting in December 2012" and rejecting the substantial truth doctrine as a basis to dismiss Heslin's defamation claim related to

8

statements disputing Heslin's assertion that he held his deceased son in his arms). As every serious student of Sandy Hook is well aware, Heslin's assertion to have "held his deceased son in his arms" contradicts the report of Wayne Carver, M.D., that the parents were not allowed to come into contact with their dead children but rather identified them on the basis of photographs. Dr. Carver made these assertions during a press conference on December 15, 2012, and can be observed making them at https://www.youtube.com/watch?v=DVLCSqoZYqY.

As Dr. Fetzer has observed, it was appropriate, since most of them only existed in the form of photographs. Noah Pozner, for example, is a fiction created out of photos of his purported older half-brother, Michael Vabner, as a child. Dr. Fetzer has explained and proven this elsewhere, including that he has been in communication with two of the Sandy Hook participants, Margaret Alice Cottle (who was cast as "Emilie Parker") and Victoria Aurelia (who was cast as "Victoria Soto"), for several years. See, for example, his recent College of Complexes presentation, "Sandy Hook: What We Know Now that We Didn't Know Then" (February 10, 2024), during which he reviews his longstanding relationship with them: https://www.bitchute.com/video/U5lxB2bvX8qV

Of special note in relation to the legal handling of Matthew Mills, "Victoria Soto" is alive and well, where, as Dr. Fetzer explains in his recent summary, she even earned a degree from New York School of Career & Applied Studies in 2017 as "Victoria Soto":

9



**NEW YORK SCHOOL OF CAREER & APPLIED STUDIES**

Apply Now | Request More Info | Students | Alumni | Giving | TouroOne

ABOUT US    ACADEMICS    ADMISSIONS & AID    STUDENT SERVICES    CAREER SERVICES    NEWS & EVENTS

Victoria Soto
Future Special Education Teacher
September 15, 2017

"I always wanted to be a teacher," said Victoria Soto of Brooklyn. "And when I found out NYSCAS had a special education major I decided to sign up."

Soto has her associate's degree in liberal arts from Kingsborough Community College and works as a certified teacher's assistant in the Block Institute in Manhattan. Soto's favorite thing about teaching? "It never gets old." she said. "There's always something new."

Soto spends her free time doing Crossfit workouts and hanging out with her Yorkie named Snickers.

See More ≥

Since the FEMA exercise (presented as mass murder) allegedly took place on December 14, 2012, this would be anomalous, indeed, had Victoria Sota actually died on that date.

This was a FEMA "Capstone" event, where the entire community becomes involved. Dr. Fetzer has learned from his Sandy Hook contacts that Eric Holder came to Newtown in 2006 and offered the residents $114,000,000 if they would participate in a staged event to illustrate what could happen if guns are not taken away from American citizens. They conducted auditions for roles, signed NDAs (non-disclosure agreements), and continue to receive benefits (including no taxes and tuition-free college), where estimates of how much the scam continues to bring in run around $1,000,000 per month. The CT government covered up the facts,

10

including the change in the law to withhold children's death certificates and the secret terms and methods used to destroy the school building and Lanza home.

The $73,000,000 dollar settlement was a scam on the public and Remington Bankruptcy creditors and, to the extent there would be a remainder after payment of creditors, to the Remington shareholders. The portion of the $73m settlement paid to the claimants after deduction of legal fees and costs are from an ordinary business venture rather than payment for tax exempt pain and suffering.[1]

Dr. Fetzer and Scott believe, and therefore assert, the Soto, et al., claimants identified on **Appendix 1** or those who ultimately received the money from claimants, owe taxes at ordinary income tax rates on the payments made to them. Dr. Fetzer and Scott therefore claim an award of a share of the taxes, penalty and interest collected from the $73,000,000 paid to the Soto, et al., claimants. We also claim an award from any tax collected from the Remington bankrupt estate that results from a denial of a business expense for the $73,000,000 paid to the Soto, et al., claimants.

The IRS is expected to demonstrate the highest level of intellectual honesty. As evidenced by the review of Fetzer claim 2021-010577, the IRS has failed that obligation in regard to the Sandy Hook culprits who have solicited donations from the public based upon the false Sandy Hook narrative. Both Federal and state courts have been corrupted by their dedication to concealing the Sandy Hook scam. The question now becomes will the IRS participate in the culprits efforts to defraud

---

[1] No claim in made that the claimants attorneys did not pay tax on the income they earned.

11

the U.S. public it has sworn to serve or extend the corruption to perhaps the most trusted of institutions that remain credible in the eyes of the American people.

WHEREFORE, Dr. Fetzer and Scott request this Form 211 for Remington Outdoor Company, Inc. and Soto, et al., claimants be reviewed by both the IRS Whistleblower Section and the Fraud Investigation Section.

Declaration under Penalty of Perjury each of the undersigned hereby declare: I have examined this application, all accompanying statements and supporting documentation, and, to the best of my knowledge and belief, they are true, correct, and complete.

Signature: _____
        William S. Scott

Signature: _____
        Dr. James H. Fetzer

Date _17 OCT 2024_

12

# Additional Fact Appendices

Appendix 1: Soto et al. Docket (pages 1-4)                                               2

Appendix 2: Remington Docket (pages 1-2)                                                 7

Appendix 3: Objections and Responses to Defendant Remington's First Requests for
    Admissions Dated May 26, 2016, by Plaintiff Leonard Pozner, Administrator of the
    Estate of Noah S. Pozner (July 22, 2016)                                            10

Appendix 4: Superior Court Donna L. Soto, Administratrix of the Estate of
    Victoria L. Soto, et. al., v. Bushmaster Firearms LLC, et. al., Complex
    Litigation Docket at Waterbury (July 27, 2021)                                       35

 

### State of Connecticut Judicial Branch
## Superior Court Case Look-up

Superior Court Case Look-up
Civil/Family
Housing
Small Claims

Attorney/Firm Juris Number Look-up

Case Look-up
By Party Name
By Docket Number
By Attorney/Firm Juris Number
By Property Address

Short Calendar Look-up
By Court Location
By Attorney/Firm Juris Number
Motion to Seal or Close
Calendar Notices

Court Events Look-up
By Date
By Docket Number
By Attorney/Firm Juris Number

Legal Notices

Pending Foreclosure Sales

Understanding
Display of Case Information

Contact Us



Comments

| UWY-CV15-6050025-S | SOTO, DONNA L., ADM OF THE ESTATE OF VICTORIA L. S Et Al v. BUSHMASTER FIREARMS INTERNATIONAL, LLC AKA FREEDOM Et Al |
|---|---|
| Prefix: X06 | Case Type: T90    File Date: 01/26/2015    Return Date: 02/03/2015 |

**Case Detail**  Notices  History  Scheduled Court Dates    E-Services Login    Screen Section Help ▶

To receive an email when there is activity on this case, click here.

**Information Updated as of: 09/26/2024**

### Case Information

Case Type: T90 - Torts - All other
Court Location: WATERBURY JD
List Type: JURY (JY)
Trial List Claim: 01/14/2022
Last Action Date: 05/17/2022 (The "last action date" is the date the information was entered in the system)

### Disposition Information

Disposition Date: 05/16/2022
Disposition: WITHDRAWAL OF ACTION AS TO REMAINING DEFENDANTS
Judge or Magistrate:

### Party & Appearance Information

| Party | No Fee Party | Category |
|---|---|---|
| **P-01  DONNA L. SOTO ADM, OF THE ESTATE OF VICTORIA L. SOTO, DECEASED** | | Plaintiff |
| Attorney: KOSKOFF KOSKOFF & BIEDER PC (032250)    File Date: 01/26/2015<br>350 FAIRFIELD AVENUE<br>BRIDGEPORT , CT 06604 | | |
| Attorney: PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196064 | | |
| Attorney: PHV SCHUTTE JACOBUS J 3/18/20 (441408)    File Date: 05/08/2020<br>PAUL WEISS RIFKIND ET AL<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196031 | | |
| **P-02  IAN AND NICOLE HOCKLEY CO-ADMS. OF THE ESTATE OF DYLAN C. HOCKLEY** | | Plaintiff |
| Attorney: KOSKOFF KOSKOFF & BIEDER PC (032250)    File Date: 01/26/2015<br>350 FAIRFIELD AVENUE<br>BRIDGEPORT , CT 06604 | | |
| Attorney: PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196064 | | |
| Attorney: PHV SCHUTTE JACOBUS J 3/18/20 (441408)    File Date: 05/08/2020<br>PAUL WEISS RIFKIND ET AL<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196031 | | |
| **P-03  WILLIAM SHERLACH EXECUTOR OF THE ESTATE OF MARY J. SHERLACH** | | Plaintiff |
| Attorney: KOSKOFF KOSKOFF & BIEDER PC (032250)    File Date: 01/26/2015<br>350 FAIRFIELD AVENUE<br>BRIDGEPORT , CT 06604 | | |
| Attorney: PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196064 | | |
| Attorney: PHV SCHUTTE JACOBUS J 3/18/20 (441408)    File Date: 05/08/2020<br>PAUL WEISS RIFKIND ET AL<br>1285 AVE OF THE AMERICAS<br>NEW YORK , NY 100196031 | | |
| **P-04  WILLIAM SHERLACH** | | Plaintiff |
| Attorney: KOSKOFF KOSKOFF & BIEDER PC (032250)    File Date: 01/26/2015<br>350 FAIRFIELD AVENUE<br>BRIDGEPORT , CT 06604 | | |

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-05  VERONIQUE DE LA ROSA & LEONARD POZNER CO-ADM. OF THE ESTATE OF**                  Plaintiff
**NOAH S. POZNER**

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-06  GILES J. ROUSSEAU ADM. OF THE ESTATE OF LAUREN G. ROUSSEAU**                  Plaintiff

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-07  DAVID C. WHEELER ADM. OF THE ESTATE OF BENJAMIN A. WHEELER**                  Plaintiff

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-08  NEIL HESLIN & SCARLETT LEWIS CO-ADMS. OF THE ESTATE OF JESSE**                  Plaintiff
**MCCORD LEWIS**

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-09  MARK AND JACQUELINE BARDEN CO-ADMS. OF THE ESTATE OF DANIEL G.**                  Plaintiff
**BARDEN**

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-10  MARY D'AVINO ADM. OF THE ESTATE OF RACHEL M. D'AVINO**                  Plaintiff

**Attorney:** ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)       File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604

**Attorney:** PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064

**Attorney:** PHV SCHUTTE JACOBUS J 3/18/20 (441408)       File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL

1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**P-11  NATALIE HAMMOND**                                                                    Plaintiff
Attorney: ✏ KOSKOFF KOSKOFF & BIEDER PC (032250)     File Date: 01/26/2015
350 FAIRFIELD AVENUE
BRIDGEPORT , CT 06604
Attorney: PHV BOEHNING H CHRISTOPHER 4/6/17 (438478) File Date: 05/08/2020
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196064
Attorney: PHV SCHUTTE JACOBUS J 3/18/20 (441408)     File Date: 05/08/2020
PAUL WEISS RIFKIND ET AL
1285 AVE OF THE AMERICAS
NEW YORK , NY 100196031

**D-01  BUSHMASTER FIREARMS INTERNATIONAL, LLC AKA FREEDOM GROUP, INC.,**      Defendant
**AKA REMINGTON OUTDOOR COMPANY, INC.**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

**D-02  FREEDOM GROUP, INC., AKA FREEDOM GROUP AKA FREEDOM GROUP, LLC,**        Defendant
**AKA REMINGTON OUTDOOR COMPANY**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

**D-03  BUSHMASTER FIREARMS AKA FREEDOM GROUP, INC., AKA REMINGTON**           Defendant
**OUTDOOR COMPANY, INC.**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

**D-04  BUSHMASTER FIREARMS, INC., AKA FREEDOM GROUP, INC., AKA REMINGTON**     Defendant
**OUTDOOR COMPANY, INC.**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

**D-05  BUSHMASTER HOLDINGS, LLC, AKA FREEDOM GROUP, INC., AKA REMINGTON**      Defendant
**OUTDOOR COMPANY, INC.**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

**D-06  REMINGTON ARMS CO., LLC, AKA BUSHMASTER FIREARMS INT., INC., AKA**      Defendant
**FREEDOM GROUP, INC., AKA REMINGTON OUTDOOR CO.**
Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611
Attorney: PHV VOGTS JAMES B 11/12/15 (437445)        File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

|  |  |  |
|---|---|---|
| Attorney: UPDIKE KELLY & SPELLACY (065040)<br>225 ASYLUM STREET<br>20TH FLOOR<br>HARTFORD , CT 06103 | File Date: 11/23/2021 | |

**D-07 REMINGTON OUTDOOR COMPANY, INC., AKA FREEDOM GROUP, INC.**        Defendant

Attorney: PHV LOTHSON ANDREW A 11/12/15 (437444)     File Date: 11/16/2015
330 NORTH WABASH
SUITE 3300
CHICAGO , IL 60611

Attorney: PHV VOGTS JAMES B 11/12/15 (437445)     File Date: 11/16/2015
SWANSON MARTIN & BELL
330 N WABASH SUITE 3300
CHICAGO , IL 60611

Attorney: UPDIKE KELLY & SPELLACY (065040)     File Date: 11/23/2021
225 ASYLUM STREET
20TH FLOOR
HARTFORD , CT 06103

**D-08 CAMFOUR, INC.**        Defendant
*REMOVED*

**D-09 CAMFOUR HOLDING, LLP, AKA CAMFOUR HOLDING, INC.**        Defendant
*REMOVED*

**D-10 RIVERVIEW SALES, INC.**        Defendant
*REMOVED*

**D-11 DAVID LAGUERCIA**        Defendant
*REMOVED*

**O-01 GEORGE KOLITIDES**        Witness
Non-Appearing

**O-02 JAMES H. FETZER PHD**        Intervening
Non-Appearing        Entity

**Viewing Documents on Civil, Housing and Small Claims Cases:**

If there is an ✎ in front of the docket number at the top of this page, then the file is electronic (paperless).

- Documents, court orders and judicial notices in electronic (paperless) civil, housing and small claims cases with a return date on or after January 1, 2014 are available publicly over the internet.* For more information on what you can view in all cases, view the Electronic Access to Court Documents Quick Card.

- For civil cases filed prior to 2014, court orders and judicial notices that are electronic are available publicly over the internet. Orders can be viewed by selecting the link to the order from the list below. Notices can be viewed by clicking the **Notices** tab above and selecting the link.*

- Documents, court orders and judicial notices in an electronic (paperless) file can be viewed at any judicial district courthouse during normal business hours.*

- Pleadings or other documents that are not electronic (paperless) can be viewed only during normal business hours at the Clerk's Office in the Judicial District where the case is located.*

- An Affidavit of Debt is not available publicly over the internet on small claims cases filed before October 16, 2017.*

*Any documents protected by law Or by court order that are Not open to the public cannot be viewed by the public online And can only be viewed in person at the clerk's office where the file is located by those authorized by law or court order to see them.

| | | | Motions / Pleadings / Documents / Case Status | |
|---|---|---|---|---|
| Entry No | File Date | Filed By | Description | Arguable |
| | 01/26/2015 | P | SUMMONS | |
| | 01/26/2015 | P | COMPLAINT | |
| | 01/26/2015 | P | RETURN OF SERVICE | |
| | 01/26/2015 | P | ADDITIONAL PARTIES PAGE | |
| | 10/21/2015 | D | APPEARANCE<br>Appearance | |
| | 10/21/2015 | D | APPEARANCE<br>Appearance | |

# APPENDIX 2:

Remington Docket (pages 1-2)

U.S. BANKRUPTCY COURT

NORTHERN DISTRICT OF ALABAMA (Decatur)
Bankruptcy Petition #: 20-81688-CRJ11

Assigned to:  Clifton R. Jessup Jr.                    Date filed: 07/27/2020
Chapter 11                                             341 meeting:
09/01/2020
Voluntary
Asset

Debtor                          represented by  Damarr Butler
Remington Outdoor Company, Inc.                 1625 Eye Street NW
100 Electronics Boulevard SW                    Washington, DC
20006
Huntsville, AL 35824                            202-383-5300
MADISON-AL                                       Email:
dbutler@omm.com
205-251-3000
Tax ID / EIN: 26-0174491                        D Christopher
Carson
aka American Heritage Arms, LLC                 Burr & Forman LLP
aka Freedom Group, Inc.                         420 North 20th
Street, Ste 3400
aka American Heritage Arms, Inc.                Birmingham, AL
35203
                                                205-251-3000
                                                Fax  : 205-458-5100
                                                Email:

ccarson@burr.com

                                                James H. Haithcock,

III

                                                Burr & Forman LLP
                                                420 North 20th

Street

                                                Ste 3400
                                                Birmingham, AL

35203

                                                205-458-5277
                                                Fax  : 205-714-6895
                                                Email:

jhaithco@burr.com

                                                Rachel S. Janger
                                                O'Melveny & Myers

LLP

                                                1625 Eye Street NW
                                                Washington, DC

20006

                                                202-383-5300
                                                Email:

rjanger@omm.com

                                                Jeffrey I. Kohn
                                                O'Melveny & Myers

LLP

                                                7 Times Square
                                                New York, NY 10036
                                                212-326-2000

jkohn@omm.com

Street

35203

hlahr@burr.com

Street

35203

dmeek@burr.com

Berry

LLP

berry@omm.com

Roberts

35203

jroberts@burr.com

Email:

Hanna Lahr
Burr & Forman LLP
420 North 20th

Suite 3400
Birmingham, AL

205-458-5462
Fax  : 205-458-5100
Email:

Derek F Meek
Burr & Forman LLP
420 North 20th

Suite 3400
Birmingham, AL

205 251-3000
Fax  : 205-458-5100
Email:

Janine Panchok-

O'Melveny & Myers

7 Times Square
New York, NY 10036
212-326-2000
Email: jpanchok-

James Phillip

Burr & Forman LLP
420 20th St N
Suite 3400
Birmingham, AL

205-458-5322
Email:

Gary Svirsky
Times Square Tower
7 Times Square
New York, NY 10036
212-326-2000
Email:

gsvirsky@omm.com

# APPENDIX 3:

# OBJECTIONS AND RESPONSES TO DEFENDANT REMINGTON'S FIRST REQUESTS FOR ADMISSIONS DATED MAY 26, 2016 BY PLAINTIFF LEONARD POZNER, ADMINISTRATOR OF THE ESTATE OF NOAH S. POZNER
(July 22, 2016)

NO. FBT CV 15 6048103 S             :      SUPERIOR COURT

DONNA L. SOTO, ADMINISTRATRIX OF
THE ESTATE OF VICTORIA L. SOTO, ET AL  :     J.D. OF FAIRFIELD

V.                               :      AT BRIDGEPORT

BUSHMASTER FIREARMS
INTERNATIONAL, LLC, a/k/a, ET AL     :      JULY 22, 2016

**OBJECTIONS AND RESPONSES TO DEFENDANT REMINGTON'S FIRST
REQUESTS FOR ADMISSIONS DATED MAY 26, 2016 BY PLAINTIFF LEONARD
POZNER, ADMINISTRATOR OF THE ESTATE OF NOAH S. POZNER**

Pursuant to Practice Book Section 13-23, plaintiff Leonard Pozner, Administrator of the

Estate of Noah S. Pozner, hereby objects and responds to Defendant Remington's First Requests

for Admissions dated May 26, 2016, as follows:

1.     One of the firearms used by Adam Lanza on December 14, 2012 was a Bushmaster Model XM-15 semi-automatic rifle, bearing serial number L534858.

     **ANSWER:**

        **Admitted.**

2.     The document attached as Exhibit A is a genuine copy of Invoice number 840927 dated February 12, 2010 issued by Bushmaster Firearms to Camfour LLC.

     **OBJECTIONS:**

     a)  **Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at \*3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at \*1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of the information, had no control or**

1

input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b) To the extent that this Request calls for plaintiffs to admit that "Bushmaster Firearms" actually issued "Invoice number 840927," plaintiffs object because that information can only be ascertained by inquiring of Remington and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot determine which Bushmaster entity conveyed the invoice without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here,

Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because it cannot be admitted or denied without making inquiry of adverse witnesses — both as to who created the Invoice, and as to what corporate entity is meant by "Bushmaster Firearms" at the time the Invoice was created.

3.   A Model XM-15 semi-automatic rifle bearing serial number L534858 was among the items sold by Bushmaster Firearms to Camfour LLC on Invoice number 840927.

**OBJECTIONS:**

a)   To the extent this Request asks the plaintiffs to take a position as to the genuineness of the Invoice attached as Ex. A, it is improper. Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at *3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of the information, had no control or input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b) Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Remington and Camfour and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot determine which Bushmaster entity conveyed the invoice without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities

4

(or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because it cannot be admitted or denied without making inquiry of adverse witnesses – both as to who created the Invoice, and as to what corporate entity is meant by "Bushmaster Firearms" at the time the Invoice was created.

4. Invoice number 840927 reflects that the Federal Firearms License number under which Bushmaster Firearms sold the Model XM-15 semi-automatic rifle bearing serial number L534858 to Camfour LLC was 6-01-005-10-2D-00956.

**OBJECTIONS:**

a) To the extent this Request asks the plaintiffs to take a position as to the genuineness of the Invoice attached as Ex. A, it is improper. Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at *3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of the information, had no control or input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b) Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Remington and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

5

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot determine which Bushmaster entity conveyed the invoice without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass-shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought

6

"against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because it cannot be admitted or denied without making inquiry of adverse witnesses – both as to who created the Invoice, and as to what corporate entity is meant by "Bushmaster Firearms" at the time the Invoice was created.

5.    Federal Firearms License number 6-01-005-10-2D-00956 is a Type 10 Manufacturer of Destructive Devices license.

**ANSWER:**

**Admitted.**

6.    A Type 10 Federal Firearm License is not a license to engage in the business of importing firearms under chapter 44 of title 18 of the United States Code.

**OBJECTION:**

a) **Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at \*2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq*. *See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at \*2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at \*1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").**

**Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at \*4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission**

7

which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

7.    A Type 10 Federal Firearm License is not a license to engage in the business as a dealer of firearms under chapter 44 of title 18 of the United States Code.

**OBJECTION:**

a)   Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at *4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit

8

that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

8.  Bushmaster Firearms did not sell the Model XM-15 semi-automatic rifle bearing serial number L534858 to Camfour LLC under a Type 01 federal firearms dealer license.

**OBJECTIONS:**

a)  To the extent this Request asks the plaintiffs to take a position as to the genuineness of the Invoice attached as Ex. A, it is improper. Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at *3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of the information, had no control or input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b)  Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Remington and relying on their representations as to what types of licenses were involved in the sale of the Bushmaster XM15-E2S. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our

9

jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot resolve that ambiguity without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because they cannot ascertain which Bushmaster entity the Request refers to without making inquiry of adverse witnesses.

10

9. Bushmaster Firearms was not a "seller" of the firearm bearing serial number L534858 as the term "seller" is defined in 15 U.S.C. § 7903(6).

**OBJECTIONS:**

a) **Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. This request asks plaintiffs to not only admit a legal conclusion (the meaning of the term "seller" in PLCAA), but to ratify Remington's belief that it can only be deemed a "seller" under 15 U.S.C. § 7903(6) if it satisfied that statutory criteria in the sale of the Bushmaster XM15-E2S. Plaintiffs believe this interpretation is fundamentally at odds with the language of 15 U.S.C. § 7903(6), which speaks to an entity's pattern of conduct and cannot be logically applied to one transaction. In any event, a Request for Admission is clearly not the proper vehicle to adjudicate this disagreement of statutory interpretation.**

**Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at \*2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at \*2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at \*1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").**

**Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at \*4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at \*1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility**

11

design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

b) Plaintiffs object on the ground that a request for admission must pertain to "matters *relevant* to the subject matter of the pending action." Practice Book § 13-22(a) (emphasis supplied). Because the meaning of "seller" under 15 U.S.C. § 7903(6) pertains to an entity's pattern of conduct – not a particular transaction – the question of whether "Bushmaster Firearms" was a "seller" of "the firearm bearing serial number L534858" is not relevant to the pending action.

c) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot resolve that ambiguity without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because they cannot ascertain which Bushmaster entity the Request refers to without making inquiry of adverse witnesses.

10.  On February 10, 2012, there was no federal or state statute that prohibited the transfer of the Model XM-15 semi-automatic rifle bearing serial number L534858 by Bushmaster Firearms in Maine to Camfour LLC in Massachusetts.

OBJECTIONS:

a) Plaintiffs object to this Request to the extent that the lawfulness of the transfer of the Model XM-15 semi-automatic rifle bearing serial number L534858 depends in part upon the genuineness of "Invoice number 840927" and its content. A Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third

12

party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at *3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of the information, had no control or input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b) Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Remington and Camfour and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively

13

deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at *4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

This Request asks plaintiffs to admit to a particular conclusion of law regarding the content of state and federal statutes. The fact that Remington tacks this conclusion onto certain facts does not place the request within the ambit of § 13-22. *See Disability Rights Council*, 234 F.R.D. at 3 ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the

14

requesting party has simply attached to operative facts."). The Request for Admission is improper.

d) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot resolve that ambiguity without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook Elementary School. DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2. Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period). *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants). Plaintiffs thus object to this Request because they cannot ascertain which Bushmaster entity the Request refers to without making inquiry of adverse witnesses.

11. The transfer of the Model XM-15 semi-automatic rifle bearing serial number L534858 rifle by Bushmaster Firearms to Camfour LLC on February 10, 2012 was in compliance with applicable federal and state laws and regulations governing transfer of firearms by federal firearms licensees to other federal firearms licensees.

**OBJECTIONS:**

a) Plaintiffs object to this Request to the extent that the lawfulness of the transfer of the Model XM-15 semi-automatic rifle bearing serial number L534858 depends in part upon the genuineness of "Invoice number 840927" and its content. A Request for Admission cannot be used to force a party to verify the genuineness of a document that the party did not prepare or execute. *See Zoll v. Zoll*, 112 Conn. App. 290, 300 (2009) (affirming trial court's sustaining of an objection to a Request for Admission on grounds that it was "inappropriate to require the plaintiff to admit or deny the genuineness of documents prepared by a third party unrelated to the plaintiff"); *Marks v. Beard*, 1994 WL 282262, at *3 (Conn. Super. June 15, 1994) (McGrath, J.) (sustaining an objection to an RFA asking plaintiff to admit the genuineness of medical reports prepared by one of her treating physicians, finding that "the plaintiff is not competent to testify as to the genuineness of a document which the plaintiff did not execute"); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) (holding that a "party need not, in answering the request [for admission], rely on information provided by others if the party itself lacks firsthand knowledge of

15

the information, had no control or input into the preparation of the document, and lacks sworn testimony or other reliable means for crediting the information provided by others"). Plaintiffs were not party to the drafting or execution of "Invoice number 840927." Therefore, the Request for Admission is improper.

b) Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Remington and Camfour and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

c) Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules.").

16

Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq*. *See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at *4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

This Request asks plaintiffs to admit to a particular conclusion of law regarding the content of state and federal statutes. The fact that Remington tacks this conclusion onto certain facts does not place the request within the ambit of § 13-22. *See Disability Rights Council*, 234 F.R.D. at 3 ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the requesting party has simply attached to operative facts."). The Request for Admission is improper.

d) In addition, plaintiffs object to this Request because it is unclear what is meant by "Bushmaster Firearms," and plaintiffs cannot resolve that ambiguity without inquiry of a Remington witness. Indeed, in a representation that appears to conflict with the admission requested here, Remington has stated that "Bushmaster Firearms International, LLC" "manufactured and shipped" the XM-15 rifle used in the December 14, 2012 mass shooting at Sandy Hook

17

Elementary School.  DN 162, Remington's Objections and Responses to Plaintiffs' First Requests for Production at Objection No. 1, p.2.  Other Remington filings suggest that "Bushmaster Firearms" and "Bushmaster Firearms International, LLC" are separate entities (or perhaps separate entities depending on the time period).  *See* DN 101, Remington's Notice of Removal, at pp.1-2 fn. 1 (stating that Bushmaster Firearms "does not exist," and that Bushmaster Firearms International, LLC also does not presently exist but is now "an unincorporated brand of Remington Arms Company, LLC"); DN 103, Application for Referral of Case to Complex Litigation Docket (CLD) at p.1, 2 (indicating that plaintiffs' suit was brought "against eleven defendants"; listing "Bushmaster Firearms," "Bushmaster Firearms International, LLC" and "Bushmaster Firearms, Inc." as separate defendants).  Plaintiffs thus object to this Request because they cannot ascertain which Bushmaster entity the Request refers to without making inquiry of adverse witnesses.

12.    The document attached as Exhibit B is a genuine copy of an ATF Form 4473 signed by Nancy J. Lanza on March 15, 2010.

ANSWER:

Admitted.

13.    Nancy J. Lanza applied to purchase a Bushmaster Model XM-15 semi-automatic rifle bearing serial number L534858 from Riverview Sales on March 15, 2010.

ANSWER:

Admitted.

14.    Riverview Sales transmitted identifying information regarding Nancy J. Lanza to NICS or the appropriate state agency on March 15, 2010.

OBJECTION:

a)  Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Riverview Sales and relying on their representations.  A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure.  *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules.").  Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned

18

closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593–94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

15. Riverview Sales received from NICS or the appropriate state agency a "proceed" response on March 29, 2010 regarding Riverview Sales' transfer of the Bushmaster Model XM-15 semi-automatic rifle to Nancy J. Lanza.

**OBJECTION:**

a) Plaintiffs object to this Request to the extent that it calls for information that can only be ascertained by inquiring of Riverview Sales and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn.

Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

16. Riverview Sales transferred Bushmaster Model XM-15 semi-automatic rifle to Nancy J. Lanza on March 29, 2010.

**ANSWER:**

Admitted.

17. On March 29, 2012, there were no federal or state statutes that prohibited the transfer of the Bushmaster Model XM-15 semi-automatic rifle by Riverview Sales to Nancy J. Lanza.

**OBJECTIONS:**

a) Plaintiffs object to this Request to the extent that it calls for information based on the conduct of Riverview Sales and the conduct and statements of Nancy J. Lanza; such information can only be ascertained by inquiring of Riverview Sales and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned

20

closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

b) Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at *4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was

21

"asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

This Request asks plaintiffs to admit to a particular conclusion of law regarding the content of state and federal statutes. The fact that Remington tacks this conclusion onto certain facts does not place the request within the ambit of § 13-22. *See Disability Rights Council*, 234 F.R.D. at 3 ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the requesting party has simply attached to operative facts."). The Request for Admission is improper.

18. The transfer of the Bushmaster Model XM-15 semi-automatic rifle by Riverview Sales to Nancy J. Lanza was in compliance with applicable federal and state laws and regulations governing transfer of firearms by federal firearms licensees to unlicensed persons.

OBJECTIONS:

a) Plaintiffs object to this Request to the extent that it calls for information based on the conduct of Riverview Sales and the conduct and statements of Nancy J. Lanza; such information can only be ascertained by inquiring of Riverview Sales and relying on their representations. A Request for Admission cannot be used to force a party to admit a fact that can only be verified by inquiring of individuals adverse to the party's interest in the litigation.

Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13-22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13-22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn.

22

Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts have long held that a party is not required to answer a request for admission that requires him or her to inquire of individuals with an adverse interest in the litigation. *See Al-Jundi v. Rockefeller*, 91 F.R.D. 590, 594 (W.D.N.Y. 1981) (court will "entertain good faith objections to specific admission requests that to obtain the requisite knowledge would require inquiry of persons having an interest in this litigation significantly adverse to the objector's own"); *Dulansky v. Iowa-Illinois Gas & Elec. Co.*, 92 F. Supp. 118, 123 (S.D. Iowa 1950) (holding that it would be improper "to require a respondent to ascertain from third persons, known to him and to the court to be hostile or interested in the outcome of the suit, facts upon which to predicate a[n admission]"); *Kendrick v. Sullivan*, 1992 WL 119125, at *4 (D.D.C. May 15, 1992) (same). The rationale for this rule is that admissions are tantamount to sworn testimony. Accordingly, to require a party to adopt the statements of a hostile witness would effectively deprive him of the right of cross-examination at trial. *Al-Jundi*, 91 F.R.D. at 593-94; *Dulansky*, 92 F. Supp. at 123; *Kendrick*, 1992 WL 119125, at *4.

b) Plaintiffs object to this Request because a Request for Admission cannot be used to force a party to admit a legal conclusion. Practice Book § 13-22 is modeled upon Rule 36 of the Federal Rules of Civil Procedure. *Vitolo v. Enterprise Leasing Corp.*, 1996 WL 497404, at *2 (Conn. Super. Aug. 21, 1996) (Corradino, J.) ("Our rule is modeled upon Rule 36 of the Federal Civil Rules."). Accordingly, Connecticut judges look to federal decisions on the meaning of Rule 36 for guidance in interpreting Practice Book § 13-22 *et seq. See Joseph McMahon Corp. v. Pacheco*, 2011 WL 2417211, at *2 (Conn. Super. May 13, 2011) (Levin, J.) ("Because Practice Book § 13–22 was patterned closely after Rule 36 of the Federal Rules of Civil Procedure, and our jurisprudence governing the form of requests for admissions is relatively undeveloped, we look to federal case law for guidance in construing Practice Book § 13–22."); *Prentice v. Dalco Elec., Inc.*, 2004 WL 376977, at *1 (Conn. Super. Feb. 4, 2004) (Frazzini, J.) ("[T]he Connecticut rule is modeled on Rule 36 of the Federal Rules of Civil Procedure, and this court can thus look for guidance to federal authorities addressing the issue.").

Federal courts agree that Rule 36 does not permit a party to request the admission of a legal conclusion. *See Matysiak v. Spectrum Servs. Co.*, 2014 WL 3819206, at *4 (D. Conn. Aug. 4, 2014) ("a party may not seek an admission as to a pure conclusion of law"); *Disability Rights Council v. Wash. Metro. Area*, 234 F.R.D. 1, 3 (D.D.C. 2006) ("[a] party cannot demand that the other party admit the truth of a legal conclusion"; sustaining objection because defendant was "asking plaintiffs to state their understanding of federal law"); *Coach, Inc. v. Horizon Trading USA Inc.*, 908 F. Supp. 2d 426, 432 (S.D.N.Y. 2012) (declining to deem several unanswered Requests for Admission admitted, because they "ask defendants to admit legal conclusions"); *Lakehead Pipe Line Co. v. Am. Home*

23

*Assur. Co.*, 177 F.R.D. 454, 458 (D. Minn. 1997) ("[A] request for admission which involves a pure matter of law, that is, requests for admissions of law which are related to the facts of the case, are considered to be inappropriate."). *See also Reichenbach v. City of Columbus*, 2006 WL 143552, at *1 (S.D. Ohio 2006) (sustaining an objection to a request for admission asking defendants to admit that the curb ramp at issue was not compliant with the federal accessibility design standards on the ground that it sought a purely legal conclusion); *English v. Cromwell*, 117 F.R.D. 132, 135 (C.D. Ill. 1986) (sustaining an objection to a request that sought admission from the defendants that they were subject to particular statutes).

This Request asks plaintiffs to admit to a particular conclusion of law regarding the content of state and federal statutes. The fact that Remington tacks this conclusion onto certain facts does not place the request within the ambit of § 13-22. *See Disability Rights Council*, 234 F.R.D. at 3 ("[I]t would be inappropriate for a party to demand that the opposing party ratify legal conclusions that the requesting party has simply attached to operative facts."). The Request for Admission is improper.

THE PLAINTIFFS,


By        /s/
        JOSHUA D. KOSKOFF
        ALINOR C. STERLING
        KATHERINE MESNER-HAGE
        jkoskoff@koskoff.com
        asterling@koskoff.com
        khage@koskoff.com
        KOSKOFF KOSKOFF & BIEDER
        350 FAIRFIELD AVENUE
        BRIDGEPORT, CT  06604
        PHONE:  (203) 336-4421
        FAX:  (203) 368-3244
        JURIS #32250

24

# APPENDIX 4:

*SUPERIOR COURT DONNA L. SOTO,
ADMINISTRATRIX OF
THE ESTATE OF VICTORIA L. SOTO,
ET AL. V. BUSHMASTER FIREARMS
INTERNATIONAL,
LLC, ET AL. COMPLEX LITIGATION
DOCKET AT WATERBURY
(JULY 27, 2021)*

No. X06-UWY-CV15-6050025-S SUPERIOR COURT DONNA L. SOTO, ADMINISTRATRIX OF THE ESTATE OF VICTORIA L. SOTO, ET AL. V. BUSHMASTER FIREARMS INTERNATIONAL, LLC, ET AL. COMPLEX LITIGATION DOCKET AT WATERBURY : : : : : : : : : JULY 27, 2021|

Soto, el al v Bushmaster, et al

| 342.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
|---|---|---|---|
| | | | Defendants' Offer of Compromise - Estate of Wheeler |
| 343.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Soto |
| 344.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Hockley |
| 345.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Lewis |
| 346.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Pozner |
| 347.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Barden |
| 348.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of D'Avino |
| 349.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Rousseau |
| 350.00 | 07/27/2021 | D | OFFER OF COMPROMISE |
| | | | Defendants' Offer of Compromise - Estate of Sherlac |

No. X06-UWY-CV15-6050025-S SUPERIOR COURT DONNA L. SOTO, ADMINISTRATRIX OF THE ESTATE OF VICTORIA L. SOTO, ET AL. V. BUSHMASTER FIREARMS INTERNATIONAL, LLC, ET AL. COMPLEX LITIGATION DOCKET AT WATERBURY : : : : : : : : : JULY 27, 2021

## DEFENDANTS' OFFER OF COMPROMISE

Pursuant to Connecticut General Statutes § 52-193 and Connecticut Practice Book § 17 11, Defendants Remington Arms Company, LLC and Remington Outdoor Company, Inc. (collectively, "Remington")1 hereby make an Offer of Compromise to Plaintiff, [the same pleading was used for each of the above named plaintiffs], in the captioned matter for the sum of THREE MILLION SIX HUNDRED AND SIXTY THOUSAND DOLLARS ($3,660,000) to settle all claims inclusive of any fees and costs on behalf of all Defendants. Any ultimate settlement pursuant to this Offer of Compromise is subject to approval from the United States Bankruptcy Court for the Northern District of Alabama pursuant to Federal Rule of Bankruptcy Procedure § 9019 and the confirmation order in In re Remington Outdoor Company, Inc., et al. 1 All of the other defendants named in the Plaintiffs' Revised Second Amended Complaint, Bushmaster Firearms, Inc., Bushmaster Firearms International, LLC, Bushmaster Holdings, LLC, and Freedom Group, Inc., have been merged into Remington Arms Company, LLC and Remington Outdoor Company, Inc. 109361650.2 DEFENDANTS REMINGTON ARMS COMPANY LLC AND REMINGTON OUTDOOR COMPANY, INC. By: /s/ James H. Rotondo Jeffrey P. Mueller Paul D. Williams James H. Rotondo DAYPITNEYLLP 242 Trumbull Street Hartford, CT 06103 Phone: (860) 275-0100 Fax: (860) 275-0343 Juris No. 14229 James B. Vogts (pro hac vice) Andrew A. Lothson (pro hac vice) SWANSON MARTIN & BELL, LLP 330 North Wabash, #3300 Chicago, IL 60611 Phone: (312) 321-9100 Fax: (312) 321-0990 Their Attorneys